# 12-651-cv

————————————————

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**
—————————————————————————————————————

**JULIE HEIMESHOFF,**

**Plaintiff-Appellant,**

**v.**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a
Connecticut Corporation, and WAL-MART STORES, Incorporated, an
Arkansas Corporation and plan sponsor of the Group Long Term Disability
Plan for Employees of WAL-MART STORES, Incorporated,**

**Defendants-Appellees.**

**Appeal from the United States District Court of Connecticut (New Haven)
Case No. 3:10-cv-01813-JBA**
—————————————————————————————————————

**JOINT APPENDIX**
—————————————————————————————————————

KRAFCHICK LAW FIRM
100 W. Harrison, S. Tower, #300
Seattle, WA 98119
Telephone:  (206) 374-7370

Attorney for Plaintiff-Appellant

BEGOS HORGAN & BROWN
2425 Post Road
Southport, CT  06890
Telephone: (203) 254-1900

Attorney for Defendants-Appellees

# TABLE OF CONTENTS

**DOCKET ENTRIES**

Complaint                                                                                      4

Declaration of Patrick W. Begos in Support of Defendants' Motion                              22
To Dismiss

Steven P. Krafchick's Declaration in Support of Plaintiff's Memorandum                        153
Of Law in Opposition to Defendants' Motion to Dismiss

Ruling on Defendants' Motion to Dismiss                                                        195

Judgment                                                                                       206

Notice of Appeal                                                                               207

U.S. District Court Civil Docket for case #10-cv-01813-JPA                                     208

**ADMINISTRATIVE RECORD EXCERPTS**

Group Insurance Policy                                                                          23

Summary Plan Description (ERISA information, Statement of ERISA                                157
Rights and Claim Procedures)

November 21, 2005 Hartford letter                                                             168

November 29, 2005 Hartford letter                                                             167

December 8, 2005 adverse decision                                                             163

May 18, 2006 letter to Hartford                                                                138

May 31, 2006 Hartford letter                                                                   130

November 29, 2006 adverse decision                                                            127

May 24, 2007 letter to Hartford                                                                136

June 5, 2007 Hartford letter                                                                   137

September 26, 2007 appeal                                                                      170

November 26, 2007 final adverse decision                                                      131

## **TRANSCRIPT**

Transcript of December 19, 2011 Proceedings                    213

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JULIE HEIMESHOFF, | Civil Action No.: |
| Plaintiff | |
| vs. | COMPLAINT FOR LONG-TERM DISABILITY BENEFITS |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation, and WAL-MART STORES, INC., an Arkansas Corporation and plan sponsor of the Group Long Term Disability Plan For Employees of WAL-MART STORES, INC., | NOVEMBER 18, 2010 |
| Defendants. | |

The Plaintiff, Julie Heimeshoff ("Plaintiff or "Ms. Heimeshoff"), by and through her attorneys Carey & Associates, P.C. and Krafchick Law Firm, PLLC, based on information and belief, alleges as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1.      Ms. Heimeshoff is an individual adult who is a citizen of the State of Arkansas, County of Benton.

2.      Defendant Hartford Life and Accident Insurance Company ("Hartford") is a corporation with its principal place of business in Simsbury, Connecticut.

3.      Defendant Wal-Mart Stores, Inc. ("Wal-Mart") is a corporation with its principal place of business in Bentonville, Arkansas.

4.      Defendant Wal-Mart Stores, Inc. offered its employees long-term disability ("LTD") insurance through the purchase of a policy of group disability insurance.

**JOINT APPENDIX 004**

5.   At all times relevant to this lawsuit, the Group Long Term Disability Plan For Employees of WAL-MART STORES, INC., (hereinafter "Plan" or "the Plan") was funded by a policy of group disability insurance issued by Hartford, bearing policy no. GLT-205215 and policy no. GLT-024554 (hereinafter "Policies" or "the Policies").[1]

6.   Hartford administered participants' claims for benefits under the Plan, including the claim for long-term disability benefits Ms. Heimeshoff submitted.

7.   The matter in controversy exceeds, exclusive of interest and costs, $75,000.00.

8.   Jurisdiction is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1332.

9.   Venue is proper in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(a).

10.  This claim is governed by ERISA 29 U.S. C. § 1001, *et seq.*

## FACTUAL ALLEGATIONS

11.  Ms. Heimeshoff worked for Wal-Mart Stores, Inc. since April 29, 1986. Her last position held was as a Senior Public Relations Manager.[2]

12.  While Ms. Heimeshoff worked for Wal-Mart Stores, Inc. she became eligible for LTD insurance.[3]

13.  In January 2005, Ms. Heimeshoff was suffering from symptoms of pain and fatigue due to Fibromyalgia.[4]

---

[1] Ms. Heimeshoff incorporates the entirety of the claim file Hartford produced in connection with her claim for long-term disability benefits as if annexed hereto.   (Bates nos. CF 00000002-CF00000930).
[2] CF 00000082
[3] CF 00000082

Complaint – Page 2

JOINT APPENDIX 005

14. In May 2005 Ms. Heimeshoff's pain, fatigue, and other disabling symptoms increased and the record shows diagnoses of Fibromyalgia with chronic pain, likely Irritable Bowel Syndrome and possible Restless Leg Syndrome, Allergies, and strong past history of lupus.[5]

15. Ms. Heimeshoff tried to continue working despite her medical conditions. However, due to her significant pain, extreme fatigue, and cognitive impairment, she had to stop working on or about June 8, 2005.[6]

16. Ms. Heimeshoff has been unable to sustain full-time employment since approximately June 6, 2005, due to severe Fibromyalgia and other disabling conditions.

17. The Social Security Administration has deemed Ms. Heimeshoff disabled since June 6, 2005.

18. Hartford defines Disability as follow:

> **Total Disability or Totally Disabled** means You are prevented from performing the Essential Duties of:
> 1) Your Occupation or a Reasonable Alternative Job offered to You by the Employer during the Elimination Period and for the 12 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 20% of Your Pre-disability Earnings; and.
> 2) after that, Any Occupation.[7]

19. Ms. Heimeshoff has been unable to perform the essential duties of her own occupation or any occupation, for profit, since June 6, 2005.

---

[4] CF 00000859
[5] CF 00000855
[6] CF 00000082
[7] CF 00000008

Complaint – Page 3

20. As a result of her multiple medical conditions causing generalized pain and fatigue, Ms. Heimeshoff meets the definition of "total disability" contained in Hartford's Policy.

21. By letter dated August 19, 2005, Hartford sent Ms. Heimeshoff a letter stating the following:

> **Our records indicate that your disability may extend beyond the 90 day Salary Continuation period.** In order to determine your eligibility for Long Term Disability (LTD) benefits, please complete and return the enclosed Group Claim forms.[8]

(emphasis added).

22. Ms. Heimeshoff filed a claim for LTD benefits with Hartford, listing extreme fatigue, significant pain, and difficulty in concentration, on or August 22, 2005.[9]

23. Ms. Heimeshoff's claim for long-term disability benefits was supported by an Attending Physician Statement completed by her rheumatologist, Michael Saitta, M.D., with a diagnosis of SLE (Systemic Lupus Erythematosis) and Fibromyalgia, with symptoms of pain and fatigue, and findings of tender points dated September 23, 2005.[10]

24. Ms. Heimeshoff underwent a thorough workup at the Mayo Clinic in September 2005 where she was evaluated for daily headaches, Fibromyalgia, depression, chronic sinusitis, ERT, back pain and alternating bowel pattern.[11]

25. The Mayo Clinic physicians diagnosed Ms. Heimeshoff with Irritable Bowel Syndrome (IBS), chronic pain syndrome consistent with Fibromyalgia, chronically positive ANA

---

[8] CF 00000927
[9] CF 00000917-919
[10] CF 00000923-924
[11] CF 00000814-815

Complaint – Page 4

with no definite history of Lupus, Fibromyalgia, Allergic rhinitis, Asthma, sleep disorder

secondary to chronic persistent pain and chronic migraine headaches.[12]

26. By letter dated November 29, 2005, Hartford notified Ms. Heimeshoff that they have not

received a response from Dr. Saitta regarding clarification on her functionality and that

they cannot make a claim determination.[13]

27. That November 29, 2005 letter states the following:

> We cannot make a claim decision without this information because it is needed to determine if you meet the policy definition of Disabled. This delay is for matters beyond our control. **If we get the information requested, we expect to make our decision within 30 days after receiving the information or advise you of the need to further extend the decision period.**[14]

(emphasis added).

28. By letter dated December 8, 2005, Hartford denied Ms. Heimeshoff's claim for disability

benefits:

> We are writing to you about your claim for Long Term Disability (LTD) benefits. These benefits are under the group insurance policy number GLT024554 for Wal-Mart Stores, Inc.
>
> We have completed our review of your claim for benefits and have determined that you have failed to provide satisfactory Proof of Loss to The Hartford. Therefore, we have determined that you are not eligible for LTD benefits at this time.
> …
> The following information, not previously submitted, is necessary for a determination of your claim. Specifically, **a response from Dr. Saitta to our letter requesting clarification on your functionality. This information is necessary in order for The Hartford to assess your claim and determine if you meet the definition of Totally Disabled from your own occupation at**

---

[12] CF 0000819, 820, 823, 827, 833, 847
[13] CF 00000073
[14] CF 00000073

Complaint – Page 5

**Wal-Mart Stores, Inc.** If you would like this information considered, we must receive it as soon as possible. Please send it to the claim office at the address shown on this letterhead.[15]

(emphasis added).

29. Ms. Heimeshoff obtained counsel in May 2006 in order to assist her in acquiring the "satisfactory Proof of Loss" the Hartford was requesting.[16]

30. By letter dated May 31, 2006, Hartford confirmed that no formal appeal was necessary and that if Hartford received clarification of Ms. Heimeshoff's functionality, they would re-open the claim.[17]

31. In order to provide Hartford the requested functional capacity clarification, Ms. Heimeshoff underwent a two-day Performance-Based Physical Capacity Evaluation ("PCE") on July 18 and 19, 2006.[18]

32. After undergoing a battery of performance tests, Dr. Becker concluded the following:

**Functional Application**
The deficits identified in the objective testing and physiological screening shows application barriers which will negatively effect vocational options, avocational interests, and options undertaken in quality of life functions.

...

**Work Tolerance**
The physiological profiles show that the examinee should be considered work intolerant. The physiological response shows that competitive and predictable sustained work is absent for all levels of category according to the Dictionary of Occupational Titles.[19]

---

[15] CF 00000069-72
[16] CF 00000068
[17] CF 00000068
[18] CF 00000638
[19] CF 00000665

Complaint – Page 6

**JOINT APPENDIX 009**

33.   Dr. Saitta, Ms. Heimeshoff's rheumatologist, explained his non-response to Hartford's request for a filled out detailed physical capacity form by letter dated August 25, 006, stating "any such assessment should be made by an experienced physical capacity expert."[20]

34.   By letter dated September 19, 2006, Ms. Heimeshoff's primary treating physician since July 2002, Stephen L. Goss, M.D., confirmed that Ms. Heimeshoff is totally disabled and has been unable to work since June 2005.

35.   On October 2, 2006, Ms. Heimeshoff's counsel forwarded Dr. Becker's PCE to the Hartford along with the report from Ms. Heimeshoff's primary treating physician, Dr. Stephen Goss.[21]

36.   Hartford hired University Disability Consortium (UDC) requesting that a **Rheumatology Specialist** give his opinion of Ms. Heimeshoff's functional capabilities 6/8/05.[22]

37.   Rheumatology Consultant Norman M. Bress, M.D. reviewed Ms. Heimeshoff's medical records.  Dr. Bress spent 8.8 hours and charged $2,092.50 for performing the following activities:  Organize, **review records including a very lengthy detailed PCE of 27 pages** – some notes hand written and very difficult to read (5.7 hours); Call to the office of Dr. Saitta – spoke with staff (.3 hours); Type and edit report (2.8).[23]

---

[20] CF 00000538
[21] CF 00000635-636
[22] CF 00000623
[23] CF 00000587-588

Complaint – Page 7

38.     Dr. Bress' report dated November 20, 2006, ignores and discounts Dr. Goss' report and

the detailed PCE of 27 pages providing evidence of work intolerance based on objective

test results.  Dr. Bress states the following:

> Exams, including those of a team of physicians at the Mayo Clinic, have
> consistently revealed no significant findings except for tender points. I
> therefore find no support for Dr. Becker's contention that the insured needs
> "continuing medical supervision." In addition there is no support for Dr.
> Becker's assertion that work rehabilitation is risky because of heart rate
> elevation. It is stated in insured's record that she does not exercise. Because
> of her deconditioning, it is not surprising that her heart rate increases with
> activities, even minimal exercise. It is therefore my opinion that the increase
> in her heart rate during the PCE is of no diagnostic relevance.
>
> With regard to functionality in patients with FM, clinical studies published in
> the medical literature (see references below) reveal that the majority of
> patients with FM are working full time in their usual occupation. ...
>
> ...
>
> **Answers to specific questions:**
> I.  It is my opinion that the insured was able to perform the activities of her
>     sedentary occupation since 06/08/2005 through the present, on a physical
>     basis. This is my opinion whether or not she fits the 1990 ACR criteria for
>     the diagnosis of FM. Please refer to above narrative for the basis for my
>     opinion.
>
> 2.  It is my opinion that the insured is currently able to work full time in a
>     sedentary capacity, on a physical basis. She has been capable of this level
>     of work throughout the time encompassed by the records provided to me.
>     Please refer to above narrative for the basis for my opinion.
>
> 3.  See # 1 and #2 above. Prognosis is good from a physical point of view.
>     Rheumatologist Dr. Warren Blackburn states that "there is no evidence
>     that fibromyalgia is a crippling or incapacitating disorder or is a prodrome
>     for more serious illness."[24]

---

[24] CF 00000582-583

Complaint – Page 8

39.    Based on Dr. Bress' medical record review, Hartford ignored the objective evidence of a

two-day PCE and the opinion of a long-time treating physician report and denied Ms.

Heimeshoff's claim by letter dated November 29, 2006, stating that:

> After reviewing all of the available records, it is Dr. Bress's medical opinion
> that Ms. Heimeshoff was able to physically perform the activities of her
> sedentary occupation since 06/08/05. Exams, including a team of physicians
> at the Mayo Clinic, have consistently revealed no exam findings except for
> tender points. There is no objective findings to support continued medical
> supervision.  In addition there is no support for Dr. Becker's assertion that
> work rehabilitation is risky because of heart rate elevation. It is stated in her
> medical records that she does not exercise. Because of her deconditioning, it
> is not surprising that her heart rate increases with activities. It is Dr. Bress's
> opinion that the increase in heart rate during the PCE is of no diagnostic
> relevance.
>
> The Physical demands Analysis completed by Ms. Heimeshoffs employer
> shows that her job is sedentary in nature. Based upon Dr. Bress's review of
> your client's records, it is his opinion that your client is physically able to
> perform the activities of her sedentary occupation with her diagnosis of
> Fibromyalgia since 06/08/05. Therefore, the current medical does not support
> that your client lacks the functionality to perform the duties of her own
> occupation throughout the Elimination Period and no LTD benefits are
> payable to her.[25]

40.    Pacific Fatigue Laboratory conducted a two-day functional capacity test called a

Cardiopulmonary Exercise (CPX) Evaluation on August 27 and 28, 2007.   Based on

objective test results, that report states:

> The findings indicate diminished functional capacity, inability to sustain
> work, inability to recover and maintain physical function due to metabolic
> and pulmonary dysfunction. Any physical work, sustained for more than a
> few minutes, will elicit a significant fatigue response.[26]

---

[25] CF 00000061-63
[26] CF 00000546

Complaint – Page 9

41.   Sheila Bastien, Ph.D., a Neuropsychologist, performed a complete neuropsychological evaluation of Ms. Heimeshoff on August 29 and 30, 2007.   Based upon her detailed evaluation, Dr. Bastien found significant neurocognitive deficits that seriously compromised Ms. Heimeshoff' ability to work:

> Ms. Heimeshoff, in my opinion, is not able to function in the workplace at this time or the foreseeable future in any area for which she has reasonable training and experience, and this has been so since 06/07/05. In fact, some of her scores are so low that she could not even function at entry-level office work, given her pain and medical problems[27]

42.   By correspondence dated September 4, 2007, Dr. Ted Becker criticized Dr. Bress' report, upon which Hartford relied, in part, as follows:

> To the readers of his correspondence I would point out that Dr. Bress provided absolutely no scientific foundation for his opinion, and absolutely no scientific rebuttal to the data in the PCE evaluation, yet he boldly stated, '.... the PCE is of no diagnostic relevance. Dr. Bress opinion is rubbish. My opinions stand on the science of work physiology stretching back to the work of A.V. Hill, 1927, as applied to the PCE report and opinions. This 1927 work remains accepted today as the basis for evaluating human performance and physical capacity testing.[28]

43.   On September 24, 2007, Dr. Goss confirmed that Ms. Heimeshoff is totally disabled and has been unable to work since June 2005:

> To recap, I have routinely seen Ms. Heimeshoff since July of 2002. In light of the corroborating assessments that have more recently been done coupled with the previous assessments and my week-to-week, month-to-month clinical impression that is no different than the previous evaluations, I do not think Ms. Heimeshoff is capable of employment even if in a sedentary job. Since June 08, 2005 she has been unable to work in any occupation on a regular full-time basis with any day-to-day or week-to-week regularity all related to the above findings of fatigue, chronic pain, and cognitive problems related to her fibromyalgia. I think she is so incapacitated due to muscular

---

[27] CF 00000519
[28] CF 00000540-541

Complaint – Page 10

discomforts that even if only required getting up and down on rare occasions and carrying only very light loads of files she could not do it. In addition, I do not think the cognitive dysfunction will allow her to function even if her muscular pain and fibromyalgia was completely controlled as well as her having relatively significant occasional to frequent headaches.[29]

44. On September 26, 2007, Ms. Heimeshoff appealed Hartford's denial. The appeal contained the most recent reports and conclusions of Dr. Becker (Everett Pacific Industrial PCE), Dr. VanNess (Pacific Fatigue Laboratory (PCE), Dr. Bastien (neuropsychological evaluation), Dr. Goss and Dr. Saitta.[30]

45. Hartford retained RRS (Reliable RS) who selected rheumatologist Tanya Lumpkins, M.D. to review records. In her report dated November 19, 2007, Dr. Lumpkins erroneously concluded, "[t]he objective data fails to support severity." She failed to address the objective evaluation by Dr. Becker. Dr. Lumpkins went on to state:

> "[t]here is no support in the record that the claimant would not tolerate, with adequate effort and training, a work hardening program to improve conditioning, and thereby improve work capacity.[31]

46. Dr. Alexander Chervinsky, Ph.D. also reviewed Ms. Heimeshoff medical records for Hartford through RRS. Dr. Chervinsky concluded that:

> Influences of medication, emotional problems, or motivation for secondary gain may account for the findings, and can not be excluded on the basis of available information.[32]

47. On November 26, 2007, Hartford issued its last and final denial letter.[33]

---

[29] CF 00000536
[30] CF 00000111-135
[31] CF 00000095-96
[32] CF 00000098
[33] CF00000083-87

Complaint – Page 11

48.     Hartford disregarded the objective and subjective medical evidence that established Ms. Heimeshoff's total disability and entitlement to long-term disability benefits

49.     Hartford used biased doctors to review and ignore medical evidence that supported Ms. Heimeshoff's total disability.

50.     Ms. Heimeshoff meets the definitions of total disability contained in the policy and is entitled to receive long-term disability benefits.

**FIRST CAUSE OF ACTION**
Recovery Of Employee Benefits
(29 U.S.C. 1132(a)(l)(B))

51.     Ms. Heimeshoff repeats the allegations contained in paragraphs 1 through 50 as if set forth at length herein.

52.     Ms. Heimeshoff's medical condition qualifies her to receive total disability benefits under the policy issued by Defendants' to cover employees, including Ms. Heimeshoff

53.     Defendants failed to provide Ms. Heimeshoff a full and fair review of its adverse LTD benefit determination as guaranteed to Ms. Heimeshoff under the terms of the Plan and applicable law.

54.     Defendants breached its contractual obligations, including the contractual obligation of good faith and fair dealing with Plaintiff; by denying disability benefits under its policy.

55.     29 U.S.C. 1133, ERISA §503, requires:

> In accordance with regulations of the secretary, every employee benefit plan **shall**
>
> (1) provide adequate notice in writing to any participant . . . whose claim for benefits under the plan has been denied, setting forth the specific reasons for

Complaint – Page 12

**JOINT APPENDIX 015**

such denial, written in manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a **full and fair review** by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. 1133 (2005) (emphasis added); See also 29 CFR 2560.503-1.

56.     29 C.F.R. 2560-503.1(g)(1)(iii) (2005) states: "A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."

57.     ERISA regulations require a meaningful dialogue between claims administrator and beneficiary.  In particular ERISA requires defendants to provide Ms. Heimeshoff a description of any additional material or information that was necessary for her to perfect the claim and to do so in a manner calculated to be understood by the claimant pursuant to 29 CFR 2560.503-1(g).  Failure to follow the requirements of procedural regulations can result in a finding of abuse of discretion.  Defendants failed to meet these requirements and therefore abused their discretion.

58.     Defendants, without any reasonable basis, ignored treating physician and expert reports and opinions as to the physical nature of Plaintiff's disability, and cherry-picked the file only for facts and opinions supporting their decision.

59.     Defendants failed to notify Ms. Heimeshoff of her rights under ERISA by failing to disclose to her what additional information she should submit in order to remain eligible for LTD benefits pursuant to 29 CFR 2560.503-1.

Complaint – Page 13

**JOINT APPENDIX 016**

60. Defendants failed to have a meaningful dialogue with Ms. Heimeshoff in a manner calculated to be understood by her as required by ERISA.

61. Defendants' actions in administering Ms. Heimeshoff's claim and in denying LTD benefits were arbitrary and capricious.

62. Defendants failed to honor the terms of the Plan.

### SECOND CAUSE OF ACTION
Breach of Fiduciary Duty
(29 U.S.C. 1132(a)(2))

63. Ms. Heimeshoff repeats the allegations contained in paragraphs 1 through 62 as if set forth at length herein.

64. At all material times, Defendants were fiduciaries with respect to their exercise of authority over the management of the Plan, their disposition of Plan assets, and their administration of the Plan.

65. Ms. Heimeshoff asserts a claim of breach of fiduciary duty against Hartford and on behalf of, and for the benefit of, the Plan and all its participants

66. Defendants were obliged to discharge their duties as Plan administrators for the exclusive benefit of Plan beneficiaries and participants by paying beneficiaries and participants the benefits to which they were, and are, entitled.

67. At all material times herein, Hartford violated its duties as set forth above, and also by having done the following:

(a) Consciously and unreasonably failing to investigate or evaluate Ms. Heimeshoff's claim fairly or in good faith, instead utilizing the information available to them in a

Complaint – Page 14

manner calculated to produce a wrongful but plausible sounding justification for denying benefits;

(b) Encouraging the improper termination or denial of a legitimate claim through the use of claims procedures and guidelines designed to increase the level and amount of terminations; and

(c) Failing to consult with qualified medical consultants.

68.     Upon information and belief, the medical consultants used by Defendants to deny and limit Plaintiff's claim receive significant income from defendants and/or other insurers for performing medical records reviews and other incidental services, and are biased due to significant financial incentives to render opinions favorable to Defendant.

69.     Upon information and belief, Defendant has a long history of employing these medical consultants to render medical opinions about Defendant claimants as it knows their opinions more likely than not will favor Defendant.

70.     Upon information and belief, Defendant's alleged record of using these medical consultants to deny claims evidences that it knows they are likely to opine that claimants can work, meaning Defendant therefore can deny or terminate claims under color of independent medical opinion, when the opinions are neither independent nor derived from proper physical medical examinations.

71.     Defendant breached its fiduciary duties toward Plaintiff by hiring record reviewers who ignored two separate functional capacity evaluations, and opine that there are no impairments, contrary to said reports, and outside their own field of expertise.

Complaint – Page 15

72. Such denials, under color of independent medical opinion, may cause some claimants to simply accept Defendant's LTD claims denials or terminations and stop pursuing their appeals, to Defendant's financial benefit.

73. If the medical consultants routinely opined that claimants were totally disabled, thereby undermining Defendant's financially driven desire to reduce the outflow of LTD payments, Defendant would likely cease using them for medical records reviews.

74. Defendants habitually violated their fiduciary duties by failing to act in accordance with the Plan documents, failing to use all prudent skill, failing to honor the duty of loyalty to act solely for the benefit of the Plan participants and beneficiaries, and failing to properly evaluate claims for benefits, including Ms. Heimeshoff's claim.

75. As remedies for Defendants' improper actions, Ms. Heimeshoff requests Hartford be removed as Plan fiduciary; and that all other available and proper relief be awarded.

**THIRD CAUSE OF ACTION**
Equitable Relief
(29 U.S.C. §1132(a)(3))

76. Ms. Heimeshoff repeats the allegations contained in paragraphs 1 through 75 as if set forth at length herein.

77. Ms. Heimeshoff asserts that a claim for LTD benefits due under the Plan, without more, does not provide an adequate remedy at law in light of Defendants' continuing course of conduct in violation of the terms of the Plan and applicable law.

Complaint – Page 16

JOINT APPENDIX 019

78.    Accordingly, Ms. Heimeshoff seeks equitable relief under 29 U.S.C. §1132(a)(3) against Defendants as an individual Plan participant, on behalf of all other Plan participants, and for the benefit of the Plan itself.

79.    Ms. Heimeshoff requests the removal of Hartford as Plan fiduciary as set forth above.

80.    In addition, Ms. Heimeshoff seeks an order from this Court requiring that her past and future LTD benefits be paid starting from June 7, 2005, that Defendants be enjoined from terminating LTD benefits for the duration of the applicable maximum benefit period under the Plan, and that she be placed in the same position she would have been in had she timely been paid the LTD benefits to which she was and is entitled ("make-whole" relief), including recovery of interest, attorneys' fees, costs and other losses resulting from Defendants' breach.

THEREFORE, Ms. Heimeshoff seeks the following relief:

81.    For a determination that Ms. Heimeshoff is entitled to receive LTD benefits under the Plan, and for an injunction mandating the payment of past and future LTD benefits to Ms. Heimeshoff from June 7, 2005 forward, covering the applicable maximum benefit period under the Plan;

82.    For an order, as an equitable remedy, enjoining Defendants from asserting any other income offsets against the LTD benefit;

83.    For damages according to proof, including "make-whole" relief as described above;

84.    For the Court to find that Hartford abused its discretion, requiring the Court under _to reopen the claim and take further evidence of Ms. Heimeshoff's disability. For a penalty

Complaint – Page 17

assessed against Hartford for $110 per day per document missing from the file, and identified as this litigation progresses, in accordance with 29 U.S.C. §1132(c);

85. For attorneys' fees and costs as permitted by law;

86. For interest as permitted by law;

87. For injunctive and equitable relief as set forth above, and

88. For such other relief as the Court deems appropriate, and the evidence supports.

89. **JURY TRIAL DEMANDED:** Ms. Heimeshoff respectfully requests a jury trial on all questions of fact raised by her Complaint.

PLAINTIFF,
JULIE HEIMESHOFF

Dated: November 18, 2010

By:_____
Mr. Mark P. Carey, #ct17828
Carey & Associates P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150
fax: (203) 255-0380
mcarey@capclaw.com

Complaint – Page 18

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------------x

JULIE HEIMESHOFF,
                                                   Index No. 3:10-cv-01813-JBA

           Plaintiff,

        – against –

                                                   June 2, 2011

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY and WAL-MART STORES, INC.,

           Defendants.

------------------------------------------------------------------------x

**Declaration of Patrick W. Begos In Support of Defendants' Motion to Dismiss**

PATRICK W. BEGOS declares the following to be true under penalty of perjury:

1.     I am a member of the firm of Begos Horgan & Brown LLP, counsel for defendants in this action. I submit this declaration in support of defendants' motion to dismiss.

2.     Annexed as Exhibit A is a copy of the "policy of group disability insurance" issued by Hartford Life and Accident Insurance Company ("Hartford") to Wal-Mart Stores, Inc. ("Wal-Mart"), identified in paragraph 5 of the Complaint.

3.     Annexed as Exhibit B are excerpts from the Administrative Record pertaining to plaintiff's claim for benefits under the Policy.

                                       S/ Patrick W Begos
                                       Patrick W. Begos ct19090
                                       BEGOS HORGAN & BROWN LLP
                                       Attorneys for Defendants
                                       327 Riverside Avenue
                                       Westport, CT 06880
                                       (203) 226-9990
                                       pwb@begoshorgan.com

AMENDMENT TO GROUP POLICY 205215 AND 24554 ON APRIL 6, 2005. ANY CHANGES BETWEEN THIS POLICY AND THE PREVIOUSLY ISSUED POLICY ARE EFFECTIVE JANUARY 1, 2005. ALL OTHER TERMS, CONDITIONS AND DATES REMAIN UNCHANGED.

Name of Policyholder: WAL-MART STORES, INC.

| Policy Number:<br>GRH/GLT-205215<br>GLT-24554 | Effective Date:<br>January 1, 1998 | Place of Delivery:<br>Delaware |
| --- | --- | --- |

| Anniversary Dates:<br>January 1 of each year, beginning in 1999. | Premium Due Dates:<br>Monthly, on the first day of each policy month. |
| --- | --- |

### HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
200 Hopmeadow Street, Simsbury, Connecticut 06089

(A stock insurance company, herein called Hartford Life)

Agrees with the Policyholder to insure certain persons who are entitled to the insurance provided by this policy. This policy is issued in consideration of the application of the Policyholder, and the payment of the first premium. The first premium is due and payable on the effective date of the policy. Subject to the policy's grace period provision, all premiums after the first must be paid when or before they are due.

Signed for Hartford Life:

Christine Hayer Repasy, *Secretary*          Thomas M. Marra, *President*

Countersigned by_____
                              Licensed Resident Agent

Table of Contents
Agreement to Insure _____ 1
Participant Employers_____ 2
Incorporation Provision _____ 3
Schedule of Insurance_____ 3.1
Premiums _____ 4
Policy Provisions_____ 7

GR-11383-HLA(1)

<div style="border:1px solid;">**EXHIBIT**<br>**A**</div>

P1-1.00

**JOINT APPENDIX 023**

## PARTICIPANT EMPLOYERS

An employer may be included as a Participant Employer if the Policyholder and Hartford Life so agree. Hartford Life will keep a list of accepted Participant Employers and the effective dates of coverage for each.

The Policyholder may act for or on behalf of all Participant Employers in all matters of the policy. The following will be binding on all Participant Employers:
- all agreements between Hartford Life and the Policyholder;
- all notices from Hartford Life to the Policyholder; and
- all notices from the Policyholder to Hartford Life.

An employee of a Participant Employer will be deemed to be an employee of the Policyholder for insurance purposes.

Coverage for a Participant Employer will terminate on the first to occur of:
- the date his premium is due, but not paid; or
- the date on which the Policyholder wants the employer to be removed from the policy. Such date must be stated in written notice to Hartford Life, and must be after the date of the notice.

JOINT APPENDIX 024

<div align="center">INCORPORATION PROVISION</div>

**Booklet-Certificate**
The Booklet-certificate(s), and the endorsement form(s) enclosed therein, attached to this Policy are hereby incorporated in, and made a part of, this policy.

Booklet Form(s):

BC-7461 5th Rev.

Endorsement Form(s):

GR-2025(496)A-HLA 7461 4th Rev.　(AR)
GR-2025(496)A-HLA 7461 4th Rev.　(MA)
GR-2025(496)A-HLA 7461 4th Rev.　(MN)
GR-2025(496)A-HLA 7461 4th Rev.　(NC)
GR-2025(496)A-HLA 7461 4th Rev.　(NH)
GR-2025(496)A-HLA 7461 4th Rev.　(NJ)
GR-2025(496)A-HLA 7461 4th Rev.　(KS)
GR-2025(496)A-HLA 7461 4th Rev.　(MO)
GR-2025(496)A-HLA 7461 4th Rev.　(AL)
GR-2025(496)A-HLA 7461 4th Rev.　(NY)
GR-2025(496)A-HLA 7461 4th Rev.　(VA)
GR-2025(496)A-HLA 7461 4th Rev.　(MS)
GR-2025(496)A-HLA 7461 2nd Rev.　(CA)
GR-2025(496)A-HLA 7461 2nd Rev.　(TX)
GR-2025(496)A-HLA 7461 2nd Rev.　(VT)
GR-2025(496)A-HLA 7461 2nd Rev.　(OK)
GR-2025(496)A-HLA BC 7461 5th Rev. (No. 2 Rev. 4)
GR-2025(496)A-HLA BC 7461 5th Rev. (No. 6)
GR-2025(496)A-HLA BC-7461 5th Rev. (No. 9)
GR-2025(496)A-HLA BC-7461 5th Rev. (No. 8)
GR-2025(496)A-HLA BC 7461 5th Rev. No. 1
GR-2025(496)A-HLA BC 7461 5th Rev. No. 4
GR-2025(496)A-HLA BC 7461 5th Rev. No. 5
GR-2025(496)A-HLA BC 7461 5th Rev. (No. 3 Rev. 3)
GR-2025(496)A-HLA BC-7461 5th Rev. (No. 7)

The terms found in the Booklet-certificate(s) will control:
- the benefit plan provisions;
- the eligibility and effective date of insurance rules;
- the termination of insurance rules;
- exclusions; and
- other general policy provisions pertaining to state insurance law requirements.

<div align="center">**JOINT APPENDIX 025**</div>

## SCHEDULE OF INSURANCE

**Schedule of Insurance**

The Schedule(s) of Insurance for Group Insurance Policies GRH GLT-205215 and GLT-24554 listed below:
* Short Term Disability Insurance
* Long Term Disability Insurance

are shown in Booklet-certificate(s) BC-7461 5th Rev..

The Schedule(s) of Insurance will control the:
* benefit amounts and maximum limits;
* eligibility and effective date rules; and
* other schedule amounts and limits.

which apply to the employees of the Policyholder.

GR-11383-HLA(3.1)                                                                              PI-3.21

Policy 000004

**JOINT APPENDIX 026**

## PREMIUMS

**Monthly Premium Rates**
The monthly premium rates to be charged for employee Coverage and/or child spouse coverage, if applicable, will be:
Short Term Disability Benefits

Hourly Employee

for each $100 of covered payroll the monthly premium rate shall be determined as follows:

| Employee Age | Rate |
|---|---|
| Less than 30 | $.79 |
| 30 - 34 | $.82 |
| 35 - 39 | $.67 |
| 40 - 44 | $.69 |
| 45 - 49 | $.77 |
| 50 or over | $1.18 |

STD Plus
Single          $.75 per Employee
Family          $1.75per Employee

Long Term Disability Benefits

for each $100 of covered payroll the monthly premium rate shall be determined as follows:

| Employee Age | Rate |
|---|---|
| Less than 30 | $.18 |
| 30 - 34 | $.36 |
| 35 - 39 | $.40 |
| 40 - 44 | $.56 |
| 45 - 49 | $.67 |
| 50 or over | $.86 |

For Long Term Disability Benefits, the amount of an employee's Earnings which is disregarded in determining his Monthly Benefit because of the Maximum Monthly Benefit limitation will also be disregarded in determining the amount of the total insured payroll.

The Monthly Premium Rates may be converted as follows:

| To Convert Rates to: | Use a Conversion Factor of: |
|---|---|
| -- annual rates | 11.8227 |
| -- semi-annual rates | 5.9557 |
| -- quarterly rates | 2.9852 |

**JOINT APPENDIX 027**

PREMIUMS
(Continued)

**Calculation**
Premiums may be calculated by multiplying the rate times the applicable number of units of coverage.

If any insurance is added, increased or becomes effective after the policy is in force, the premium charges will begin:
- the day the coverage is effective, if it is also the first day of a policy month; or if not
- the first day of the next policy month.

For insurance which is terminated, premium charges will stop as of the first day of the next policy month.

Premiums may be calculated by any other method which both Hartford Life and the Policyholder agree to in writing.

GR-11383-HLA(5)                                                                 PI-5.17

**JOINT APPENDIX 028**

**Premium Payments**

Premium payments are due and payable in full to a place designated by Hartford Life or, with respect to the initial premium payment, premium payments may be made to an authorized agent of Hartford Life.

Payment of premiums for a period before it is due will not guarantee the insurance for that period.

**Experience Rating**

If the policy is experience rated, any credit amount due the Policyholder will be allowed him on the Policy Anniversary Date and, at the Policyholder's request, will be:

- paid to him in cash;
- used to reduce his premiums; or
- used to provide additional insurance for Covered Persons.

Any credit amount shall be determined by the rating plan or plans used by Hartford Life.

**JOINT APPENDIX 029**

## POLICY PROVISIONS

**Entire Contract**
The contract between the parties consists of:
- the policy;
- the application of the Policyholder, a copy of which is attached to and made a part of the policy when issued; and
- the applications, if any, of each insured person.

All statements made by the Policyholder, Participant Employers, and persons insured under the policy are true and complete to the best of the knowledge and belief of the person(s) making them. No statement will be used in any contest unless it is in writing and a copy of it is given to the person who made it, or to his beneficiary.

**Incontestability**
Except for non-payment of premium, the insurance provided by the policy cannot be contested after such insurance has been in effect for a period of 2 years.

**Change in The Policy**
No change may be made unless approved in writing by the President; or a Vice President; an Assistant Vice President; a Secretary; or an Assistant Secretary of Hartford Life. No other person may change or waive any part of the policy. Any approved change shall be added to the policy in writing.

If any change to state or federal law, including but not limited to the Federal Social Security Act, affects Hartford Life's liability under the policy, Hartford Life may change the policy, the premiums or both. Such change:
- will be effective as of the date of the change to the state or federal law;
- will not be made until Hartford Life gives the Policyholder 31 days notice.

**Right to Amend**
Notwithstanding the above, after the policy has been in force for 12 months, Hartford Life may change any or all of the provisions of this contract by notifying the Policyholder. Hartford Life must give the Policyholder at least 31 days advance written notice of any change.

**Grace Period**
Hartford Life will allow the Policyholder a 60 day grace period for the payment of all premiums after the first. During this 60 day period, the policy will stay in force. If the owed premium is not paid by the 60th day, the policy will automatically terminate. If the Policyholder gives Hartford Life written advance notice of an earlier cancellation date, the policy will terminate on the earlier date. Premium is due for each day the policy is in force.

GR-11383-HLA(7)                                                                                                    PI-7.11

Policy 000008

**JOINT APPENDIX 030**

## POLICY PROVISIONS
## (Continued)

**Termination of Policy**
Hartford Life may terminate the policy for the following reasons by giving the Policyholder 31 days written notice:
- The Policyholder fails to furnish any information which Hartford Life may reasonably require;
- The Policyholder fails to perform any of his other obligations pertaining to this policy;
- Less than 100% of the persons eligible for coverage on a Non-contributory Basis are insured; or
- Less than 75% of the persons eligible for coverage on a Contributory Basis are insured.
- Fewer than 10 persons are insured.

In addition, Hartford Life may terminate this policy on any premium due date after the policy has been in force for 12 months.

**Certificate**
Hartford Life will give the Policyholder an individual Booklet-certificate for each insured employee. The Booklet-certificate is part of the policy, and will explain the important features of the policy.

**Data To Be Furnished**
The Policyholder will give Hartford Life all information Hartford Life needs regarding matters pertaining to the insurance. At any reasonable time while the policy is in force and for 1 year after that, Hartford Life may inspect any of the Policyholder's documents, books, or records which may affect the insurance or premiums of this policy.

If the Policyholder gives Hartford Life any incorrect information, the relevant facts will be determined to establish if insurance is in effect and in what amount.

No person will be deprived of insurance to which he is otherwise entitled or have insurance to which he is not entitled, because of any misstatement of fact by the Policyholder. Any required adjustment may be made in premiums or benefits.

**No Replacement for Workers' Compensation**
The policy does not replace Workers' Compensation or affect any requirement for Workers' Compensation coverage.

**Time Period**
All periods begin and end at 12:01 A.M., standard time, at the Policyholder's address.

**Jurisdiction**
This policy is governed by the laws of the state where it is delivered.

GR-11383-HLA(8)                                                           PI-8.00

Policy 000009

**JOINT APPENDIX 031**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
Hartford, Connecticut
(Herein called The Hartford)

---

**CERTIFICATE OF INSURANCE**
Under
**Group Insurance Policies**
**GLT-205215 EFFECTIVE January 1, 1990**
and
**GLT-24554 EFFECTIVE September 1, 1988**
Issued by
**The Hartford**
to
**WAL-MART STORES, INC.**
(Herein called The Policyholder)

---

This is to certify that The Hartford has issued and delivered the above named group insurance policies to the Policyholder.

The policies insure the associates who:

- are eligible for the insurance; and
- become insured; and
- continue to be insured;

according to the terms of the policies.

- The terms of the policies which affect your insurance are contained in the following pages.

This Certificate of Insurance and the following pages will become your Booklet-certificate. This Booklet-certificate is a part of the policies.

This Booklet-certificate replaces any other which The Hartford may have issued to the Policyholder to give to you under the group policies specified above.

---

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

*Lynda Godkin*
Lynda Godkin, Secretary

*Lowndes A. Smith*
Lowndes A. Smith, President

GR-2025(302)A

3

Policy 000010

**JOINT APPENDIX 032**

**PLAN OF INSURANCE**

**Eligible Class**

All Active Full-time Associates as follows:

(1) Managers earning $50,000.00 or more per year, excluding Store Managers and Assistant Store Managers

(2) Office Management, Store Managers, Assistant Store Managers, Pilots and all other Active Full-time Salaried Associates

(3) Hourly Pharmacists who work in California.

(4) Hourly Associates, except Hourly Pharmacists who work in California, who are enrolled in a Weekly Disability Plan.

**Eligibility Waiting Period ***

With respect to Class 4, the date on which you complete 90 days of continuous service in the eligible class.

With respect to All Other Classes, the date on which you enter the eligible class.

* If you are a peak-time hourly Associate and your status is changed to full-time, you are eligible on the date you complete 90 days of continuous service as an Active Full-time Associate.

**Benefit Percentage: 60%.**

If you do not sign up for Long Term Disability coverage when first eligible, and if you are Disabled during your first year of coverage, your benefit will be reduced to 40%, and will remain at 40% for the duration of the claim.

**Maximum Monthly Benefit: $10,000.00**

**Minimum Monthly Benefit: $50.00 for a maximum of 12 months.**

**Basis of Insurance:** This insurance is provided on a Contributory Basis.

**Elimination Period:** With respect to associates in Classes 1-3 the latter of:

(1) the first 90 days of any one period of Total Disability; or

(2) the end of your Employer sponsored salary continuation program.

With respect to associates in Class 4, the latter of:

(1) the first 6 months of any one period of Total Disability; or

(2) the end of your Weekly Disability Benefits.

The benefits described herein are those in effect as of January 1, 2000.

4

Policy 000011

**JOINT APPENDIX 033**

Total Disability or Totally Disabled means that:
- (1) during the Elimination Period; and
- (2) for the next 12 months, you are prevented by:
    - (a) accidental bodily injury;
    - (b) sickness;
    - (c) Mental Illness;
    - (d) substance abuse; or
    - (e) pregnancy,

from performing the essential duties of your occupation, and are under the continuous care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.

"Your occupation" includes similar job positions with the Employer which may be offered to you, with a rate of pay 60% or greater of your Indexed Pre-disability Earnings.

Partially Disabled means that you are prevented by Disability from doing all the material and substantial duties of your own or any occupation on a full-time basis, except that:
- (1) you are performing at least one of the material duties of your own occupation on either a full-time or part-time basis;
- (2) you are under the continuous care of a Physician; and
- (3) you are currently earning 20% to 80% less per month than your Indexed Pre-disability Earnings due to the same injury or sickness that caused the disability.

## INTERPRETATION OF POLICY TERMS AND CONDITIONS

The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

5

Policy 000012

## JOINT APPENDIX 034

## DEFINITIONS

The terms listed, if used, will have these meanings.

**You** means the Insured Person to whom this booklet-certificate is issued.

**Actively at Work**
You will be considered to be actively at work with your Employer on a day which is one of your employer's scheduled work days if you are performing, in the usual way, all of the regular duties of your job on a full time basis on that day. You will be deemed to be actively at work on a day which is not one of your Employer's scheduled work days only if you were actively at work on the preceding scheduled work day.

**Contributory Insurance** means insurance for which you enroll and agree to pay all or part of the cost.

**Active Full-Time Associate** means an employee who works for the Policyholder on a regular basis in the usual course of the Policyholder's business. The associate must work the number of hours in the Policyholder's normal work week. With respect to associates in Classes 1 & 2, this must be at least 30 hours per week. With respect to associates in Classes 3 & 4 this must be at least 28 hours per week or 20 hours per week if hired prior to September 1, 1979.

**Disability** means any:
    (1) accidental bodily injury;
    (2) sickness; or
    (3) pregnancy.

**Eligibility Waiting Period** means the number of continuous days of service you must satisfy as an Active Full-Time Associate in a class eligible for insurance before your coverage under the policy becomes effective. See the Plan of Insurance for the Eligibility Waiting Period.

**Elimination Period** means the period of time you must be Totally Disabled before benefits become payable. See the Plan of Insurance for the Elimination Period.

**Monthly Benefit** means a monthly sum payable to you while you are Disabled, subject to the terms of this Plan.

**Pre-existing Condition** means any Disability, diagnosed or undiagnosed, for which you receive Medical Care during the 365 day period which ends on the day before:
    (1) your effective date of insurance; and
    (2) the effective date of a Change in Coverage.

All manifestations, symptoms or findings which result:
    (1) from the same or related Disability; or
    (2) from any aggravations of Disability;
are considered to be the same Disability for the purpose of determining a Pre-existing Condition.

6

Policy 000013

JOINT APPENDIX 035

**Medical Care** means care which is received when:
  (1) a Physician is consulted or medical advice is given; or
  (2) treatment is recommended or prescribed by, or received from a Physician.

**Treatment**, as used above, includes, but is not limited to:
  (1) any medical examinations, tests, attendance or observation;
  (2) any medical services, supplies or equipment, including their prescription or use; or
  (3) any prescribed drugs or medicines, including their prescription or use.

**Physician** means a legally qualified physician other than yourself, your spouse, father, mother, brother, sister, son or daughter who is practicing within the scope of his license.

**Other Income Benefits** means the benefits shown below:
  (1) The amount of disability, retirement, pension or annuity benefits from any:
      (a) group insurance or pension plan;
      (b) Railroad Retirement Act;
      (c) plan or arrangement or coverage, whether insured or not, as a result of employment by or association with your employer or as a result of membership in or association with any:
          (i) group;
          (ii) association;
          (iii) union; or
          (iv) other organization; or
      (d) plan provided by law.
  (2) The amount of benefits to which you are entitled under any:
      (a) workers' compensation law;
      (b) occupational disease law;
      (c) unemployment compensation law; or
      (d) other act or law of like intent.
  (3) Any damages or settlement (exclusive of fees and interest) which is made in lieu of workers' compensation benefits and paid to:
      (a) you;
      (b) your employer; or
      (c) a workers' compensation insurer;
      but only to the extent that any damages or settlement represent your loss of income.
  (4) The amount of disability or retirement benefits under the United States Social Security Act to which you and your spouse and children may be entitled because of your disability or retirement.
  (5) Portion of a settlement or judgment, minus associated costs of a lawsuit, that represents or compensates for your loss of earnings.

7

Policy 000014

**JOINT APPENDIX 036**

Other Income Benefits will include:

(1) early retirement benefits if you so elect;

(2) disability income benefits under a group life insurance plan regardless of whether you may or may not elect to apply for such benefits even though you are Disabled;

(3) temporary and permanent disability benefits provided under any Workers' Compensation law or any other act or law of like intent; and

(4) any "no-fault" automobile policy insurance plan.*

If you are paid Other Income Benefits in a lump sum, The Hartford will pro-rate the lump sum:

(1) over the period of time it would have been paid if not paid in a lump sum; or

(2) if such period of time cannot be determined, over a period of 60 months.

If you are Disabled and you receive Other Income Benefits in a lump sum, they will be considered Other Income Benefits regardless of any roll-over provision or election into any fund, plan or arrangement.

The Hartford may make a retroactive allocation of any retroactive Other Income Benefit payments.

Other Income Benefits will not include:

(1) proceeds from any:

(a) source of personal investment income;

(b) personal disability income plan, unless the plan is obtained through a group-sponsored or employer-related program; or

(c) Veteran's Administration Disability benefits.

(2) benefits from military retirement pension plans;

(3) distribution from any form of profit sharing regardless of pre-tax or after-tax treatment as found under Section 401(k) of the Internal Revenue Code;

(4) proceeds or income from any:

(a) Individual- or employer- sponsored I.R.A., Individual Tax Sheltered Annuity, or any deferred compensation plan;

(b) Employee Stock Option Plan or any thrift plan;

(c) a partner or proprietor H.R. 10(Keough Plan) under the Self-Employed Individual Tax Retirement Act; or

(d) a capital account.

* Not applicable to residents of Pennsylvania.

8

Policy 000015

**JOINT APPENDIX 037**

(6) the amount of any increase in benefits paid under any federal or state law, if the increase:
    (a) takes effect after the date benefits become payable under the policy; and
    (b) is a general increase which:
        (i) is required by law; and
        (ii) applies to all persons who are entitled to such benefits.

**Salaried Employee** means an Active Full-time Associate who:
(1) does only tasks which are administrative, sales, clerical or supervisory; and
(2) is paid by the employer on a regular salaried basis.

**Non-Salaried Employee** means an Active Full-time Associate who:
(1) is paid by the hour; or
(2) does not meet this Plan's definition of Salaried Employee.

**Rehabilitative Employment** means employment or service which:
(1) prepares a Disabled person to resume gainful work; and
(2) is approved, in writing, by The Hartford.

The term Rehabilitative Employment will include, when appropriate, any necessary and feasible:
(1) vocational testing;
(2) vocational training;
(3) work-place modification;
(4) prosthesis; and
(5) job placement.

**Monthly Income** means the sum of:
(1) your Monthly Rate of Basic Earnings; and
(2) any disability benefits which were being paid before you became Totally Disabled, except any benefits:
    (a) provided by the Policyholder's Employee Benefit Plan;
    (b) paid by a personal policy; or
    (c) received from the Veteran's Administration.

9

Policy 000016

**JOINT APPENDIX 038**

With respect to Office Management and Pilots:

**Monthly Rate of Basic Earnings\*** means your regular monthly pay including bonuses, but not counting any other fringe benefit or extra compensation.

With respect to Full Time Managers, Assistant Managers, Store Managers and Assistant Store Managers:

**Monthly Rate of Basic Earnings\*** means your current fiscal year's draw plus contract settlement paid or to be paid in the current fiscal year ending January 31 divided by 12.

With respect to all Hourly Associates:

**Monthly Rate of Basic Earnings\*** means your total gross pay including bonuses and overtime for the past 52 weeks divided by 12.

\*  If you become Totally Disabled, your Monthly Rate of Basic Earnings will be the rate in effect on your last day as an Active Full-time Associate before becoming Disabled.

**Current Monthly Earnings** means the monthly earnings you receive from any employer or for any work, while Disabled and eligible for Partial Disability benefits under this Plan.

**Indexed Pre-disability Earnings:** means your Pre-disability Earnings adjusted annually by 7%. The first adjustment will take effect on the first July 1st to occur following one full calendar year during which you have been continuously Disabled. After this first adjustment, your Pre-disability Earnings will be increased by additional adjustment of 7% on each following July 1st, up to a maximum of 5 adjustments.

**Pre-disability Earnings** means your Monthly Rate of Basic Earnings in effect on the date immediately prior to becoming Totally Disabled.

**Disabled** means either Totally or Partially Disabled.

**Totally Disabled:** See the Plan of Insurance for the definition of Totally Disabled.

**Partially Disabled:** See the Plan of Insurance for the definition of Partially Disabled.

10

Policy 000017

**JOINT APPENDIX 039**

## DATES OF ELIGIBILITY AND COVERAGE

**Eligible Persons:** All persons who are in the class or classes which are shown on the Plan of Insurance will be considered Eligible Persons.

**When You Are Eligible:** You will become eligible for coverage on either:

(1) the Policy Effective Date, if you have completed the Eligibility Waiting Period; or if not

(2) the date on which you complete the Eligibility Waiting Period.

See the Plan of Insurance for the Eligibility Waiting Period.

**When You Are Insured — Contributory Insurance:** Your coverage will begin on the earliest to occur of the following dates:

(1) the date you become eligible, if you enroll or have enrolled by then if you are in Class 4;

(2) the date on which you enroll, if you enroll within 60 days after the date you are eligible if you are in class 1, 2 or 3; or

(3) the first day of the pay period in which The Hartford approves evidence of insurability or on January 1st if you apply on or after the date Open Enrollment begins and are approved by The Hartford prior to January 1st. Evidence is required if you enroll after you become eligible if you are in class 4 or more than 60 days after you become eligible if you are in classes 1, 2 or 3. Any evidence of insurability must be furnished at your own expense.

If you become ineligible for insurance before you submit any required evidence of insurability to The Hartford, and you later become eligible, you will still be required to furnish such evidence.

All of the above dates are subject to the Deferred Effective Date provision below.

**Deferred Effective Date:** If you are absent from work due to Disability on the date your insurance would otherwise have become effective, your effective date will be deferred. You insurance will not become effective until you return to active full-time work.

**Enrollment:** To enroll for insurance, you must:

(1) complete and sign a group insurance enrollment card which is satisfactory to The Hartford; and

(2) deliver it to the employer.

11

Policy 000018

**JOINT APPENDIX 040**

## TERMINATION

**Termination Date of Insurance**

Your insurance will terminate on the earliest to occur of the following dates:

(1) the date the policy terminates;

(2) the date premium payment is due but not paid by the Policyholder or the employer;

(3) the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution;

(4) the first day on which you receive benefits from a pension plan provided or sponsored by your employer;

(5) the date your employment terminates. Your employment terminates on the date you cease to be an Active Full-time Associate in a class eligible for insurance.

**Continuation of coverage during a leave of absence or layoff.**
If you are granted an approved leave of absence or are temporarily laid off, the Employer may continue your insurance for 90 days following the date last worked, subject to the following:

(1) the leave authorization must be in writing, or must be documented as a leave for military purposes;

(2) your benefit level, or the amount of earnings upon which you benefits may be based, will be that in effect on the day before said leave commenced; and

(3) such continuation will cease immediately if one of the following events should occur:

(a) the leave terminates prior the agreed upon date;

(b) the termination of the Group Insurance Policy;

(c) the Group Insurance Policy no longer insures your class.

No premium will be required during an approved leave of absence or layoff.

**Continuation of Insurance**

If you are Disabled and you cease to be an Active Full-time Associate, your insurance will be continued:

(1) during the Elimination Period while you remain Totally Disabled by the same Disability; and

(2) after the Elimination Period for as long as you are entitled to benefits under the policy.

During the period in which you are so entitled to benefits, no premium will be due for you.

12

Policy 000019

**JOINT APPENDIX 041**

**Continuation during a family or medical leave**

If you are granted a leave of absence according to the Family and Medical Leave Act of 1993, your Employer may continue your insurance for up to 12 weeks, or longer if required by state law, following the date your coverage would have terminated, subject to the following:

    (1) the leave authorization must be in writing;

    (2) the required premium for you must be paid;

    (3) your benefit level, or the amount of earnings upon which you benefits may be based, will be that in effect on the day before said leave commenced; and

    (4) such continuation will cease immediately if one of the following events should occur:

        (a) the leave terminates prior the agreed upon date;

        (b) the termination of the Group Insurance Policy;

        (c) the non-payment of premium when due by the Policyholder or you or the employer;

        (d) the Group Insurance Policy no longer insures your class.

**Extension of Benefits**

If you are entitled to benefits while Disabled and the policy terminates, benefits:

    (1) will continue as long as you remain Disabled by the same Disability, but

    (2) will not be provided beyond the date The Hartford would have ceased to pay benefits had the insurance remained in force.

Termination of the policy for any reason will have no effect on The Hartford's liability under this provision.

13

Policy 000020

**JOINT APPENDIX 042**

## BENEFITS

### Article 1.    Benefit Payment Due to Disability

You will be paid benefits if, while insured under the group policy, you:

(1) become Totally Disabled;

(2) remain Totally Disabled throughout the Elimination Period;

(3) remain Disabled beyond the Elimination Period; and

(4) submit proof of loss satisfactory to The Hartford.

Benefits accrue as of the first day after the Elimination Period and are paid monthly. No benefit will be paid for any day on which you are not under the care of a legally qualified Physician.

The Hartford will pay benefits until the first to occur of:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof that you are continuously Disabled;

(3) the date you refuse to be examined, if The Hartford requires an examination;

(4) the date you die; or

(5) the date determined from the table below.

### MAXIMUM DURATION OF BENEFITS TABLE

| Age When Totally Disabled | Benefits Payable |
|---|---|
| Prior to Age 62 | To Age 65 |
| Age 62 | 4 years |
| Age 63 | 3 ½ years |
| Age 64 | 3 years |
| Age 65 | 2 ½ years |
| Age 66 | 2 ¼ years |
| Age 67 | 2 years |
| Age 68 | 1 ¾ years |
| Age 69 or older | 1 ½ years |

### Article 1.A Benefit Payment Due to Mental Illness or Substance Abuse

If you are Disabled because of:

(1) Mental Illness that results from any cause;

(2) any condition that may result from Mental Illness;

(3) alcoholism; or

14

Policy 000021

JOINT APPENDIX 043

    (4) the non-medical use of:
       (a) narcotics;
       (b) sedatives;
       (c) stimulants;
       (d) hallucinogens; or
       (e) any other such substance;

then, subject to all other provisions of this Plan, benefits will be payable only:

    (1) for so long as you are confined in a hospital or other place licensed to provide medical care for your Disability; or

    (2) when you are not so confined, a total of 24 months for all such disabilities during your lifetime.

**Mental Illness** means any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

### Article 1.B. Benefit Payment Due to Partial Disability

If you:

    (1) submit satisfactory proof to The Hartford that you are Partially Disabled within 31 days after the end of a period for which a Monthly Benefit was payable due to Total Disability; and

    (2) this Partial Disability results from the same injury or sickness that caused the Total Disability,

then a Monthly Benefit will continue to be payable according to the terms of this Plan.

Benefit payments under this provision will cease, however, on the first to occur of:

    (1) the date your Current Monthly Earnings exceed 80% of your Indexed Pre-disability Earnings;

    (2) one of the dates described in the third paragraph of Article 1., Benefit Payment Due to Disability; or

    (3) the date you return to work in an occupation other than your own. If benefits ceased due to this item (3), a benefit may still be payable according to Article 1.C, Benefit Payment Due to Rehabilitative Employment.

### Article 1.C Benefit Payment Due to Rehabilitative Employment

If you are:

    (1) either Partially Disabled or Totally Disabled; and

    (2) engaged in a program of Rehabilitative Employment,

you will continue to be paid a Monthly Benefit. The Monthly Benefit, however, will be reduced by 50% of any income you receive from each month of Rehabilitative Employment.

15

Policy 000022

JOINT APPENDIX 044

The sum of your Monthly Benefit and total income received from a program of Rehabilitative Employment may not exceed 100% of your Pre-disability Earnings. If this sum exceeds your Pre-disability Earnings, the Monthly Benefit paid by The Hartford will be reduced proportionately.

The term Pre-disability Earnings as used in this Benefit means your Monthly Rate of Basic Earnings in effect on the day immediately prior to your becoming Disabled.

### Article 2.   Successive Periods of Disability

With respect to associates in classes 1, 2 and 3, attempts to return to work as an Active Full-time Associate during the Elimination Period will not interrupt the Elimination Period, if you are unable to continue working for more than an accumulated total of six months.

Any day you were Actively at Work will not count towards the Elimination Period.

With respect to associates in class 4, if you cease to be Totally Disabled and return to work for a total of 30 days or less during an Elimination Period, the Elimination Period will not be interrupted or extended.

Except for the 30 days or less you work, you must be Totally Disabled by the same condition for the total Elimination Period.

After the Elimination Period, when a return to work as an Active Full-time Associate is followed by recurrent Disability, and such Disability is:
  (1) due to the same cause; or
  (2) due to a related cause; and
  (3) within 6 months of return to work,
the Period of Disability prior to your return to work and the recurrent Disability will be considered one Period of Disability, provided the Group Insurance Policy remains in force.

If you return to work as an Active Full-time Associate for 6 months or more, any recurrence of a Disability will be treated as a new Disability. Another Elimination Period must be met.

The term "Period of Disability" as used in this provision means a continuous length of time during which you are Disabled under this Plan.

See the Plan of Insurance for the Elimination Period that applies to you.

### Article 3. Calculation of Monthly Benefit

To determine the Monthly Benefit The Hartford will pay each month while you are Disabled:
  (1) Multiply your Monthly Income by the Benefit Percentage;
  (2) Take the lesser of:
      (a) the resulting product; or
      (b) the Maximum Monthly Benefit;

16

Policy 000023

**JOINT APPENDIX 045**

(3) Carry forward the amount in item (2) above and from it subtract:
   (a) all Other Income Benefits, including those for which you could collect but did not apply;
   (b) 50% of income from Rehabilitative Employment; and
   (c) all other income from any employer or for any work.

In no event will the benefit payable be less than the Minimum Monthly Benefit shown in the Plan of Insurance.

The resulting sum will be your Monthly Benefit.

If a Monthly Benefit is payable for less than a month, The Hartford will pay 1/30 of the Monthly Benefit for each day you were Disabled.

See the Plan of Insurance for the Benefit Percentage factor and Maximum Monthly Benefit.

See Definitions, on pages 6 and 8 for the meanings of Monthly Income and Other Income Benefits.

### Article 3.A Calculation of Monthly Benefit Due to Partial Disability

If you are Partially Disabled and are currently earning less than 80% of your Indexed Pre-disability Earnings, the following calculation is used to determine your Monthly Benefit:

$$(A \text{ divided by } B) \times C = D$$

where

A = Your Indexed Pre-disability Earnings less your Current Monthly Earnings.

B = Your Indexed Pre-disability Earnings.

C = The Monthly Benefit payable if you were otherwise Totally Disabled. (Disregard all other income from any employer or for any work when determining this figure.)

D = The Partial Disability payable.

If a Monthly Benefit is payable for less than a month, The Hartford will pay 1/30 of the Monthly Benefit for each day you were Disabled.

### Article 4.   Change in Coverage

**Change in Class or Monthly Rate of Basic Earnings**
Your coverage may increase or decrease on the date there is a change in your class or Monthly Rate of Basic Earnings.

No increase in coverage will be effective unless on that date you:
   (1) are an Active Full-time Associate; and
   (2) were not absent from work due to Disability during the 30 day period before the change in class or earnings.

A change in your Rate of Basic Earnings will become effective on the date The Hartford receives notice of change.

17

Policy 000024

**JOINT APPENDIX 046**

**Change in the Plan of Insurance**

. Any decrease in coverage because of a change in this Plan of Insurance will become effective on the date of the change.

Any increase in coverage because of a change in this Plan of Insurance will become effective on the date of the change, subject to the following limitations:

(1) If you are absent from full-time work due to Disability, the increase will not become effective until you return to work as an Active Full-time Associate.

(2) If you are Disabled due to or contributed to by a Pre-existing Condition which commenced prior to the increase, the increase will not become effective unless such Disability begins:

(a) after the last day of 365 consecutive days while insured on a full-time basis during which you did not receive Medical Care for the Pre-existing Condition; or

(b) after the last day of a 730 consecutive day period during which you were continuously insured on a full-time basis under this Plan.

**Article 5.   Survivor Income Benefit**

If you die:

(1) after having met the Elimination Period shown on this Plan of Insurance; or

(2) while receiving benefits under this Plan,

then a lump sum of $5,000.00 gross:

(1) that would have been paid to you; or

(2) that was paid to you,

will be payable to your surviving Spouse.

If there is no surviving Spouse then benefits will be payable to your surviving children, in equal shares.

If there is are no surviving Spouse or Children, then benefits will be payable to your estate.

18

Policy 000025

JOINT APPENDIX 047

If a minor Child is entitled to benefits, it is The Hartford's option to make benefit payments to the person caring for and supporting the Child until a legal guardian is appointed.

The following terms apply to Survivor Income Benefits:

(1) Spouse means your wife or husband who:
    (a) is mentally competent; and
    (b) was not legally separated from you at the time of your death.

(2) Children means your children, step-children, legally adopted children and foster children.

## EXCLUSIONS

**Exclusions**

This Plan does not cover and no benefit will be payable for any disability which:

(1) is caused by your commission of or attempt to commit:
    (a) assault;
    (b) battery; or
    (c) felony;

(2) due to:
    (a) war;
    (b) any act of war (declared or not);
    (c) insurrection;
    (d) rebellion;
    (e) your taking part in a riot or civil disorder; or

(3) due to or contributed to by a Pre-existing Condition.

**Pre-existing Conditions Limitations**

The following will apply to Exclusion (3): No benefit will be payable under this Plan for any Disability that is due to, contributed to by, or results from a Pre-existing Condition, unless such Disability begins:

(1) after the last day of 365 consecutive days while insured under this Plan on a full-time basis during which you did not receive Medical Care for the Pre-existing Condition; or

(2) after the last day of a 730 consecutive day period during which you were continuously insured on a full-time basis under this Plan.

19

Policy 000026

**JOINT APPENDIX 048**

CLAIMS

**Notice of Claim**
You must give The Hartford written notice of claim within 30 days after the loss happens or starts. If notice cannot be given with that time, it must be given as soon as possible. Such notice must include your name, your address and the policy number.

**Claim Forms**
When The Hartford receives a notice of claim, you will be sent forms for providing The Hartford with proof of loss. The Hartford will send these forms within 15 days after receiving a notice of claim.

If The Hartford does not send the forms within 15 days, you may submit any other written proof which fully describes the nature and extent of your claim.

**Proof of Loss**
Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, The Hartford may require further written proof that you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:

   (1) it was not possible to give proof within the required time; and

   (2) proof is given as soon as possible; but

   (3) not later than 1 year after it is due, unless you are not legally competent.

The Hartford has the right to require, as part of proof of loss:

   (1) your signed statement identifying all Other Income Benefits; and

   (2) proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

After submitting proof of loss, you will be required to apply for Social Security disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider denial and, if denied again, to request a hearing before an Administration Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if proof of loss is satisfactory.

You will not be required to claim any retirement benefits which you may only get on a reduced basis.

20

Policy 000027

**JOINT APPENDIX 049**

**Payment of Claims**

All payments are payable to you. Any payments owed at your death may be paid to your estate. If any payment is owed to:

(1) your estate;

(2) a person who is a minor; or

(3) a person who is not legally competent;

then The Hartford may pay up to $1,000 to any of your relatives who is entitled to it in the opinion of The Hartford. Any such payment shall fulfill The Hartford's responsibility for the amount paid.

**Time Payment of Claims**

If written proof of loss is furnished, accrued benefits will be paid at the end of each month that you are Disabled.

If payment for a part of a month is due at the end of the claim, it will be paid as soon as written proof of loss is received.

**Appeal of Claims Denied**

If a claim for benefits is wholly or partly denied, you will be furnished with written notification of the decision. This written decision will:

(1) give the specific reason(s) for the denial;

(2) make specific reference to the policy provisions on which the denial is based;

(3) provide a description of any additional information necessary to prepare a claim and an explanation of why it is necessary; and

(4) provide an explanation of the review procedure.

On any denied claim, you or your representative may appeal to The Hartford for a full and fair review.

You may:

(1) request a review upon written application within 60 days of the claim denial;

(2) review pertinent documents; and

(3) submit issues and documents in writing.

A decision will be made by The Hartford no more than 60 days after the receipt of the request, except in special circumstances (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received.

The written decision will include specific reference to the policy provisions on which the decision is based.

21

Policy 000028

**Legal Actions**

Legal action cannot be taken against The Hartford:

(1) sooner than 60 days after due proof of loss has been furnished; or

(2) after the shortest period allowed by the laws of the state where the policy is delivered. This is 3 years after the time written proof of loss is required to be furnished according to the terms of the policy.

**Physical Examination**

The Hartford may have you examined to determine if you are Disabled. Any such examination will be:

(1) at The Hartford's expense; and

(2) as reasonably required by The Hartford.

**Our subrogation rights.***

If you:

(1) suffer a Disability because of the act or omission of a third party;

(2) become entitled to and are paid benefits under the Group Insurance Policy in compensation for lost wages; and

(3) do not initiate legal action for the recovery of such benefits from the third party in a reasonable period of time,

then we will be subrogated to any rights you may have against the third party and may, at our option, bring legal action to recover any payments made by us in connection with the Disability.

* Not applicable to residents of Minnesota, Missouri, North Carolina or Virginia.

22

Policy 000029

JOINT APPENDIX 051

**PART II**

**WEEKLY DISABILITY BENEFITS**

23

Policy 000030

**TABLE OF CONTENTS**

Page

Certificate of Insurance ................................................. 25

Plan of Insurance ........................................................ 26

Definitions ................................................................. 27

Dates of Eligibility and Coverage .................................. 27

Termination ................................................................ 28

Weekly Disability Benefit .............................................. 29

Exclusions ................................................................. 31

Claims ...................................................................... 31

24

Policy 000031

**JOINT APPENDIX 053**

# HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
## Hartford, Connecticut
### (Herein called The Hartford)

## CERTIFICATE OF INSURANCE
Under
### Group Insurance Policy GRH-205215
### EFFECTIVE January 1, 1990
Issued by
### The Hartford
to
## WAL-MART STORES, INC.
### (Herein called The Policyholder)

This is to certify that The Hartford has issued and delivered the above named group insurance policy to the Policyholder. The policy insures the associates who:

- are eligible for the insurance; and
- become insured; and
- continue to be insured;

according to the terms of the policy.

The terms of the policy which affect your insurance are contained in the following pages.

This Certificate of Insurance and the following pages will become your Booklet-certificate. This Booklet-certificate is a part of the policy.

This Booklet-certificate replaces any other which The Hartford may have issued to the Policyholder to give to you under the group policy specified above.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

*Lynda Godkin, Secretary*

*Lowndes A. Smith, President*

GR-2025(402)A

25

JOINT APPENDIX 054

## PLAN OF INSURANCE

**Eligible Classes**
All Active Full-time Hourly Associates.

**Eligibility Waiting Period**
If you are working full-time for the employer on the Policy Effective Date — None

If you start working full-time for the employer after the Policy Effective Date — the date on which you complete 90 days of continuous service in the eligible class.

If you are a peak-time hourly Associate and your status is changed to full-time, you are eligible on the date you complete 90 days of continuous service as an Active Full-time Hourly Associate.

**Basis of Insurance**
This insurance is provided on a Contributory Basis.

### AMOUNTS OF INSURANCE
### Associate Only

WEEKLY DISABILITY BENEFIT — 60%*
Maximum Weekly Benefit — $600.00
Maximum Payment Period — 26 weeks per disability
Benefits Commence:    Accident — 15th day;
                      Sickness — 15th day.

*See Additional Provisions.

### ADDITIONAL PROVISIONS

WEEKLY DISABILITY BENEFITS

The Maximum Weekly Benefit shown in the preceding table will in no event exceed 60% of your average weekly earnings.

If you do not sign up for Weekly Disability Benefits coverage when first eligible, and you become Disabled during your first year of coverage, your benefit will be reduced to 40%, and will remain at 40% for the duration of the claim.

Your Weekly Disability Benefit Amount payable for any weekly period will be reduced by the sum of any payments you received for the same weekly period under any compulsory benefit act or law of any State or Territory.

If a Weekly Benefit is payable for less than a week, we will pay 1/7 of the Weekly Benefit for each day you were Disabled.

The benefits described herein are those in effect as of January 1, 2000.

26

Policy 000033

JOINT APPENDIX 055

## ADDITIONAL PROVISIONS (Continued)
### CHANGE IN BENEFITS

Changes in coverage due to:
    (1) change in Earnings; or
    (2) change in this Plan of Insurance
will become effective on the date of such change, except that any increase in coverage will be subject to the Deferred Effective Date provisions.

A retroactive change in your rate of Earnings will become effective on the date the change is determined in the rate of Earnings.

### INTERPRETATION OF POLICY TERMS AND CONDITIONS

The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

### DEFINITIONS

The terms listed, if used, will have these meanings.

**He**
He or she.

**His**
His or her.

**Contributory Insurance**
Insurance for which you enroll and agree to pay all or part of the cost.

**Active Full-time Hourly Associate**
An employee who works for the Policyholder on a regular basis in the usual course of the Policyholder's business. The associate must work the number of hours in the Policyholder's normal work week. This must be at least 28 hours per week or 20 hours per week if hired prior to September 1, 1979.

**Earnings**
Regular pay including bonuses and overtime pay (but not counting commissions, or any other pay or fringe benefit) paid during the past 26 regular pay periods and divided by 52 weeks.

**Physician**
means a legally qualified physician other than yourself, your spouse, father, mother, brother, sister, son or daughter who is practicing within the scope of his license.

### DATES OF ELIGIBILITY AND COVERAGE

**Eligible Persons**
All persons who are in the class or classes which are shown on the Plan of Insurance will be considered Eligible Persons.

27

Policy 000034

JOINT APPENDIX 056

**When You Are Eligible**
    (1) the Policy Effective Date, if you have completed the Eligibility Waiting Period; or, if not,
    (2) the date on which you complete the Eligibility Waiting Period.

See the Plan of Insurance for your Eligibility Waiting Period.

**When You Are Insured — Contributory Insurance**
Your coverage will start on the earliest of these dates:
    (1) the date you become eligible, if you enroll on or before that date;
    (2) the first day of the pay period in which The Hartford approves evidence of insurability or on January 1st if you apply on or after the date Open Enrollment begins and are approved by The Hartford prior to January 1st. Evidence is required if you enroll after you become eligible. Such evidence must be furnished at your own expense.

If you become ineligible for insurance before you submit any required evidence of insurability to The Hartford, and you later become eligible, you will still be required to furnish such evidence.

To enroll for insurance you have to:
    (1) complete and sign a group insurance enrollment card which is acceptable to The Hartford; and
    (2) deliver it to your employer.

**Deferred Effective Date**
If you are absent from work due to sickness or injury on the date your insurance would have become effective or been increased, your effective date will be deferred. Your insurance will not become effective or be increased until you return to active full-time work.

## TERMINATION

Termination Date of Insurance — Insured Persons Coverage

Your insurance will terminate on the earliest of:
    (1) the date the policy terminates;
    (2) the date premium payment is due but not paid by the Policyholder;
    (3) the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution; or
    (4) the date your employment terminates. This means that you have ceased active full-time work in an eligible class.

    If your employment terminates because of:
    (a) injury;
    (b) sickness; or
    (c) pregnancy,

28

Policy 000035

JOINT APPENDIX 057

your Weekly Disability insurance:

(a) may be continued while you remain disabled until the end of the period for which you are entitled to weekly benefits; and

(b) if terminated, may be reinstated on the date on which you return to active full-time work.

Such continuation will also end on the first to occur of the dates stated in items 1-3 above.

**Continuation of coverage during a leave of absence or layoff.**
If you are granted an approved leave of absence or are temporarily laid off, the Employer may continue your insurance for 90 days following the date last worked, subject to the following:

(1) the leave authorization must be in writing, or must be documented as a leave for military purposes;

(2) your benefit level, or the amount of earnings upon which your benefits may be based, will be that in effect on the day before said leave commenced; and

(3) such continuation will cease immediately if one of the following events should occur:

    (a) the leave terminates prior to the agreed upon date;

    (b) the termination of the Group Insurance Policy;

    (c) the Group Insurance Policy no longer insures your class.

No premium will be required during an approved leave of absence or layoff.

**Continuation during a family or medical leave**
If you are granted a leave of absence according to the Family and Medical Leave Act of 1993, your Employer may continue your insurance for up to 12 weeks, or longer if required by state law, following the date your coverage would have terminated, subject to the following:

(1) the leave authorization must be in writing;

(2) the required premium for you must be paid;

(3) your benefit level, or the amount of earnings upon which you benefits may be based, will be that in effect on the day before said leave commenced; and

(4) such continuation will cease immediately if one of the following events should occur:

    (a) the leave terminates prior the agreed upon date;

    (b) the termination of the Group Insurance Policy;

    (c) the non-payment of premium when due by the Policyholder or you; or

    (d) the Group Insurance Policy no longer insures your class.

## WEEKLY DISABILITY BENEFIT
### Insured Persons Coverage

If, while covered under this Benefit, you become totally and continuously disabled because of:

(1) injury;

(2) sickness; or

(3) pregnancy,

29

Policy 000036

**JOINT APPENDIX 058**

The Hartford will pay a Weekly Disability Benefit as shown in the Plan of Insurance. No benefit, however, will be payable for any day on which you are not under the continuous care of a Physician.

The amount of any Weekly Disability Benefit payable shall be reduced by the total amount of any payments you receive or are entitled to receive for the same weekly period under any state law or any "no-fault" automobile insurance plan.* This includes any amount which is not received solely because you fail to apply for it.

A change in your rate of earnings may not be deemed effective before the date The Hartford receives notice of the change.

**STD Plus-Premium Contributions\*\***

If you have elected Short Term Disability Plus, and you become disabled and eligible for benefits under the Weekly Disability Benefit, The Hartford will pay contributions due from you towards any of the following benefits for which you and/or your family are enrolled under Wal-Mart's Personal Choice Plan:

      Medical
      Dental
      Optional Life
      Dependent Life
      Accidental Death and Dismemberment
      STD Plus

This benefit begins with contributions due after the 14th day of continuous disability and will continue until the earlier to occur of:

    (1) the last day you are disabled; or
    (2) the last day of a period of 8 weeks of benefit.

At the end of the 8 week period you must resume all premium payments becoming due for your applicable coverages.

**Successive Periods of Disability**

If successive Periods of Disability are:

    (1) due to the same or related cause; and
    (2) separated by:
        (a) less than 30 calendar days from the date you were no longer Totally Disabled, as determined by The Hartford; or
        (b) more than 30 calendar days from the date you were no longer Totally Disabled, as determined by The Hartford, and these periods of disability are considered to be the same period of disability under your Long Term Disability coverage, if applicable,

\* With respect to residents of North Carolina and Pennsylvania only, we will not offset with any "no-fault" automobile insurance plan.

\*\* STD Plus is not available in California, Rhode Island or Puerto Rico.

30

Policy 000037

**JOINT APPENDIX 059**

the successive periods will be considered one Period of Disability, provided the Policy remains in force and you remain insured.

The term "Period of Disability" as used in this provision means a continuous length of time during which you are Totally Disabled under this Plan.

### Definition for this Benefit

Totally Disabled means that you are unable to do the material and substantial duties of your occupation. Your occupation includes similar job positions with the employer which may be offered to you with a rate of pay 60% or greater of your pre-disability earnings.

## EXCLUSIONS

The policy does not cover, and no benefit shall be paid for any of the following:

    (1) any injury, sickness or pregnancy which is not treated by a physician or surgeon;

    (2) any loss caused or contributed to by:

        (a) war or act of war (declared or not); or

        (b) sickness contracted or injury sustained while in the armed forces of any country engaged in war or other armed conflict;

    (3) any sickness for which Workers' Compensation benefits are paid, or may be paid, if duly claimed; or

    (4) any injury sustained as a result of doing any work for pay or profit.

## CLAIMS

### Notice of Claim

A claimant must give The Hartford written notice of a claim within 30 days after the loss happens or starts. If notice cannot be given within that time, it must be given as soon as possible after that. Such notice must include:

    (1) the claimant's name;

    (2) the claimant's address; and

    (3) the policy number.

### Claim Forms

When The Hartford receives a notice of claim, forms will be sent to the claimant for providing The Hartford proof of loss. The Hartford will send these forms within 15 days after receiving a notice of claim. If The Hartford does not send the forms within 15 days, the claimant may submit any other written proof which fully describes the nature and extent of this claim.

### Proof of Loss

Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. If proof is not given by the time it is due, it will not affect the claim if:

31

Policy 000038

## JOINT APPENDIX 060

(1) it was not possible to give proof within the required time; and

(2) proof is given as soon as possible; but

(3) not later than a year after it is due, unless the claimant is not legally competent.

The Hartford reserves the right to determine if proof of loss is satisfactory.

## Time Payment of Claims

Claims payable for loss will be paid at the end of each two weeks during the period for which The Hartford owes payment.

If any payment is due at the end of a claim, it will be paid as soon as written proof of loss is received.

All benefit payments will be made to you.

The Hartford may pay up to $1,000 to any relative who is entitled to it in the opinion of The Hartford. Any such payment made by The Hartford shall fulfill The Hartford's responsibility in the amount paid.

## Physical Examination and Autopsy

The Hartford reserves the right to:

(1) examine any claimant; and

(2) to make an autopsy, in the case of death, if it is not forbidden by law.

Any such examinations made will be at the expense of The Hartford.

## Legal Actions

Legal action cannot be taken against The Hartford:

(1) sooner than 60 days after due proof of loss has been furnished; or

(2) after the shortest period allowed by the laws of the state where the policy is delivered. This is 3 years after the time written proof of loss is required to be furnished according to the terms of the policy.

## No Replacement for Workers' Compensation

The policy does not:

(1) replace Workers' Compensation; or

(2) affect any requirement for Workers' Compensation coverage.

## Physician-Patient Relationship

The Insured Person may choose any licensed physician. The Hartford shall not in any way disturb the physician-patient relationship.

## Appeal of Claims Denied

If a claim for benefits is wholly or partially denied, notice of the decision will be furnished to the employee. This written decision will:

(1) give the specific reason(s) for the denial;

(2) make specific reference to the policy provisions on which the denial is based;

32

Policy 000039

JOINT APPENDIX 061

(3) provide a description of any additional information necessary to prepare a claim and an explanation of why it is necessary; and

(4) provide an explanation of the review procedure.

On any denied claim, an employee or his representative may appeal to The Hartford for a full and fair review.

The claimant may:

(1) request a review upon written application within 60 days of receipt of claim denial;

(2) review pertinent documents; and

(3) submit issues and comments in writing.

A decision will be made by The Hartford no more than 60 days after the receipt of the request, except in special circumstances (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific references to the policy provisions on which the decision is based.

**Our subrogation rights.**

If you:

(1) suffer a Disability because of the act or omission of a third party;

(2) become entitled to and are paid benefits under the Group Insurance Policy in compensation for lost wages; and

(3) do not initiate legal action for the recovery of such benefits from the third party in a reasonable period of time,

then we will be subrogated to any rights you may have against the third party and may, at our option, bring legal action to recover any payments made by us in connection with the Disability.

33

Policy 000040

JOINT APPENDIX 062

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GLT-24554
                   GLT-205215
                   GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of
Massachusetts and is included to bring your Booklet-certificate
into conformity with Massachusetts state law.

**Continuation**
The following is added to the Termination section of your
booklet.

**Continuation of coverage.**
If your insurance terminates because your employment terminates
or you cease to be a member of an eligible class, your insurance
will automatically be continued until the end of a 31 day period
from the date your insurance terminates or the date you become
eligible for similar benefits under another group plan, whichever
occurs first.

If your insurance terminates because your employment is
terminated as a result of a plant closing or covered partial
closing, your insurance may be continued. You must elect in
writing to continue insurance and pay the required premium for
continued coverage. Coverage will cease on the earliest to occur
of the following dates:

    (1)   90 days from the date you were no longer eligible for
           coverage as an Active Full-time Employee;
    (2)   the date you become eligible for similar benefits under
           another group plan;
    (3)   the last day of the period for which required premium is
           made;
    (4)   the date the Group Insurance Policy terminates;
    (5)   the date your Employer ceases to be a Participant
           Employer, if applicable.

Continued coverage is subject to all other applicable terms and
conditions of the policy.

_____

GR-2025(496)A-HLA 7461 4th Rev.        (MA)        3-'98

Policy 000041

**JOINT APPENDIX 063**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:   WAL-MART STORES, INC.

Group Policy No.:   GLT-24554
                    GLT-205215
                    GRH-205215

Effective Date:   January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provisions are applicable to residents of Minnesota
and are included to bring your Booklet-certificate into
conformity with Minnesota state law.

**1. Mental Illness and Substance Abuse**

The following provision replaces the provision of the same title
appearing on pages 14 and 15 in the Disability Benefits section
of your Booklet-certificate.

**Mental Illness and substance abuse.**
If you are Disabled because of:
  (1)   Mental Illness that results from any cause;
  (2)   any condition that may result from Mental Illness;
  (3)   alcoholism under treatment; or
  (4)   the non-medical use of narcotics,
then, subject to all other Policy provisions, benefits will be
payable:
  (1)   only for so long as you are confined in a hospital or
        other place licensed to provide medical care for the
        disabling condition; or
  (2)   when you are not so confined, a total of 24 months for
        all such Disabilities during your lifetime.

**Mental Illness** means any psychological, behavioral or emotional
disorder or ailment of the mind, including physical
manifestations of psychological, behavioral or emotional
disorders, but excluding demonstrable, structural brain damage.

---

GR-2025(496)A-HLA 7461 4th Rev.      (MN)          3-'98

Policy 000042

**JOINT APPENDIX 064**

**2. Replacement of Prior Group Disability Insurance**

The Deferred Effective Date provisions will not apply to you on the Plan Effective Date if you were covered under the prior plan and Actively at Work on the day before the Plan Effective Date.

**3. Limitations**

The following provision replaces the provision of the same title appearing on page 19 in the Exclusions section of your Booklet-certificate.

**Pre-existing Condition limitations.**

The following will apply to Exclusion (3):
No benefit will be payable under the Plan for any Disability that is due to, contributed to by, or results from a Pre-Existing Condition, unless:
- (1)  such Disability begins after the last day of 365 consecutive days while insured during which you received no Medical Care for the Pre-existing condition; or
- (2)  loss is incurred for the Disability after the last day of 730 consecutive days during which you have been continuously insured under this Plan.

**Pre-Existing Condition** means any accidental bodily injury, sickness, mental illness, pregnancy, or episode of substance abuse, for which you received Medical Care during the 365 day period that ends the day before:
- (1)  your effective date of coverage; or
- (2)  the effective date of a Change in Coverage.

**Medical Care** is received when:
- (1)  a Physician is consulted or medical advice is given; or
- (2)  treatment is recommended, prescribed by, or received from a Physician.

Treatment includes but is not limited to:
- (1)  Medical examinations, tests, attendance or observation;
- (2)  use of drugs, medicines, medical services, supplies or equipment.

Policy 000043

**JOINT APPENDIX 065**

**4. Proof of Loss**

The following provision replaces the provision on pages 20 and 31 in the Claims sections of your Booklet-certificate.

**Proof of a loss.**
Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, we may require further written proof that you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:

    (1)   it was not possible to give proof within the required time; and

    (2)   proof is given as soon as possible.

The Hartford has the right to require, as part of the proof of loss:

    (1)   your signed statement identifying all Other Income Benefits; and

    (2)   proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

**5. Subrogation**

The provision entitled "Our subrogation rights" appearing on page 33 in the Claims section of your Booklet-certificate does not apply to you.

Policy 000044

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GLT-24554
GLT-205215
GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provisions are applicable to residents of Arkansas
and are included to bring your Booklet-certificate into
conformity with Arkansas state law.

**1. Insurer Information Notice**

Any questions regarding the plan may be directed to The Hartford
Insurance Group Sales Office indicated below:

Hartford Insurance Group
4550 North Point Parkway
Alpharetta, GA 30202

Telephone: 1-800-578-5953

If the question is not resolved, you may contact the Arkansas
Insurance Department:

Arkansas Insurance Department
Consumer Services Division
1200 West third Street
Little Rock, Arkansas 72201-1904

Telephone: 1-800-852-5494

This notice is for information only and does not become a
condition of the plan.

**2. Minimum Benefit**

The Schedule of Insurance is amended to include a Minimum Benefit
of:
(a) $50. per month for Long Term Disability; and
(b) $12.50 per week for Short Term Disability.

In no event will any benefit payable be less than these amounts.

---

GR-2025(496)A-HLA 7461 4th Rev.  . (AR)  3-'98

Policyholder: WAL-MART STORES, INC.

Group Policy No.: GLT-24554
GLT-205215
GRH-205215

Effective Date: January 1, 1998

This endorsement forms part of your booklet-certificate which describes the provisions of the group policy specified above.

The following provisions are applicable to residents of North Carolina and are included to bring your Booklet-certificate into conformity with North Carolina state law.

**1. Other Income Benefits Definition**

The following replaces the first two paragraphs of the same definition appearing on page 7 in the Definitions section of your Booklet-certificate.

**Other Income Benefits** mean the amount of any benefit for loss of income, provided to you as a result of the period of Disability for which you or your family are claiming benefits under this plan. This includes any such benefits for which you or your family are eligible or that are paid to you, your family or to a third party on your behalf, pursuant to any:

(1) temporary or permanent disability benefits under a Workers' Compensation Law, occupational disease law, or similar law;

(2) governmental law or program that provides disability or unemployment benefits as a result of your job with the Employer;

(3) plan or arrangement of coverage, whether insured or not, as a result of employment by or association with the Employer or as a result of membership in or association with any group, association, union or other organization;

GR-2025(496)A-HLA 7461 4th Rev.        (NC)        3-'98

Policy 000046

**JOINT APPENDIX 068**

...cy where the premium is wholly or partially paid by the employee;

(5) disability benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that you or your family are eligible to receive because of your Disability.

Other Income Benefits also mean any such payments that are made to you, your family, or to a third party on your behalf, pursuant to any:

(1) disability benefit under the Employer's Retirement Plan;

(2) retirement benefit from a Retirement Plan that is wholly or partially funded by employer contributions, unless:

(a) you were receiving it prior to becoming Disabled; or

(b) you immediately transfer the payment to another plan qualified by the United States Internal Revenue Service for the funding of a future retirement.

Other Income Benefits will not include the portion, if any, of such retirement benefit that was funded by your after-tax contributions;

(3) retirement benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that you or your family receive because of your retirement, unless you were receiving them prior to becoming Disabled.

## 2. Total Disability Benefits

With respect to the requirement that you be under the care of a Physician other than yourself in order for benefits to be payable, that requirement is further amended to be as follows:

No benefits will be payable unless you are under the care of a Physician other than yourself or a member of your immediate family. A member of your immediate family is your spouse, father, mother, brother, sister, son or daughter.

Regular care by a Physician will cease to be required if, in the opinion of qualified medical professionals, further medical care and treatment would be of no value to you.

## 3. Proof of Loss

The following provision replaces the provisions appearing on pages 20 and 31 in the Claims sections of your Booklet-certificate.

Policy 000047

**JOINT APPENDIX 069**

Proof of loss.

Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, we may require further written proof that you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:

    (1)   it was not possible to give proof within the required time; and

    (2)   proof is given as soon as possible; but

    (3)   not later than 1 year after it is due, unless you are not legally competent.

The Hartford has the right to require, as part of the proof of loss:

    (1)   your signed statement identifying all Other Income Benefits; and

    (2)   proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

After submitting proof of loss, you will be required to apply for Social Security disability benefits when the duration of Total Disability meets the minimum duration required to qualify for such benefits.  If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider the denial and, if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if your proof of loss is satisfactory.

You will not be required to claim any retirement benefits which you may only get on a reduced basis.

## 4. Notification

The following provision replaces the provisions appearing on pages 20 and 31 in the Claims sections of your Booklet-certificate.

You must give The Hartford written notice of a claim within 30 days after Disability starts. If notice cannot be given within that time, it must be given as soon as possible. Such notice must include your name, your address and the Group Insurance Policy number.  The notice should be sent to the Hartford Life and Accident Insurance Company, Hartford Plaza, Hartford, Connecticut 06115, or to The Employer, or an authorized agent of the Hartford Life and Accident Insurance Company.

Policy 000048

**JOINT APPENDIX 070**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.:   GLT-24554
                    GLT-205215
                    GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of New
Hampshire and is included to bring your Booklet-certificate into
conformity with New Hampshire state law.

**Where to Call For Information Regarding a Claim**

If you have a question regarding a claim, you or the policyholder
may call The Hartford at 1-800-752-9713. When calling, please
give us the following information:
   (1)   the policy number; and
   (2)   the name of the policyholder (employer or organization),
         as shown in this certificate.

GR-2025(496)A-HLA 7461 4th Rev.         (NH)           3-'98

Policy 000049

**JOINT APPENDIX 071**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GLT-24554
                   GLT-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of New Jersey
and is included to bring your Booklet-certificate into conformity
with New Jersey state law.

**Subrogation**

The provision entitled "Our subrogation rights" appearing in the
Claims section of your Long Term Disability Booklet-certificate
does not apply to you.

GR-2025(496)A-HLA 7461 4th Rev.        (NJ)        3-'98

Policy 000050

JOINT APPENDIX 072

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC. ASSOCIATES HEALTH
AND WELFARE TRUST

Group Policy No.: GRH-20969
GLT-24554
GLT-205215

Effective Date: January 1, 1990

This endorsement forms part of your booklet-certificate which describes the provisions of the group policy specified above.

The following provisions are applicable to residents of Texas and are included to bring your booklet-certificate into conformity with Texas state law.

The following provision is included to bring your booklet-certificate into conformity with Texas state law.

| 1. IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| To obtain information or make a Complaint: | Para Obtener Informacion O Para Someter Una Queja: |
| You may call The Hartford's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al numero de telefono gratis de Hartford's para informacion o para de someter una queja al: |
| 1-800-752-9713 If about a claim | 1-800-752-9713 ascerca de un reclamo |
| 1-800-428-5711 If not about a claim | 1-800-428-5711 para una queja |
| You may also write to The Hartford at: | Usted tambien puede escribir a Hartford: |
| P.O. Box 2999 | P.O. Box 2999 |
| Hartford, CT 06104-2999 | Hartford, CT 06104-2999 |

(over)

_Lynda Godkin_, Secretary

Lowndes A. Smith, President

GR-2025(496)A-HLA 7451 2nd Rev.     (TX)     9-95

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512)475-1771

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact The Hartford first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

1-800-252-3439

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512)475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo debe comunicarse con el (la compania) The Hartford primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

## 2. Workers' Compensation Notice

**THE INSURANCE POLICY UNDER WHICH THIS CERTIFICATE IS ISSUED IS NOT A POLICY OF WORKERS' COMPENSATION INSURANCE. YOU SHOULD CONSULT YOUR EMPLOYER TO DETERMINE WHETHER YOUR EMPLOYER IS A SUBSCRIBER TO THE WORKERS' COMPENSATION SYSTEM.**

Policy 000052

**JOINT APPENDIX 074**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
**Hartford, Connecticut**
**Endorsement**

Policyholder: WAL-MART STORES, INC. ASSOCIATES HEALTH
AND WELFARE TRUST

Group Policy No.: GRH-20969
GLT-24554
GLT-205215

Effective Date: January 1, 1990

This endorsement forms part of your booklet-certificate which describes the provisions of the group policy specified above.

The following provision is applicable to residents of Vermont and New Hampshire and is included to bring your Booklet-certificate into conformity with Vermont and New Hampshire state law.

**Where To Call With Claim Questions**

If you have a question about a claim, you may call The Hartford at the following toll-free telephone number: 1-800-445-9057.

When calling, please provide the following information:

(1) The policy number; and
(2) The name of the policyholder (employer or organization), as shown in this Booklet-certificate's Schedule of Insurance.

Lynda Godkin, Secretary          Lowndes A. Smith, President

GR-2025(496)A-HLA 7461 2nd Rev.     (VT)     9-'95

JOINT APPENDIX 075

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC. ASSOCIATES HEALTH
AND WELFARE TRUST
Group Policy No.: GRH-20969
GLT-24554
GLT-205215

Effective Date: January 1, 1990

This endorsement forms part of your booklet-certificate which describes the provisions of the group policy specified above.

The following provision is applicable to residents of Oklahoma and is included to bring your booklet-certificate into conformity with Oklahoma state law.

**Fraud Warning**

**WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of insurance fraud.

Lynda Godkin, Secretary

Lowndes A. Smith, President

GR-2025(496)A-HLA 7461 2nd Rev.     (OK)     9-95

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC. ASSOCIATES HEALTH
AND WELFARE TRUST

Group Policy No.: GRH-20969
GLT-24554
GLT-205215

Effective Date: January 1, 1990

This endorsement forms part of your booklet-certificate which describes the provisions of the group policy specified above.

The following provision is applicable to residents of California and is included to bring your Booklet-certificate into conformity with California state law.

**Notice of Family Care and Medical Leave Act**

You may be entitled to continue your coverage for up to 12 weeks during any 12 month period if you are absent from Active Full-time work due to a family care or medical leave of absence under the provisions of the California Family Care and Medical Leave Act. During such period, your coverage may be continued according to a plan established by your employer. Please contact your employer for further information on your right to continued coverage during a family care or medical leave of absence.

Lynda Godkin, Secretary

Lowndes A. Smith, President

GR-2025(496)A-HLA 7461 2nd Rev.    (CA)                9-96

JOINT APPENDIX 077

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.: GLT-024554

Effective Date: January 1, 2002

This endorsement forms a part of your Booklet-certificate which
describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees, the **ERISA**
section of Your Booklet-certificate is amended to read as follows:

Christine Hayer Repasy, *Secretary*          Thomas M. Marra, *President*

GR-2025(496)A-HLA BC 7461 5th Rev. No. 5          5-'02

JOINT APPENDIX 078

ERISA

The Following Important Notice
Is Provided by Your Employer
for your Information Only.

Conforming Instrument

For the purpose of meeting certain requirements of the Employee
Retirement Income Security Act of 1974, the following information
and the attached Claim Procedures and Statement of ERISA Rights
are provided for use with your booklet-certificate to form the
Summary Plan Description.

The benefits described in your booklet are provided under a group
plan by the Insurance Company and are subject to the terms and
conditions of that plan.

A copy of this plan is available for your review during normal
working hours in the office of the Plan Administrator.

1. Plan Name

Group Short Term Disability and Long Term Disability Plan
for employees of WAL-MART STORES, INC.

2. Plan Number

501

2

Case 3:10-cv-01813-JBA   Document 28   Filed 06/02/11   Page 58 of 131

Policy 000057

3. Employer/Plan Sponsor

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR 72716

4. Employer Identification Number

71-0415188

5. Type of Plan

Welfare Benefit Plan providing Group Short Term Disability
and Long Term Disability.

6. Plan Administrator

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR 72716

7. Agent for Service of Legal Process

For the Plan:

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR 72716

Policy 000058

For the Policy:

Hartford Life And Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be made on a plan trustee or the plan administrator.

8. Sources of Contributions -- The Employer pays the premium for the insurance, but may allocate part of the cost to the employee. The Employer determines the portion of the cost to be paid by the employee.

9. Type of Administration -- The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan.

10. The Plan and its records are kept on a Policy Year basis.

11. Labor Organizations

None

12. Names and Addresses of Trustees

None

Policy 000059

### 13. Plan Amendment Procedure

The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.



Policy 000060

*Statement of ERISA Rights*

You are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

1. Receive Information About Your Plan and Benefits:

a) Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

b) Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

c) Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

6

Policy 000061

**JOINT APPENDIX 083**

2. *Prudent Actions by Plan Fiduciaries:*

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

JOINT APPENDIX 084

3. Enforce Your Rights:

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

8

Policy 000063

4. Assistance with Your Questions:

   If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.



9

Policy 000064

**Claim Procedures for Disability Income Insurance Plans**

1. Claims for Benefits:

If you would like to present a claim for benefits for yourself or your insured dependents, you should obtain a claim form(s) from your Employer or Plan Administrator. The applicable section of such form(s) should be completed by (1) you, (2) the Employer or Administrator and (3) the Attending Physician or hospital.

Following completion, the claim form(s) must be forwarded to the individual authorized to evaluate claims (Administrator or Insurance Company's Claim Representative). The individual authorized to evaluate claims will determine if benefits are payable and, if due, issue payment(s) to you.

The Insurance Company will make a decision no more than 45 days after receipt of your claim. The time for decision may be extended for two additional 30 day periods provided that, prior to any extension period, the Insurance Company notifies you in writing that an extension is necessary due to matters beyond the control of the plan, identifies those matters and gives the date by which it expects to render its decision. If your claim is extended due to your failure to submit information necessary to decide your claim, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to our request.

10

Policy 000065

**JOINT APPENDIX 087**

The written decision will include: 1) specific reasons for the decision, 2) specific references to the plan provisions on which the decision is based, 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary, 4) a description of the review procedures and time limits applicable to such procedures, 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal, and, 6)(A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the denial, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the denial and that a copy will be provided free of charge to you upon request, or (B) if denial is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request.



Policy 000066

JOINT APPENDIX 088

2. Appealing Denial of Claims:

On any wholly or partially denied claim, you or your
· representative may appeal to us for a full and fair review. You
may:

1. request a review upon written application within 180 days
   of the claim denial;
2. request, free of charge, copies of all documents,
   records, and other information relevant to your claim;
   and
3. submit written comments, documents, records and
   other information relating to your claim.

The Insurance Company will make a decision no more than 45
days after we receive your appeal. The time for decision may
be extended for one additional 45 day period provided that,
prior to the extension, the Insurance Company notifies you in
writing that an extension is necessary due to special
circumstances, identifies those circumstances and gives the
date by which it expects to render its decision. If your claim is
extended due to your failure to submit information necessary to
decide your claim on appeal, the time for decision shall be
tolled from the date on which the notification of the extension
is sent to you until the date we receive your response to the
request. The written decision will include specific references to
the plan provisions on which the decision is based and any
other notice(s), statement(s) or information required by
applicable law.

12



Policy 000067

Case 3:10-cv-01813-JBA   Document 28   Filed 06/02/11   Page 68 of 131

JOINT APPENDIX 089

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.: GRH/GLT-024554

Effective Date: June 1, 2003

This endorsement forms a part of your Booklet-certificate which describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees, the Full-time Employment shown in the Schedule of Insurance of the Long Term Disability Portion of Your Booklet-certificate is amended to read as follows:

Full-time Employment:
An employee who works for the Policyholder on a regular basis in the usual course of the Policyholder's business and is listed in Wal-Mart's eligibility system as Full-time

Christine Hayer Repasy, *Secretary*

Thomas M. Marra, *President*

GR-2025(496)A-HLA BC-7461 5th Rev. (No. 7)

6-'03

**JOINT APPENDIX 090**

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY
Hartford, Connecticut
Endorsement

Policyholder:   WAL-MART STORES. INC.

Group Policy No.:   GLT-024554

This endorsement forms a part of your Booklet-certificate which
describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees, Your Booklet-
certificate is amended as follows:

1.  The Eligible Class(es) shown in the Schedule of Insurance of
    the Long Term Disability portion of Your Booklet-certificate is
    amended to read as follows:

    **Who is eligible for coverage?**
    Eligible Class(es):
    All Active Full-time Salaried Management, Salaried
    Pharmacists & Pilots not located in Puerto Rico.

2.  The Full-time Employment shown in the Schedule of Insurance
    of the Long Term Disability portion of your Booklet-certificate
    is amended to read as follows:

    Full-time Employment:       34 hours weekly

Christine Hayer Repasy, *Secretary*          Thomas M. Marra, *President*

GR-2025(496)A-HLA BC 7461 5th Rev. (No. 3 Rev. 3)     12-'04

Policy 000069

**JOINT APPENDIX 091**

enrolled in a Weekly Disability Plan.

2. The Full-time Employment shown in the Schedule of Insurance of the Short Term Disability portion of your booklet-certificate is amended to read as follows:

Full-time Employment:          34 hours weekly

3. The Weekly Benefit shown in the Schedule of Insurance of the Short Term Disability portion of Your Booklet-certificate is amended to read as follows:

With respect to All Active Full-time On-Time Enrolled Associates:
The Weekly Benefit will be the lesser of:
  • 50% of your Weekly Earnings; or
  • $600,

reduced by Other Income Benefits.

With respect to All Active Full-time Late Enrollees approved through Medical Underwriting with disability dates commencing within 12 months of enrollment date:
The Weekly Benefit will be the lesser of:
  • 40% of your Weekly Earnings; or
  • $600,

reduced by Other Income Benefits.

With respect to All Active Full-time Late Enrollees approved through Medical Underwriting with disability dates commencing 12 months or later after enrollment date:
The Weekly Benefit will be the lesser of:
  • 50% of your Weekly Earnings; or
  • $600,

reduced by Other Income Benefits.

2

Policy 000070

## JOINT APPENDIX 092

With respect to All Active Full-time Late Enrollees declined
by Medical Underwriting with Disability Dates commencing
less than or equal to 5 years after coverage effective date:
The Weekly Benefit will be the lesser of:
- 40% of your Weekly Earnings; or
- $600,

reduced by Other Income Benefits.

With respect to All Active Full-time Late Enrollees declined
by Medical Underwriting with Disability Dates commencing
more than 5 years after coverage effective date:
The Weekly Benefit will be the lesser of:
- 50% of your Weekly Earnings; or
- $600,

reduced by Other Income Benefits.

4. The Eligibility Waiting Period shown in the Schedule of
Insurance of the Short Term Disability portion of Your
Booklet-certificate is amended to read as follows:

Class 1:
When will You become eligible? (Eligibility Waiting
Period)
You will be eligible for coverage on the date on which You
complete a waiting period of 90 days of continuous service.

Class 2:
When will You become eligible? (Eligibility Waiting
Period)
You will be eligible for coverage on the date on which You
complete a waiting period of 180 days of continuous service.

5. The Eligible Class(es) shown in the Schedule of Insurance of
the Long Term Disability portion of Your Booklet-certificate
is amended to read as follows:

3

Policy 000071

JOINT APPENDIX 093

Who is eligible for coverage?
Eligible Class(es):
All Active Full-time Associates as follows:
(1) Hourly Pharmacists who work in California.
(2) Hourly Field Logistics Associates, Hourly Field
    Supervisor positions in stores and clubs and Hourly
    Pharmacists not based in California, excluding Associates
    who are based in Puerto Rico.
(3) Non-Puerto Rico Hourly Associates except Hourly Field
    Supervisor positions in stores and clubs, Hourly Field
    Logistics Associates and Hourly Pharmacists who are
    enrolled in a Weekly Disability Plan.

6.  The Full-time Employment shown in the Schedule of
    Insurance of the Long Term Disability portion of your
    booklet-certificate is amended to read as follows:

    Full-time Employment:        34 hours weekly

7.  The Maximum Monthly Benefit and Benefit Percentage
    shown in the Schedule of Insurance of the Long Term
    Disability portion of Your Booklet-certificate is amended to
    read as follows:

    With respect to All Active Full-time On-Time Enrolled
    Associates:
    Maximum Monthly Benefit: $10,000
    Benefit Percentage: 50%

    With respect to All Active Full-time Late Enrollees approved
    through Medical Underwriting with disability dates
    commencing within 12 months of enrollment date:
    Maximum Monthly Benefit: $6,667
    Benefit Percentage: 40%

    With respect to All Active Full-time Late Enrollees approved
    through Medical Underwriting with disability dates
    commencing 12 months or later after enrollment date:

4

Policy 000072

**JOINT APPENDIX 094**

Maximum Monthly Benefit: $10,000
Benefit Percentage: 50%

With respect to All Active Full-time Late Enrollees declined
by Medical Underwriting with Disability Dates commencing
less than or equal to 5 years after coverage effective date:
Maximum Monthly Benefit: $6,667
Benefit Percentage: 40%

With respect to All Active Full-time Late Enrollees declined
by Medical Underwriting with Disability Dates commencing
more than 5 years after coverage effective date:
Maximum Monthly Benefit: $10,000
Benefit Percentage: 50%

8.  The Eligibility Waiting Period shown in the Schedule of
    Insurance of the Long Term Disability portion of Your
    Booklet-certificate is amended to read as follows:

    Classes 1 & 2:
    When will You become eligible? (Eligibility Waiting
    Period)
    You will be eligible for coverage on the first day of the month
    following the date on which You complete a waiting period of
    90 days of continuous service.

    Class 3:
    When will You become eligible? (Eligibility Waiting
    Period)
    You will be eligible for coverage on the first day of the month
    following the date on which You complete a waiting period of
    180 days of continuous service.

5

Policy 000073

**JOINT APPENDIX 095**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.:   GLT-024554
                    GRH/GLT-205215

Effective Date: January 1, 2005

This endorsement forms a part of your Booklet-certificate which describes the provisions of the group policy specified above.

With respect to All Active Full-time Associates, Your Booklet-certificate is amended to read as follows:

1. The definition of Actively at Work shown in the Definitions section of the Long Term Disability portion of Your Booklet-certificate is amended to read as follows:

   **Actively at Work**
   You will be considered to be actively at work with the Company on a day which is one of your scheduled work days if you are performing, in the usual way, all the regular duties of your job on a full time basis on that day. You will be deemed to be Actively at Work on a day which is not one of your regularly scheduled days only if you were Actively at Work on the preceding scheduled work day.

2. The definition of Actively at Work shall be included in the Definitions section of the Short Term Disability portion of Your Booklet-certificate:

   **Actively at Work**
   You will be considered to be actively at work with the Company on a day which is one of your scheduled work days if you are performing, in the usual way, all the regular duties of your job on a full time basis on that day. You will be deemed to be Actively at Work on a day which is not one of your regularly scheduled days only if you were Actively at Work on the preceding scheduled work day.

Christine Hayer Repasy, *Secretary*          Thomas M. Marra, *President*

GR-2025(496)A-HLA 7461 5th Rev. (No. 9)                                    4-'05

Policy 000074

**JOINT APPENDIX 096**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of Kansas and
is included to bring your Booklet-certificate into conformity
with Kansas state law.

**Subrogation**

The provision entitled 'Our subrogation rights.', on page 33 of
your booklet-certificate, is deleted and does not apply to you.

_____


GR-2025(496)A-HLA 7461 4th Rev.          (KS)          3-'98

Policy 000075

**JOINT APPENDIX 097**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.: GRH-205215

Effective Date: January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of Missouri
and is included to bring your Booklet-certificate into conformity
with Missouri state law.

**Subrogation**

The provision entitled "Our subrogation rights", on page 33 of
your booklet-certificate, is deleted and does not apply to you.

GR-2025(496)A-HLA 7461 4th Rev.      (MO)       3-'98

Policy 000076

**JOINT APPENDIX 098**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of Alabama and
is included to bring your Booklet-certificate into conformity
with Alabama state law.

**Subrogation**

The subrogation provision appearing on page 33 of your booklet is
deleted and replaced with the following.

**Our subrogation rights.**
If you:
    (1)   suffer a Disability because of the act or omission of a
        third party;
    (2)   become entitled to and are paid benefits under the Group
        Insurance Policy in compensation for lost wages; and
    (3)   do not initiate legal action for the recovery of such
        benefits from the third party in a reasonable period of
        time,
then we will be subrogated to any rights you may have against the
third party and may, at our option, bring legal action to recover
any payments made by us in connection with the Disability.  Such
right may be exercised only if you have been, or will be, fully
compensated for the lost wages.

----

GR-2025(496)A-HLA 7461 4th Rev.     (AL)        3-'98

Policy 000077

**JOINT APPENDIX 099**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provisions are applicable to residents of New York
and are included to bring your Booklet-certificate into
conformity with New York state law.

**1. Subrogation**

The provision entitled "Our subrogation rights", on page 33 of
your booklet-certificate, is deleted.

----

GR-2025(496)A-HLA 7461 4th Rev.        (NY)           3-'98

Policy 000078

**JOINT APPENDIX 100**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GRH-206215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of Virginia
and is included to bring your Booklet-certificate into conformity
with Virginia state law.

**Subrogation**

The provision entitled "Our subrogation rights", on page 33 of
your booklet-certificate, is deleted and does not apply to you.

_____

GR-2025(496)A-HLA 7461 4th Rev.       (VA)            3-'98

Policy 000079

**JOINT APPENDIX 101**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GRH-205215

Effective Date:  January 1, 1998

This endorsement forms part of your booklet-certificate which
describes the provisions of the group policy specified above.

The following provision is applicable to residents of Mississippi
and is included to bring your Booklet-certificate into conformity
with Mississippi state law.

**Subrogation**

The subrogation provision appearing on page 33 of your booklet is
deleted and replaced with the following.

**Our subrogation rights**
If you:
    (1)    suffer a Disability because of the act or omission of a
           third party;
    (2)    become entitled to and are paid benefits under the Group
           Insurance Policy in compensation for lost wages; and
    (3)    do not initiate legal action for the recovery of such
           benefits from the third party in a reasonable period of
           time,
then we will be subrogated to any rights you may have against the
third party and may, at our option, bring legal action to recover
any payments made by us in connection with the Disability.  Such
right may be exercised only if you have been, or will be, fully
compensated for the lost wages.

_____

GR-2025(496)A-HLA 7461 4th Rev.        (MS)        3-'98

Policy 000080

**JOINT APPENDIX 102**

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.: GRH/GLT-205215

Effective Date: January 1, 2004

This endorsement forms a part of your Booklet-certificate which
describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees, Your Booklet-
certificate is amended as follows:

1. The Eligible Class(es) shown in the Schedule of Insurance of
   the Short Term Disability portion of Your Booklet-certificate
   is amended to read as follows:

   Who is eligible for coverage?
   Eligible Class(es):
   All Active Full-time Associates as follows:
   (1) Hourly Field Logistics Associates, Hourly Field
       Supervisor positions in stores and clubs and Hourly
       Pharmacists not based in California, excluding Associates
       who are based in Puerto Rico.
   (2) Non-Puerto Rico Hourly Associates except Hourly Field
       Supervisor positions in stores and clubs, Hourly Field
       Logistics Associates and Hourly Pharmacists who are

Christine Hayes Repasy, Secretary          Thomas M. Marra, President

GR-2025(496)A-HLA BC 7461 5th Rev. (No. 2 Rev. 4)          3-'04

Policy 000081

**JOINT APPENDIX 103**

enrolled in a Weekly Disability Plan

2. The Full-time Employment shown in the Schedule of Insurance of the Short Term Disability portion of your booklet-certificate is amended to read as follows.

Full-time Employment:          34 hours weekly

3. The Weekly Benefit shown in the Schedule of Insurance of the Short Term Disability portion of Your Booklet-certificate is amended to read as follows:

With respect to All Active Full-time On-Time Enrolled Associates:
The Weekly Benefit will be the lesser of:
- 50% of your Weekly Earnings; or
- $600,

reduced by Other Income Benefits.

With respect to All Active Full-time Late Enrollees approved through Medical Underwriting with disability dates commencing within 12 months of enrollment date:
The Weekly Benefit will be the lesser of:
- 40% of your Weekly Earnings; or
- $600,

reduced by Other Income Benefits.

With respect to All Active Full-time Late Enrollees approved through Medical Underwriting with disability dates commencing 12 months or later after enrollment date:
The Weekly Benefit will be the lesser of:
- 50% of your Weekly Earnings; or
- $600,

reduced by Other Income Benefits.

Policy 000082

**JOINT APPENDIX 104**

With respect to All Active Full-time Late Enrollees declined by Medical Underwriting with Disability Dates commencing less than or equal to 5 years after coverage effective date. The Weekly Benefit will be the lesser of:
- 40% of your Weekly Earnings; or
- $600.

reduced by Other Income Benefits.

With respect to All Active Full-time Late Enrollees declined by Medical Underwriting with Disability Dates commencing more than 5 years after coverage effective date:
The Weekly Benefit will be the lesser of:
- 50% of your Weekly Earnings; or
- $600.

reduced by Other Income Benefits.

4. The Eligibility Waiting Period shown in the Schedule of Insurance of the Short Term Disability portion of Your Booklet-certificate is amended to read as follows:

Class 1:
When will You become eligible? (Eligibility Waiting Period)
You will be eligible for coverage on the date on which You complete a waiting period of 90 days of continuous service.

Class 2:
When will You become eligible? (Eligibility Waiting Period)
You will be eligible for coverage on the date on which You complete a waiting period of 180 days of continuous service.

5. The Eligible Class(es) shown in the Schedule of Insurance of the Long Term Disability portion of Your Booklet-certificate is amended to read as follows:

====================================================

3

Policy 000083

**JOINT APPENDIX 105**

Maximum Monthly Benefit: $10,000
Benefit Percentage: 50%

With respect to All Active Full-time Late Enrollees declined
by Medical Underwriting with Disability Dates commencing
less than or equal to 5 years after coverage effective date
Maximum Monthly Benefit: $6,667
Benefit Percentage: 40%

With respect to All Active Full-time Late Enrollees declined
by Medical Underwriting with Disability Dates commencing
more than 5 years after coverage effective date:
Maximum Monthly Benefit: $10,000
Benefit Percentage: 50%

8.  The **Eligibility Waiting Period** shown in the Schedule of
    Insurance of the Long Term Disability portion of Your
    Booklet-certificate is amended to read as follows:

    Classes 1 & 2:
    **When will You become eligible? (Eligibility Waiting
    Period)**
    You will be eligible for coverage on the first day of the month
    following the date on which You complete a waiting period of
    90 days of continuous service.

    Class 3:
    **When will You become eligible? (Eligibility Waiting
    Period)**
    You will be eligible for coverage on the first day of the month
    following the date on which You complete a waiting period of
    180 days of continuous service.

5

Policy 000084

**JOINT APPENDIX 106**

Who is eligible for coverage?
Eligible Class(es):
All Active Full-time Associates as follows:
(1) Hourly Pharmacists who work in California.
(2) Hourly Field Logistics Associates, Hourly Field
Supervisor positions in stores and clubs and Hourly
Pharmacists not based in California, excluding Associates
who are based in Puerto Rico.
(3) Non-Puerto Rico Hourly Associates except Hourly Field
Supervisor positions in stores and clubs, Hourly Field
Logistics Associates and Hourly Pharmacists who are
enrolled in a Weekly Disability Plan.

6. The Full-time Employment shown in the Schedule of
Insurance of the Long Term Disability portion of your
booklet-certificate is amended to read as follows:

Full-time Employment: 34 hours weekly

7. The Maximum Monthly Benefit and Benefit Percentage
shown in the Schedule of Insurance of the Long Term
Disability portion of Your Booklet-certificate is amended to
read as follows:

With respect to All Active Full-time On-Time Enrolled
Associates:
Maximum Monthly Benefit: $10,000
Benefit Percentage: 50%

With respect to All Active Full-time Late Enrollees approved
through Medical Underwriting with disability dates
commencing within 12 months of enrollment date:
Maximum Monthly Benefit: $6,667
Benefit Percentage: 40%

With respect to All Active Full-time Late Enrollees approved
through Medical Underwriting with disability dates
commencing 12 months or later after enrollment date:

4

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY
Hartford, Connecticut
Endorsement


Policyholder: WAL-MART STORES, INC.

Group Policy No.: GRH/GLT-205215

Effective Date: January 1, 2002

This endorsement forms a part of your Booklet-certificate which
describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees, the ERISA
section of Your Booklet-certificate is amended to read as follows:


Christine Hayer Repary, *Secretary*        Thomas M. Marra, *President*

GR-2025(496)A-HLA BC 7461 5th Rev. No. 4              5-'02

JOINT APPENDIX 108

ERISA

The Following Important Notice
is Provided by Your Employer
for your Information Only.

*Conforming Instrument*

For the purpose of meeting certain requirements of the Employee
Retirement Income Security Act of 1974, the following information
and the attached Claim Procedures and Statement of ERISA Rights
are provided for use with your booklet-certificate to form the
Summary Plan Description.

The benefits described in your booklet are provided under a group
plan by the Insurance Company and are subject to the terms and
conditions of that plan.

A copy of this plan is available for your review during normal
working hours in the office of the Plan Administrator.

1.  **Plan Name**

    Group Short Term Disability and Long Term Disability Plan
    for employees of WAL-MART STORES, INC.

2.  **Plan Number**

    501

2



Policy 000087

Case 3:10-cv-01813-JBA   Document 28   Filed 06/02/11   Page 88 of 131

3. Employer/Plan Sponsor

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR 72716

4. Employer Identification Number

71-0415188

5. Type of Plan

Welfare Benefit Plan providing Group Short Term Disability
and Long Term Disability.

6. Plan Administrator

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR 72716

7. Agent for Service of Legal Process

For the Plan:

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR 72716



3

Policy 000088

For the Policy:

Hartford Life And Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be
made on a plan trustee or the plan administrator.

8. **Sources of Contributions** -- The Employer pays the premium
for the insurance, but may allocate part of the cost to the
employee. The Employer determines the portion of the cost to
be paid by the employee.

9. **Type of Administration** -- The plan is administered by the
Plan Administrator with benefits provided in accordance with
the provisions of the applicable group plan.

10. The Plan and its records are kept on a Policy Year basis.

11. **Labor Organizations**

None

12. **Names and Addresses of Trustees**

None

Policy 000089

4

**JOINT APPENDIX 111**

### 13. Plan Amendment Procedure

The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.

Policy 000090

**JOINT APPENDIX 112**

*Statement of ERISA Rights*

You are entitled to certain rights and protections under the *Employee Retirement Income Security Act of 1974 (ERISA).* ERISA provides that all plan participants shall be entitled to:

1.  Receive Information About Your Plan and Benefits:

a)  Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

b)  Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

c)  Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

6

Policy 000091

**JOINT APPENDIX 113**

J. Prudent Actions by Plan Fiduciaries:

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

Policy 000092

3. Enforce Your Rights:

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

8

Policy 000093

JOINT APPENDIX 115

4.  *Assistance with Your Questions:*

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.



9

Policy 000094

**JOINT APPENDIX 116**

Claim Procedures for Disability Income Insurance Plans

1. Claims for Benefits:

If you would like to present a claim for benefits for yourself or your insured dependents, you should obtain a claim form(s) from your Employer or Plan Administrator. The applicable section of such form(s) should be completed by (1) you, (2) the Employer or Administrator and (3) the Attending Physician or hospital.

Following completion, the claim form(s) must be forwarded to the individual authorized to evaluate claims (Administrator or Insurance Company's Claim Representative). The individual authorized to evaluate claims will determine if benefits are payable and, if due, issue payment(s) to you.

The Insurance Company will make a decision no more than 45 days after receipt of your claim. The time for decision may be extended for two additional 30 day periods provided that, prior to any extension period, the Insurance Company notifies you in writing that an extension is necessary due to matters beyond the control of the plan, identifies those matters and gives the date by which it expects to render its decision. If your claim is extended due to your failure to submit information necessary to decide your claim, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to our request.



10

Policy 000095

**JOINT APPENDIX 117**

The written decision will include: 1) specific reasons for the decision, 2) specific references to the plan provisions on which the decision is based, 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary, 4) a description of the review procedures and time limits applicable to such procedures, 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal, and, 6)(A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the denial, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the denial and that a copy will be provided free of charge to you upon request, or (B) if denial is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request.

**JOINT APPENDIX 118**

2. Appealing Denial of Claims:

On any wholly or partially denied claim, you or your representative may appeal to us for a full and fair review. You may:

1. request a review upon written application within 180 days of the claim denial;

2. request, free of charge, copies of all documents, records, and other information relevant to your claim; and

3. submit written comments, documents, records and other information relating to your claim.

The Insurance Company will make a decision no more than 45 days after we receive your appeal. The time for decision may be extended for one additional 45 day period provided that, prior to the extension, the Insurance Company notifies you in writing that an extension is necessary due to special circumstances, identifies those circumstances and gives the date by which it expects to render its decision. If your claim is extended due to your failure to submit information necessary to decide your claim on appeal, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to the request. The written decision will include specific references to the plan provisions on which the decision is based and any other notice(s), statement(s) or information required by applicable law.



12

Policy 000097

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY
Hartford, Connecticut
Endorsement

Policyholder:  WAL-MART STORES, INC.

Group Policy No.:  GRH/GLT-205215

Effective Date:  January 1, 2005

This endorsement forms a part of your Booklet-certificate which
describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees, Your Booklet-
certificate is amended as follows:

1. The Total Disability or Totally Disabled definition shown in
the Plan of Insurance section of the Long Term Disability
portion of Your Booklet-certificate is amended to read as
follows:

    **Total Disability or Totally Disabled** means that:
    1. during the Elimination Period; and
    2. for the next 12 months, you are prevented by:
        a) accidental bodily injury;
        b) sickness;
        c) Mental Illness;
        d) Substance Abuse; or
        e) pregnancy,

Christine Hayer Repasy, *Secretary*          Thomas M. Marra, *President*

GR-2025(496)A-HLA BC 7461 5th Rev. (No. 8)          12-'04

I

**JOINT APPENDIX 120**

from performing the Essential Duties of Your Occupation, and are under the care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.

"Your Occupation" includes similar job positions with the Employer, which may be offered to you, with a rate of pay 50 % or greater of your Indexed Pre-disability Earnings.

2

Policy 000099

**JOINT APPENDIX 121**

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY
Hartford. Connecticut
Endorsement

Policyholder: WAL-MART STORES. INC.

Group Policy No.: GRH/GLT-205215

Effective Date: June 1, 2003

This endorsement forms a part of your Booklet-certificate which describes the provisions of the group policy specified above.

With respect to All Active Full-time Employees. Your Booklet-certificate is amended as follows:

1.  The **Full-time Employment** shown in the **Schedule of Insurance** of the Short Term Disability Portion of Your Booklet-certificate is amended to read as follows:

    Full-time Employment:                    An employee who works for the Policyholder on a regular basis in the usual course of the Policyholder's business and is listed in Wal-Mart's eligibility system as Full-time

2.  The **Full-time Employment** shown in the **Schedule of Insurance** of the Long Term Disability Portion of Your Booklet-certificate is amended to read as follows:

    Full-time Employment:                    An employee who works for the Policyholder on a regular basis in the usual course of the Policyholder's business and is listed in Wal-Mart's eligibility system as Full-time

Christine Hayer Repasy, *Secretary*            Thomas M. Marra, *President*

GR-2025(496)A-HLA BC 7461 5th Rev. (No. 6)                                    6-'03

I

**JOINT APPENDIX 122**

...... INSURANCE
**COMPANY**
Hartford, Connecticut
Endorsement

Policyholder: WAL-MART STORES, INC.

Group Policy No.: GRH/GLT-205215

Effective Date: January 1, 2000

This endorsement forms a part of your Booklet-certificate which describes the provisions of the group policy specified above.

The definition of Other Income Benefits as shown in the Definitions section of the Long Term Disability portion your booklet-certificate is amended to read as follows:

Other Income Benefits means the benefits shown below:
(1) The amount of disability or annuity benefits from any:
   (a) group insurance or pension plan;
   (b) Railroad Retirement Act;
   (c) plan or arrangement or coverage, whether insured or not, as a result of employment by or association with your employer or as a result of membership in or association with any:
      (i) group;
      (ii) association;
      (iii) union; or
      (iv) other organization; or
   (d) plan provided by law.
(2) Pension benefits that commence after the date of Disability and any disability based pension benefits.
(3) The amount of benefits to which you are entitled under any:
   (a) workers' compensation law;
   (b) occupational disease law;

*Lynda Godkin*
Lynda Godkin, Secretary

*[signature]*
Lorraine A. Smith, President

GR-2025(496)A-HLA BC 7461 5th Rev. No. 1                4-'01

l

**JOINT APPENDIX 123**

... or law of like intent.

which is made in lieu of workers' compensation benefits and paid to:

(a) you;
(b) your employer; or
(c) a workers' compensation insurer;

but only to the extent that any damages or settlement represent your loss of income.

(5) The amount of disability or retirement benefits under the United States Social Security Act to which you and your spouse and children may be entitled because of your disability or retirement.

(6) Portion of a settlement or judgment, minus associated costs of a lawsuit, that represents or compensates for your loss of earnings.

Other Income Benefits will include:

(1) early retirement benefits if you so elect;
(2) disability income benefits under a group life insurance plan regardless of whether you may or may not elect to apply for such benefits even though you are Disabled;
(3) temporary and permanent disability benefits provided under any Workers' Compensation law or any other act or law of like intent; and
(4) any "no-fault" automobile policy insurance plan.*

If you are paid Other Income Benefits in a lump sum, The Hartford will pro-rate the lump sum:

(1) over the period of time it would have been paid if not paid in a lump sum; or
(2) if such period of time cannot be determined, over a period of 60 months.

If you are Disabled and you receive Other Income Benefits in a lump sum, they will be considered Other Income Benefits regardless of any roll-over provision or election into any fund, plan or arrangement.

The Hartford may make a retroactive allocation of any retroactive Other Income Benefit payments.

Other Income Benefits will not include:

(1) proceeds from any:
(a) source of personal investment income;

2

Policy 000102

**JOINT APPENDIX 124**

... plan, unless the plan is ~~purged through a group-sponsored or employer-related program; or~~

  (c) Veteran's Administration Disability benefits.

 (2) benefits from military retirement pension plans;

 (3) distribution from any form of profit sharing regardless of pre-tax or after-tax treatment as found under Section 401(k) of the Internal Revenue Code;

 (4) proceeds or income from any:

  (a) Individual- or employer- sponsored I.R.A., Individual Tax Sheltered Annuity, or any deferred compensation plan;

  (b) Employee Stock Option Plan or any thrift plan;

  (c) a partner or proprietor H.R. 10(Keough Plan) under the Self-Employed Individual Tax Retirement Act; or

  (d) a capital account.

 (5) Non-disability pension benefits.

\* Not applicable to residents of Pennsylvania.

3

Policy 000103

**JOINT APPENDIX 125**

Report: E401773R                    The Hartford - Benefit Management Services                                    Page 30
Office: Atlanta Disability Claim Office      Comments: Summary Detail Report
Date Of Report:12/07/2010              Date Range: 09/28/2005 - 03/29/2010
                                          For business Role: Examiner
                                    . Claimant: Julie Heimeshoff 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
                                          Case: Wal-Mart Stores, Inc.
                              Claim Owner: Mary E Roman Role: Examiner Office: Atlanta

had to cut interview short as ee was ill and unable to talk much.  ee states just got back from 2 week treatment with mayo clinic.  they dx her with Lupus, fibro and chronic fatigue.  Ee states she is having severe pain

Functionality

ee spends time in bed due to pain and fatigue.

Job Requirements/Work History/Relationship With Employer/Plans For Rtw

ee does not expect to RTW.  Salary cont. ended 9/8/05.  EE did work more than 1/2 day 6/8/05 but did leave early.

Social Security/Other Income

will have ee apply ssd

Other

Got # of supervisor to send PDA to  Sarah Clark  479-273-8771.  ee has copies of her records and will send


09/28/2005 02:44:18 p.m. ET John Wentworth Examiner Atlanta  CLAIM MANAGEMENT
Recommendation/Plan: Examiner Claim Management Plan                          Sign off required: N

S:  EE complains of joint inflammation, fatigue, pain that began May of 1990.  Diagnosed with Lupus in 1991 and Fibro in 1993.  EE states early in morning or on days where she experiences a high level of pain and muscle fatigue, must have assistance getting out of bed.

O:  EE is a 37 yr old female Sr. PR Manager with walmart.  DOH 4/29/86 and LTD 1/1/92.  EE has 3 yrs of college education.  EE is married with 1 child.

Pension No
POF B

APS dated 9/23/05 from Dr. Saitta, Rheumatologist, lists dx as Lupus with a secondary dx of fibromyalgia.  Ee reports pain and fatigue.  FOV was 7/15/03.  EE has apt. at Mayo clinic 9/8/05.  Dr. states ability to do acitivities is sporadic depending on ee condition that day.

A:  Ee is not subject to Pre-x. EE payable at 50%.  No gap.  TDOO under investigation.

P:  Do interview and send acknowledgment.  Send med request to dr Saitta, dr. goss, and Dr hatley.


09/28/2005 02:32:32 p.m. ET John Wentworth Examiner Atlanta  LTD/PW CLAIMANT INTERVIEW
LTD/PW CLAIMANT INTERVIEW
Relationship to Claimant: Claimant      Date of Call: 09/28/2005                  Not Contacted: Left Message

EXHIBIT
B



THE
HARTFORD

November 29, 2006

Krafchick Law Firm
Attn: Kristian Soholm
2701 First Ave.
#340
Seattle, WA  98121

Policy Holder:     Wal-Mart Stores, Inc.
Associate:         Julie E. Heimeshoff
Policy Number:     GLT024554


Dear Ms. Soholm:

We are writing to you about your client's claim for Long Term Disability (LTD) benefits. These benefits are under the group insurance policy number GLT024554 for Wal-Mart Stores, Inc.

We have completed our review of your client's claim for benefits and have determined that she does not meet the definition of Total Disability throughout and beyond the Elimination Period (06/09/05-09/08/05).  Because of this, Long Term Disability (LTD) benefits are not payable to her under the terms of this policy.

On page 14 of the Policy, it states "You will be paid benefits if, while insured under the group policy, you:
   (1) become Totally Disabled;
   (2) remain Totally Disabled throughout the Elimination Period;
   (3) remain Disabled beyond the Elimination Period; and
   (4) submit proof of loss satisfactory to The Hartford."

On page 5 of the Policy, it states "Total Disability or Totally Disabled means that:
   (1) during the Elimination Period; and
   (2) for the next 12 months, you are prevented by:
      (a) accidental bodily injury;
      (b) sickness;
      (c) Mental Illness;
      (d) substance abuse; or
      (e) pregnancy,
from performing the essential duties of your occupation, and are under the continuous care of a Physician and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

Benefit Management Services
Atlanta Disability Claim Office
P.O. Box 1810
Alpharetta, GA 30023-1810
Facsimile (860)392-0713


Hartford Admin. Record 000039


**JOINT APPENDIX 127**

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training or experience.

'Your occupation' includes similar job positions with the Employer which may be offered to you, with a rate of pay 50% or greater of your Indexed Pre-Disability Earnings."

On page 6 of your policy, it states "Elimination Period means the period of time you must be Totally Disabled before benefits become payable."

On page 4 of your policy it states "Elimination Period: With respect to associates in Classes 1-3, the latter of:
(1) the first 90 days of any one period of Total Disability; or
(2) the end of your Employer sponsored salary continuation program."

We based our decision to deny your claim on policy language. All the papers contained in your client's file were viewed as a whole. This included:

1) A signed LTD application from Ms. Heimeshoff dated 08/22/05.
2) A signed Attending Physician Statement from Dr. Saitta dated 09/23/05.
3) Medical records from Dr. Saitta from 06/09/05-09/23/05.
4) Medical records from the Mayo Clinic from September 2005.
5) Medical records from Dr. Goss from 11/02/04-09/19/06.
6) A Physical Capacity Exam (PCE) by Dr. Becker dated 07/19/06.
7) An independent review of your client's medical records by Dr. Bress, Rheumatologist, from the University Disability Consortium dated 11/20/06.
8) Attempt by Dr. Brees to discuss your client's case with Dr. Saitta on 11/20/06.
9) A Physical Demands Analysis from Wal-Mart for a Senior Public Relations Manager showing her job as sedentary in nature.

We had your client's medical records reviewed by an independent physician, Dr. Bress on 11/20/06 to determine if your client was able to perform the essential duties of her occupation as a Senior Public Relations Manager throughout and beyond the Elimination Period (06/09/05-09/08/05). Dr. Brees attempted to discuss Ms. Heimeshoff's case with Dr. Saitta on 11/20/06 but was informed to put his questions in writing. At this time, Dr. Bress has not received a response from Dr. Saitta. It should be noted, as stated in our 12/08/05 denial letter, that we never received a response from Dr. Saitta for clarification on your client's functionality that was sent to him on 10/21/05, 11/1/05, 11/8/05 and 11/21/05.

After reviewing all of the available records, it is Dr. Bress's medical opinion that Ms. Heimeshoff was able to physically perform the activities of her sedentary occupation since 06/08/05. Exams, including a team of physicians at the Mayo Clinic, have consistently revealed no exam findings except for tender points. There is no objective findings to support continued medical supervision. In addition there is no support for Dr. Becker's assertion that work rehabilitation is risky because of heart rate elevation. It is stated in her medical records that she does not exercise. Because of her

Hartford Admin. Record 000040

# JOINT APPENDIX 128

deconditioning, it is not surprising that her heart rate increases with activities. It is Dr. Bress's opinion that the increase in heart rate during the PCE is of no diagnostic relevance.

The Physical demands Analysis completed by Ms. Heimeshoff's employer shows that her job is sedentary in nature. Based upon Dr. Bress's review of your client's records, it is his opinion that your client is physically able to perform the activities of her sedentary occupation with her diagnosis of Fibromyalgia since 06/08/05. Therefore, the current medical does not support that your client lacks the functionality to perform the duties of her own occupation throughout the Elimination Period and no LTD benefits are payable to her.

The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

Please send your appeal letter to:

Claim Appeal Unit
Benefit Management Services
Hartford Life Insurance Company
P.O. Box 2999
Hartford, CT 06104-2999

If you have any questions, please feel free to contact our office at (800) 492-5678, x64230. Our office hours are 8:00 AM to 8:00 PM EST, Monday through Friday.

Sincerely,



John Wentworth, Senior Examiner
Hartford Life and Accident Insurance Co.

CC:   Julie E. Heimeshoff

Hartford Admin. Record 000041

**JOINT APPENDIX 129**



THE
HARTFORD

May 31, 2006

Steven Krafchick
2701 First Ave.
#340
Seattle, WA 98121

Policy Holder:      Wal-Mart Stores, Inc.
Associate:          Julie E. Heimeshoff
Policy Number:      GLT024554

Dear Mr. Krafchick:

This letter is about your claimant's claim for Long Term Disability (LTD) benefits. I am in receipt of your 5/19/06 letter. I have attached a copy of Ms. Heimeshoff's LTD policy, her LTD claim file, and copy of our internal notes. The Wal-Mart policy does not go through underwriting before being provided LTD coverage.

As stated in our 12/8/05 letter, we did not deny Ms. Heimeshoff's claim based upon the medical records not supporting her Disability. The reason for the denial was the fact that we were unable to get her attending physician to respond to our letters asking for clarification on her functionality, thus preventing us from determining if she continued to meet the policy definition of Disabled. We still have not received this clarification. In this case, a formal appeal does not need to be filed to re-open her claim. Our 12/8/05 letter states that we need a response from Dr. Saitta to our 10/21/05 letter asking if she can do sedentary work to re-open her claim. Once we receive it, we will re-open her claim.

If you have any questions, please feel free to contact our office at (800) 492-5678, x64230. Our office hours are 8:00 AM to 8:00 PM EST, Monday through Friday.

Sincerely,


John Wentworth, Senior Examiner
Hartford Life and Accident Insurance Co.


Benefit Management Services
Benefit Disability Claim Office
Alpharetta Disability Claim Office
Alpharetta, GA 30023-1810
Alpharetta (860)392-0713-1810
Facsimile (860)392-0713


Hartford Admin. Record 000048


**JOINT APPENDIX 130**



Hartford Life
Atlanta Disability Claim Office
P. O. Box 1810
Alpharetta, GA 30023-1810

November 26, 2007

Krafchick Law Firm
Kristian Erik Soholm, Attorney at Law
2701 First Ave, Ste 340
Seattle, WA 98121-1123

Policy Holder:   Wal-Mart Stores, Inc.
Claimant:        Julie E. Heimeshoff
Policy Number:   GLT024554

Dear Mr. Soholm:

We have received the appeal that you submitted in connection with the above referenced claim for Long Term Disability (LTD) benefits. Please refer to our letter of 11/29/06 (copy attached) which listed the policy provisions that apply to this matter. That letter also listed the evidence contained in your client's claim file. We have again reviewed those items, along with the following specific information:

- Appeal Letter from you dated 5/24/07 and 9/26/07
- Fibromyalgia Literature
- Neuropsychological Report by Sheila Bastien dated 8/29/07 and 8/30/07
- Medical Letter from Garrett Goss Clinic dated 9/24/07
- Medical Note from Dr. Michael Saiita dated 8/25/07
- Letter from Everett Pacific Industrial Rehabilitation dated 9/4/07
- CPX report from Pacific Fatigue Laboratory dated 8/27/07 and 8/28/07
- Letters from Julie Heimeshoff dated 4/22/07
- Letter from Volker Heimeshoff dated 4/8/07
- Letter from Paula Stimmel undated
- Letter from Sherli Burns dated 8/5/06
- Letter from Kaylynn Jordan dated 4/24/07
- Letter from Carla Murray dated 4/24/07
- Independent Medical Reviews

As part of your appeal you have presented literature, additional medical information and letters from your client, family and friends. Also, you note disagreement with the claim handling, investigation and that your client should have been physically examined by an Independent Medical Professional.

In order to provide a fair and impartial appeal review, the claim file was examined.

Hartford Admin. Record 000069

**JOINT APPENDIX 131**

Page 2
Julie E. Heimeshoff

The date of disability was 6/9/05 but your completed claim filing was 10/2/06, over a year later, an Independent Medical Examination would not have been a true example of your client's functionality. A physical examination would not support your client's level of functionality at the time of disability as it had been over a year between her date of disability and the final claim filing. Therefore, in order to medically clarify her condition and level of functionality as of the 6/9/05 date of disability, your client's file was referred for Independent Medical Reviews by Specialists.

Your client's medical records were reviewed by a Board Certified Rheumatologist. The medical record supports your client retains the residual physical capacity to perform sedentary work, and therefore has the work capacity to perform her occupation. The basis of the impairment supported by the attending physicians is the subjective complaints of pain and fatigue that is reported to affect cognitive function.

The data fails to support severity. The assessment of the PBPCE which was performed by Dr. Theodore Becker, PhD. on 08/10/2006 was reviewed. The elevation in the pulse is consistent with deconditioning; however, it is not of a sufficient severity to preclude your client from performing sedentary work, nor does the elevation in the pulse support that she would fail from a work rehabilitation program. The routine recommendations for the treatment of fibromyalgia include exercise and life style modifications. There is no support in the record that your client would not tolerate, with adequate effort and training, a work hardening program to improve conditioning, and thereby improve work capacity. The residual physical capacity is sufficient for sedentary work occupations.

The effect of pain and the medication used to treat pain requires the recommendations of no working at unprotected heights, no driving a company vehicle, no working with heavy machinery or safety sensitive materials. The recommendations are made to avoid safety risks to the claimant or others as a result of potential decreased cognitive function from the pain or the pain medications.

Your client, based on the medical record, would be independent, ambulating without assistive devices and retains the ability to sit, stand and walk, listen and talk. There are no restrictions on fine motor manipulation or computer entry work. She has subjective complaints of pain and fatigue; the symptoms were reportedly present since 1991, as per the outpatient note with Dr. Shayan Alam on 9/15/05. It is unclear whether the change in 6/05 that resulted in an inability to work was the same pain that dated to 1991 while she was working for 14 years (with pain).

Your client's medical records were also reviewed by a Board Certified Clinical Neuropsychologist. The records indicate she was reportedly diagnosed with Lupus in 1991 and with Fibromyalgia in 1994. The diagnosis of Lupus was doubted on comprehensive evaluation in 2005, with no evidence of the disease at that time. Ms. Heimeshoff apparently complained of a number of somatic problems including pain (multiple types), fatigue, problems with stamina, sleep, as well as difficulties with concentration and memory.

The notes suggested depression with psychopharmacologic treatment that was felt to have had little influence on her status. Ms. Heimeshoff reportedly enjoyed her job and attempted to maintain work activities with the help of her family, friends, and understanding coworkers, but stopped working in 6/05. Developmental history was reported to be unremarkable with a mention of childhood speech problems, yet no note of subsequent sequelae and high school GPA = 3.87. The claimant's IQ was measured in 1973 and was reported to be 127 (unverified report, unspecified testing method).

Hartford Admin. Record 000070

**JOINT APPENDIX 132**

Page 3
Julie E. Heimeshoff

In addition to problems noted above, the medical history was reportedly significant for asthma, gynecological problems with a hysterectomy, osteoporosis, pericarditis, gastrointestinal problems, temporomandibular joint dysfunction, and migraine headaches. Brain imaging was reported to be within normal limits.

Your client's mental health history was noted to be significant for marriage counseling during Ms. Heimshoff's first marriage. There have reportedly been several trials of treatment with antidepressant medications, with no apparent concomitant psychiatric or psychotherapeutic follow-up. There was a reported psychiatric evaluation as a part of Ms. Heimshoff's Mayo Clinic work-up in 2005 with reported indications of depression and anxiety symptoms and suggestions for pharmacotherapy and counseling/psychotherapy. There was no indication of ongoing psychiatric or psychotherapeutic follow-up.

Ms. Heimeshoff is reportedly being treated with long acting opioid analgesics as well as hypnotic medications. A neuropsychological assessment was stated to have been conducted on 9/13/07. Some of the test scores were included in the report. Some cognitive symptom validity testing was done and reported to suggest adequate effort. Assessment of affect was limited to BDI-II which generated a score within the mildly depressed range, though it was interpreted as indicating "minimal depression". The examination of the report and test results suggested largely normal cognitive performance, with some weak and inconsistent scores. Performance on measures assessing speed of information processing was inconsistent with some of the simpler measures generating low scores, while more complex ones producing normal levels of performance. While measures of manual motor speed and dexterity were in the mildly to moderately impaired range, Ms. Heimeshoff still demonstrated entirely normal performance with both hands on a complex task requiring efficient integration of spatial and motor functioning. Her attention and immediate memory performance was well within normal limits. Memory performance was weak, although the assessment was quite limited, based on one verbal and one non-verbal measure. Influence of emotional/personality status on current presentation was not sufficiently assessed. Symptom validity with regard to endorsement of complaints of somatic or emotional difficulties was not assessed.

Information relevant to the field of neuropsychology did not support the presence of notable restrictions or limitations. Results of the neuropsychological assessment generated largely normal findings with some variable and low scores.

The available data relevant to the field of neuropsychology do not indicate restrictions or limitations. The presence of problems is based on Ms. Heimshoff's subjective complaints. The neuropsychological assessment offered limited evaluation of cognitive and emotional functioning that does not rule out the influence of emotional factors such as possible somatoform disorder, or motivation for secondary gain. It may be noted that the presence of somatoform disorder does not rule out successful engagement in work activities. Ms. Heimeshoff is apparently being maintained on several medications including opiate analgesics and hypnotics. These medications would require restrictions from working with heavy machinery, driving a company vehicle, and no working at heights.

Hartford Admin. Record 000071

**JOINT APPENDIX 133**

Page 4
Julie E. Heimeshoff

The neuropsychological evaluation results suggested a largely normal level of functioning with some variable and weak scores. Some areas of functioning were insufficiently addressed. Most importantly, assessment of "affective status" was based on a single brief inventory assessing depression and not containing any validity indicators. Affective and somatoform factors are likely influences in this case and necessitate comprehensive testing (e.g., MMPI-2). Assessment of learning and memory was quite limited with one measure in the verbal and one in the nonverbal domain. Some additional learning and memory-related information can be gained from other data, yet overall this testing seems insufficient.

There was some concern regarding test administration and scoring. "Word Memory Test" was not listed among the administered tests, yet was included among the test results with a reported "perfect score". If the examiner referred to the Green's Word Memory Test, it contains several indices and it is unclear which indicator was reported or which portions of this measure were administered.

With regard to interpretation, the examining neuropsychologist seems to have overemphasized some of the findings to suggest pathology without sufficient justification. For example, despite a very good, high average level score on the information subtest, a measure of fund of general knowledge, performance was felt to indicate cognitive slippage, some loss of remote memory, and confusion. The source of this interpretation was not clear. An error on the most difficult and commonly missed item of the Arithmetic subtest indicated "a problem with dyscalculia" despite a clearly normal overall score that was within the upper portion of the average range. "Organic-like reversals" were reported for the Digit Span subtest despite a normal level score, and common occurrence of reversal errors regardless of cerebral dysfunction. On the Tactual Performance Test, the three timed block placement trials were performed well within normal limits relative to Heaton (2004) age and education-stratified norms. In the report this performance was felt to suggest "tactual-perceptual problem with her left hand, or some difficulties in learning". In fact, this performance suggests good manual dexterity and speed of processing and normal procedural learning over trials. One mildly impaired score on the Thurstone Verbal Fluency Test was felt to suggest "brain dysfunction/damage", despite good performance on several other measures sensitive to cerebral impairment. These limitations as well as some others place doubt on the examining neuropsychologist's conclusions.

Based on the Independent Medical Reviews by Specialists the medical evidence does not support the limitation that your client is unable to perform any level of work/no work capabilities. From review of the additional information provided on appeal along with review of the information previously in file, there is no medical or vocational evidence to refute our original decision. Therefore, the appeal review concludes that the weight of the medical and vocational evidence in our file supports that your client is able to perform at least sedentary full time work and her own occupation is identified within that capacity. Because she is employable in her own sedentary work, she is not disabled and the decision to deny LTD benefits was correct under the terms of the policy. This is our final decision and the file remains closed.

Hartford Admin. Record 000072

**JOINT APPENDIX 134**

Page 5
Julie E. Heimeshoff

You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your client's claim. You may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA").

Sincerely,

Robyn J. Cóte, Appeal Specialist
Hartford Life and Accident Insurance Co.

Enclosure

Hartford Admin. Record 000073

**JOINT APPENDIX 135**

05/25/2007 FRI 12:43  FAX 206 374 7377 Krafchick Law Firm                    @002/002



Legal Services for Injured People

Steven P. Krafchick
   *Attorney at Law*

Kristian H. Soholm
   *Attorney at Law*

*Legal Assistants*
Julie Busko
Curtis Williams
Nadia Sayah-Sira

May 24, 2007

John Wentworth
Hartford Life Insurance Company
Benefits Management Services
PO Box 2999
Hartford, CT  06104

> Re:   Our Client:    Julie Heimeshoff
>       Your Insured:  Julie E. Heimeshoff
>       Claim No.:     GLT024554
>       Date of Loss:  6/7/2005

Dear Mr. Wentworth:

Please take notice that we are appealing your decision to deny our client's claim for Long Term Disability (LTD) benefits as stated in you letter of November 29, 2006, received by our firm on December 4, 2006.

We are currently gathering material to support Ms. Heimeshoff's disability and will need more time to submit information. We request that you provide until September 30, 2007 to submit additional materials we agree to the tolling of the time you will need to make your decision until the receipt of these supporting documents. This date is requested due to the availability of experts during the coming summer months and that our firm is expected to be moving to a new location in late August or early September.

If we do not hear from you to the contrary within fourteen (14) days, we will consider that as an agreement to this extension request.

Very truly yours,

KRAFCHICK LAW FIRM

Steven P. Krafchick

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123 (206)374-7370 Fax (206)374-7377 Email: klf@krafchick.com

05/25/2007  3:41PM

Hartford Admin. Record 000095

**JOINT APPENDIX 136**



THE
HARTFORD

June 5, 2007

Steven Krafchick
2701 First Ave.
#340
Seattle, WA  98121

Policy Holder:  .   Wal-Mart Stores, Inc.
Associate:           Julie E. Heimeshoff
Policy Number:   GLT024554

Dear Mr. Krafchick:

We have received your letter indicating that you are appealing the decision that was made on your client's claim for Long Term Disability (LTD) benefits.

Your letter states that additional information will be submitted in connection with the appeal. Please send that information to the following address:

    BMS Claim Appeal Unit
    Benefit Management Services
    Hartford Life Insurance Company
    P.O. Box 2999
    Hartford, CT  06104-2999

Please note that we will grant an extension ending on September 30, 2007.  If we do not receive additional information by that time, we will evaluate your appeal using the information currently in our file.

Appeal Unit
Benefit Management Services
Hartford Life and Accident Insurance Co

**JOINT APPENDIX 137**

## Krafchick Law Firm

Legal Services for Injured People

Steven P. Krafchick
*Attorney at Law*

Kristian E. Soholm
*Attorney at Law*

May 18, 2006

*Legal Assistants:*
Julia Busko
Curtis Williams
Sarah Thai
Cody Barber

John Wentworth
Hartford Life and Accident Insurance Co.
Claim Appeal Unit
P.O. Box 2999
Hartford, CT 06104

RECEIVED

MAY 26 '06

APPEALS UNIT

> **RE:**   Our Client:      **Julie Heimeshoff**
> Your Insured:   **Wal-Mart Stores, Inc.**
> Claim No.:      **GLT024554**
> Date of Loss:   **12/8/2005**

Dear Mr. Wentworth:

We represent Julie Heimeshoff, who has a disability claim with Wal-Mart Stores, Inc. Please send all future correspondence in this matter to us. Also, please confirm the accuracy of the above-referenced claim number and advise us of any payments you have made to our client.

We have a copy of your letter to Ms. Heimeshoff, dated December 8, 2005. We understand that you have denied her Long Term Disability claim on the basis of a failure to provide satisfactory Proof of Loss to the Hartford, specifically, The Hartford's request for clarification of her functionality. We also understand that you have given her notice that she has 180 days from the date she received your letter to appeal.

**We are appealing Hartford Life and Accident Insurance Company's denial of Ms. Heimeshoff's long term disability benefits.** We are requesting that you allow us to submit additional information in support of our client's claim. We ask that you provide us an additional one hundred eighty (180) days from our receipt of the requested complete claim record in order to submit information.

So that we can fully understand the claim and advise our client, please provide us with a complete copy of the administrative record relating to our client's claim for disability benefits. This should include the entire claim file with copies of any statements taken from our client, or others, regarding our eligibility for disability benefits; copies of all correspondence between our client and your company regarding this claim for disability benefits; a copy of the applicable disability policy; all applications for benefits completed by our client; all medical records received and/or reviewed regarding our client's claim for disability benefits; all medical evaluations pertaining to our client's qualification for benefits; all other expert consultants or internal evaluations of the client's physical condition, mental condition, or qualification for

Hartford Admin. Record 000763

2701 First Avenue, Suite 340   Seattle, Washington 98121-1123   (206)374-7370   Fax (206)374-7377

## JOINT APPENDIX 138

May 19, 2006
Page 2

benefits; all documents relating to requests for disability benefits from Social Security or other agencies; all internal notes and evaluations; a copy of policies and procedures governing handling of this claim; and any additional information you may have to assist us in evaluating this case fairly. We also request your underwriting file for this claim. An authorization for release of this information signed by our client is enclosed.

If you contend that this claim is governed by ERISA, please identify the plan administrator (name, address, phone number, fax number) and provide a copy of the Summary Plan Description or tell us the name, phone and fax numbers, and address of the person to contact to get the SPD. Also provide a copy of the insurance policy or policies applicable to our client's claim for disability benefits and a copy of Form 5500 filed with the Department of Labor.

In particular, if you believe this plan is governed by ERISA, we also request a copy of all documents, records, and other information relevant to our client's claim for benefits pursuant to 29 CFR 2560.503-1. This should include all documents, records or other information that was relied upon in making the benefit determination; that was submitted, considered, or generated in the course of making the benefit determination without regard to whether such document, record, or other information was relied upon in making the benefit determination; that demonstrates compliance with required administrative processes or safeguards; or that constitutes a statement of policy or guidance with respect to the plan concerning the denied benefit for our client's diagnosis, whether or not it was relied on in making the benefit determination. Furthermore it should include any internal rule, guideline, protocol, or other similar criterion applicable to handling of this claim.

Whether or not you contend this claim is governed by ERISA, we also request that you tell us the amount of the monthly benefit our client will be entitled to if eligibility for benefits is established under the applicable policy or plan. Please let us know if there are any cost of living adjustments or other income deductions that you believe would apply.

We hereby request that you provide us with one hundred eighty (180) days from our receipt of the requested complete administrative record to submit additional information in support of our client's claim. If we do not hear from you to the contrary within fourteen (14) days, we will consider that as an agreement to this extension request.

We are currently investigating this case and its implications for our client. If you can respond to this letter within the next week or so, we are certain we can establish a cooperative working relationship with you to resolve this claim.

Very truly yours,

KRAFCHICK LAW FIRM

Steven P. Krafchick

Encl.: Auth. for Release

Hartford Admin. Record 000764

2701 First Avenue, Suite 340   Seattle, Washington 98121-1123  (206)374-7370   Fax (206)374-7377

# JOINT APPENDIX 139



## THE HARTFORD

## LTD PAYMENT OPTIONS AND REIMBURSEMENT AGREEMENT

The policy issued by Hartford Life Insurance Company/Hartford Life and Accident Insurance Company (The Hartford) provides that Long Term Disability (LTD) benefits will be reduced by the amount of any Other Income Benefits which you are eligible to receive. Please refer to your Insurance Certificate Booklet for a full description of Other Income Benefits.

We understand that you have applied for the Other Income Benefits shown below, but that no decision has yet been made on that application. If your LTD benefits are calculated without a reduction for Other Income Benefits and those benefits are later awarded on a retroactive basis, a sizable overpayment of your LTD benefits could result. You may wish to avoid accumulation of a large overpayment by having us deduct an estimated Other Income Benefit amount from your LTD benefit payments.

Please tell us whether or not to use an estimated Other Income Benefit amount by checking Option A or Option B below and signing this form.

In the Options below Other Income Benefits means    Social Security Disability

- [ ] **A.** Please estimate the amount of my monthly Other Income Benefits and reduce my monthly Long Term Disability benefit by this amount. The Hartford will adjust my monthly LTD benefit rate when they receive proof showing the amount of Other Income Benefits awarded or proof of denial.

- [x] **B.** Please pay me my monthly Long Term Disability benefit with no reduction for estimated Other Income Benefits. I understand that this may result in an overpayment of my LTD benefits which I will be required to refund to The Hartford in a lump sum.

If I receive Long Term Disability benefits greater than those which should have been paid as a result of choosing either of the above options, I understand that I will be required to provide a lump sum repayment to The Hartford. The Hartford has the option to reduce or eliminate future Long Term Disability benefit payments in order to recover any overpayment balance that is not reimbursed.

_Julie E. Heimeshoff_
Name *(Please print)*

_1052_
Social Security Number

_[signature]_
Signature

_8-22-05_
Date

LC-6436-2

_Pension_
_ru_

Retirement / Pension Questionnaire

Retirement /Pension benefits may be a reduction to your Long Term Disability (LTD) benefit under the terms of your LTD policy. In order to determine if receipt of these benefits will affect your claim, please provide the following information.

Name: Julie Heimeshoff    SS#: 11052

Please answer all of the following for any past or present employer:

| | |
|---|---|
| Yes / **No** | I am currently receiving **retirement / pension benefits**. If yes, please attach a copy of your approval letter and/or most recent pay stub indicating your benefit start date. |
| Yes / **No** | I have applied for (or will apply for) **retirement / pension benefits** on _____ (date), but have not yet received a determination on the start date and amount. If yes, please complete the retirement benefit information at the bottom of this form. |
| Yes / **No** | In the future, I may become entitled to **retirement / pension benefits** on _____ (month/year). If yes, please complete the retirement benefit information at the bottom of this form. |
| Yes / **No** | I have already received a **lump sum distribution** from an employer retirement / pension fund. If yes, please attach copy of lump sum distribution notice. |
| Yes / **No** | I started receiving (or will be entitled to receive) a **military retirement benefit** on _____ (date). If yes, please complete the retirement benefit information at the bottom of this form. |
| Yes / **No** | I will be entitled to receive a **union retirement benefit** on _____ (date). Please complete the retirement benefit information at the bottom of this form. |
| | **Retirement Benefit Information:**<br><br>Name of Employer: _____<br><br>Address of Employer: _____<br><br>Phone Number: _____<br><br>Date of Retirement distribution: _____ Amount: _____<br><br>Type of Retirement benefit (if known): _____<br><br>*Please attach a separate sheet if you are receiving or eligible to receive pension or retirement benefits from more than one Employer* |

_____    8·22·05
Your Signature              Date

PoF B

# SOCIAL SECURITY QUESTIONNAIRE

NAME Julie Hewneshoff

POLICYHOLDER/EMPLOYER WAL-MART STORES, INC

Please check off the item(s) appropriate to the current status of your Social Security claim and promptly return this form to us together **with a copy of any correspondence you receive from the Social Security Administration.**

☐ I have applied for Social Security Disability/Retirement (Circle whichever is appropriate) benefits on _____ and have enclosed a copy of my application or the receipt for my application.

☐ I received a Social Security award and enclose **a complete copy** of the award.

☐ I have been notified that my Social Security application has been approved in the amount of $_____ per month. As soon as I receive the award letter, I will send a copy.

☐ My dependents are entitled to receive benefits based on my Social Security Award. **I enclose a copy of the Dependent Award(s).**
My dependents are:   Name                    Date of Birth                    Date of High School Graduation

_____     _____     _____

_____     _____     _____

My Spouse's Social Security Number is _____
Is your Spouse employed? _____ Yes          _____ No
Is your Spouse Retired?      _____ Yes          _____ No
Do you have any handicapped children (regardless of age)? _____ Yes _____ No
If yes, first name and date of birth: _____

☐ I was denied Social Security Benefits on _____ and enclose **a complete copy of the denial letter.**

☐ I have appealed the denial of Social Security benefits. Date of Appeal _____
Type of Appeal:
  ☐ Request for Reconsideration
  ☐ Request for a Hearing

☐ I am/am not (circle one) currently represented by an attorney.
Name: _____ Telephone #: _____
Address: _____

☐ I was/will (Circle one) be examined by a Social Security physician on _____ and enclose a copy of Social Security's appointment request.

☑ I have not applied for Social Security for the following reasons:

  ☐ I anticipate returning to work by: _UNKNOWN_

  ☐ Other (specify): _I have not been off of work for the required 6 months_

Your Signature: _[signature]_          Date: 8·22·05



# THE HARTFORD

## SOCIAL SECURITY ADMINISTRATION CONSENT
## AUTHORIZATION FOR RELEASE OF INFORMATION

Insured's Name (Please print): Julie E Heimeshoff

Social Security #: 1052     Date of Birth: 10·07·1967

I authorize the Social Security Administration to release information for myself and family members receiving benefits as recorded on my Master Beneficiary Record, *including* information regarding monthly *amounts* I receive on any other record, an estimate of my Primary Insurance Amount, Family Maximum, and calculation of Average Current Earnings for any benefit I may be eligible for, a summary or detailed earnings information, status of any claims filed, and copies of Award and/or Denial Notices to The Hartford Insurance Group, or its affiliates, subsidiaries or designated representatives ("The Hartford").

I understand that the information obtained by use of the Authorization will be used for the purpose of evaluating and administering a claim for benefits. Any information obtained will not be released by The Hartford to any person or organization EXCEPT to reinsuring companies or their representatives, The Index System, Medical Information Bureau, Health Claim Index, physicians who have treated me, or other persons or organizations performing business or legal services in connection with my claim, or as may be otherwise lawfully required, or as I may further authorize, or as may be necessary to prevent or to detect the perpetration of a fraud.

I understand that a photocopy or facsimile of this Authorization is as valid as the original. This authorization will be valid for one year from date of signature.

I am the individual or legal guardian to whom the information/record applies. I understand that if I make any representation, which I know to be false, in order to obtain information from Social Security records, I could be subject to a fine or imprisonment.

_____     _____
Signature of Insured or Guardian     Relationship to Insured (if signed by Guardian)

8·22·05
_____
Date

**LC-7341-0** Printed in U.S.A.



**THE HARTFORD**

AUTHORIZATION TO DISCLOSE HEALTH INFORMATION
HARTFORD LIFE INSURANCE COMPANY
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

Julie B. Heimeshoff

10-7-1967

REDACTED052
REDACTED052

Name of Claimant                     Date of Birth               Social Security Number

TO:   Any physician, medical practitioner, hospital, pharmacy, clinic or other medical or medically-related facility or provider of medical or dental services or supplies who has provided payment, treatment or services to me or on my behalf within the last 10 years,

Any past or present employer;

Any group insurance policyholder, insurance contract holder, insurance company or reinsurance company, benefit plan administrator, claims administrator that has provided payment, treatment or services to me or on my behalf within the last 10 years and Insurance Services Office, Inc.,

I have filed a claim for insurance coverage under a group life, accidental death and dismemberment and/or disability income policy issued by Hartford Fire Insurance Company, Hartford Life Insurance Company and/or Hartford Life and Accident Insurance Company. This Authorization is intended to comply with the requirements of §164.508(c) of the Standards for the Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") effective April 14, 2003. However, by signing this Authorization, I understand that Hartford Fire Insurance Company, Hartford Life Insurance Company, Hartford Life and Accident Insurance Company and their affiliates, employees, representatives and agents (collectively "Hartford") are not subject to the requirements of HIPAA. Hartford will use information received in accordance with this Authorization for the purpose of evaluating and administering claims for group life, accidental death and dismemberment and/or disability income benefits.

By signing this Authorization, I authorize you to release and disclose to Hartford, a complete copy of any and all health information, including but not limited to x-rays, photocopies of medical records, medical histories, physical, mental or diagnostic examinations, and treatment notes (collectively, "Health Information"). For purposes of this Authorization, Health Information specifically includes confidential information regarding HIV/AIDS; sexually transmitted diseases and communicable diseases, alcohol or drug use, and treatment of mental illness but excludes psychotherapy notes as defined by HIPAA .

By signing this Authorization, I acknowledge and agree that any agreements I have made to restrict disclosure of my Health Information do not apply to this Authorization and I authorize any person or entity identified above to release and disclose my complete medical file without restriction.

By signing this Authorization, I acknowledge that I understand the following:

*   That any Health Information disclosed under this Authorization may no longer be protected by the federal privacy standards under HIPAA and may be re-disclosed without the knowledge of any person or entity authorized to disclose the Health Information. Note that Hartford will only use Health Information obtained under this Authorization for the purpose of evaluating and administering claims for group life, accidental death and dismemberment and/or disability income benefits, including obtaining reinsurance and conducting legal and business activities that relate to such claims. Hartford will only disclose Health Information obtained under this Authorization in accordance with its Corporate Privacy Policy.

*   That my claim for benefits may be delayed and/or denied if Hartford is unable to obtain Health Information necessary to properly assess my claim because I do not properly sign, date, and deliver this authorization or any person subject to HIPAA that receives it does not comply with it.

*   That, if necessary, Hartford will send this authorization to persons or entities authorized to release Health Information about me. I have a right, at any time, to revoke this authorization by submitting a written request directly to such persons or entities. My revocation will not be effective to the extent that action has been taken in reliance upon this Authorization or Hartford otherwise has the right to contest the policy or claim under the policy.

*   That this Authorization will expire two (2) years from the date of my signature below.

*   That a photographic copy of this Authorization shall be as valid as the original and I am entitled to a signed copy of this Authorization.

8-22-05

Signature of Claimant or Personal Representative                     Date

Description of Personal Representative's Authority or Relation to Insured (Required if signed by Personal Representative)

LC-7358-0 (05/03) Printed in U.S.A.

Hartford Admin. Record 000901

**JOINT APPENDIX 144**



APPLICATION FOR LONG TERM DISABILITY INCOME BENEFITS  Section II
HARTFORD LIFE INSURANCE COMPANY  Employee's Statement
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

**To Be Completed by the Employee** ( BE SURE TO ANSWER ALL QUESTIONS — FAILURE TO DO SO MAY DELAY YOUR CLAIM )

**A. Information about you**

| Last name | First | Middle Initial | Social Security Number |
|---|---|---|---|
| Heimeshoff | Julie | E | 1052 |

| Address (Street) | City | State/Province | Zip |
|---|---|---|---|
| 18 Lulworth Lane | Bella Vista | AR | 72715 |

Telephone Number
(479) 531.4844

| Date of Birth (Month, Day, Year) | Height | Weight | | | |
|---|---|---|---|---|---|
| 1967 | 5'8" | 160 | ☐ Male  ☒ Female | ☐ Single  ☒ Married | ☐ Widowed  ☐ Divorced |

| Your employer (include division, if applicable) | Occupation |
|---|---|
| WAL-MART STORES, INC | Sr. PR Manager |

When your disability began, did you have more than one employer (includes self-employment)? ☐ Yes ☒ No. If "Yes," please provide the name, address and phone number of that employer. Indicate the dates when you worked (or were self-employed).

Please indicate the extent of your formal education (Circle one)

High School:  1  2  3  4  5  6  7  8  9  10  11  ⑫
College:  1  2  ③  4    Masters _____  Ph.D. _____

Trade School: _____  Current Occupational Licenses: _____

Briefly describe your past work experience for the last 20 years (Begin with your most recent job.)

| Job Title | Duties | Years Worked |
|---|---|---|
| (a) Sr PR Manager - Wal-Mart | internal communication team | 1½ 2004-Curr |
| (b) The CorpEd · WalMart | Team Lead for Corp. Education development | 3 - 2001-200 |
| (c) Loss Prevention Merch Systems · WalMart | Manager & coordinator for merchandise & systems | 5 - 96 - 2001 |
| (d) Ops development - WalMart  Field - WalMart | Manager of projects and development  numerous store level positions | 2 - 94 - 96  8 - 86 - 94 |

Now, or at some time in the future, would you be interested in seeking rehabilitation to some other kind of work? ☐ Yes ☐ No

Have you contacted your State Department of Vocational Rehabilitation? ☐ Yes ☒ No
If "Yes," please include the name, address and telephone number of your counselor.

**B. Information About your Family** (required to determine your eligibility for Social Security Benefits)

Spouse's Name (Last, first)
Volker Heimeshoff , Volker

| Spouse's Social Security Number | Date of Birth (Month, Day, Year) | Is your spouse employed? | Retired? |
|---|---|---|---|
| | 08·09·1968 | ☒ Yes ☐ No | ☐ Yes ☒ No |

Do you have any children under Age 19? ☒ Yes ☐ No
If "Yes," name and date of birth of each child  RACHEL LEIGH DAVIS  3·02·1992

Do you have any children with disabilities (regardless of age)? ☐ Yes ☒ No
If "Yes," name and date of birth of each child

**C. Information About the Condition Causing Your Disability**

**1a. For illness, answer the following questions:**

What were your first symptoms?
Joint inflammation, fatigue, pain

When did you first notice them?
1991 - MAY

Have you had this illness before? ☐ Yes ☒ No If so, when?
Diagnosed with SLE in 1991
Fibromyalgia in 1993

LC-4571-16 (Rev 04/03)    (3)

**JOINT APPENDIX 145**

**C. Information About the Condition Caus    · Your Disability (cont'd...)**

1b. Next to any Activity of Daily Living (ADL, please place the number shown next to the statement that most accurately reflects your ability/inability to perform each: 1 = I can perform this activity independently; 2 = I can perform this activity with the use of equipment or adaptive devices; 3 = I cannot perform this activity. *See note*

( ) Bathe *(tub, shower, or sponge)*     ( ) Transfer from Bed to Chair
( ) Dress     ( ) Voluntary bladder and bowel control or ability to maintain a reasonable level of personal hygiene.
( ) Toilet     ( ) Feed yourself with food that has been prepared and made available to you.

If you indicated (3) for any of the above activities, please describe the impairment and restrictions to your functionality that preclude you from performing the activity. *In ~~Date~~ Early AM or on days of I experience a high level of Pain & muscle fatigue – Must have assistance getting out of bed or completing any above activity*

Have you suffered a severe Cognitive Impairment that renders you unable to perform common tasks, such as using the phone, money management, or medication management? ☐ Yes ☒ No  If "Yes," describe:

**2. For an injury, answer the following questions:**
When, where and how did the injury occur?
*N/A*

**3. For Illness, Injury or Pregnancy, answer the following questions:**

Date you were first treated by a physician?  Name of Physician *Current Physician Dr. Michael SAITTA*
      *7    15    2003*
   (Month)   (Day)   (Year)    Address of Physician *#6 West SunBridge Dr Fayetteville AR 7270?*

Before you stopped working, did your condition require you to change your job, or the way you did your job? ☒ Yes ☐ No  If "Yes," explain:
*not formally – found it was more & more difficult to appear on time & difficulty in concentration*

What aspect of your condition made you unable to work?
*Extreme fatigue, significant pain,*

Is your condition related to your occupation? ☐ Yes ☒ No  If "Yes," explain:

Have you filed, or do you intend to file a Workers' Compensation claim? ☐ Yes ☒ No

**D. Information About the Disability**

| Last day you worked before the disability | Did you work a full day? ☐ Yes ☒ No  If "No," explain: | Date you were first unable to work |
|---|---|---|
| *6    8    2005*<br>(Month) (Day) (Year) | *left early due to pain &* | *6    8    2005*<br>(Month) (Day) (Year) |

Since that date, have you done any work? ☐ Yes ☒ No  If "Yes," please indicate dates worked, name of employer, and amount earned.

If you have not returned to work, do you expect to?
☐ Yes Part time *(date)* _____ Full time *(date)* _____
☐ No  *UNKNOWN*

**E. Information About Physicians and Hospitals**

First medical attention for the current disability was given by *(complete below)*

| Doctor's Name<br>~~Dr Robert MacArthur~~ *Michael Saitta* | Telephone *479.571.8226*<br>FAX: *(479)571-8227* | Specialty<br>*Rheumatology* |
|---|---|---|
| Address *(Street, City, State, Zip)*<br>*#6 West Sunbridge Dr. Fayetteville, AR* ~~Bentonville OK~~ *72703* | | Dates seen<br>~~1991~~ *7-2003 to Current* |

List all Physicians and Hospitals you have seen for this condition *(attach separate sheet, if needed)*

| Doctor's Name<br>*Dr Stacy Goss* | Telephone *479-795-1301*<br>FAX: *(479) 795-1304* | Specialty<br>*Internal Medicine* |
|---|---|---|
| Address *(Street, City, State, Zip)*<br>*805 W Centerton Blvd Centerton, AR   72719* | | Dates seen<br>*5/2000 to Current* |

Hospital

| Address *(Street, City, State, Zip)* | Dates of Confinement<br>to |
|---|---|

Have you consulted any other physicians or been hospitalized in the past three years? ☐ Yes ☐ No
If "Yes," complete the following concerning your past treatment *(attach separate sheet, if needed)*

| Doctor's Name<br>*Dr Tina Hatley* | Telephone *479.254.9777*<br>FAX: *(479) 254-9729* | Specialty<br>*Allergy* |
|---|---|---|
| Address *(Street, City, State, Zip)*<br>*2203 SE 6 Str, Suite 7 Bentonville, AR 72712* | | Dates Seen<br>*Feb 28, 2005 to Current* |

Hospital

| Address *(Street, City, State, Zip)* | Dates of Confinement<br>to |
|---|---|

LC-4571-16 (Rev 04/03)                    (4)

---

**Authorization to Obtain and Release Information**

---

TO: Any physician, medical practitioner, hospital, pharmacy, clinic or other medical or medically-related facility or provider of medical or dental services or supplies;

any employer, group policyholder, contract holder or insurer, benefit plan administrator, administrator, The Index System, business entities, financial institutions, consumer reporting agencies, educational institutions, or

any Federal, State or Local Government Agency, including Social Security Administration and Veterans Administration.

I authorize you to release and send to: (i) Hartford Fire Insurance Company, Hartford Life Insurance Company, Hartford Life and Accident Insurance Company, and any affiliate of one or more of these three companies, known collectively as The Hartford; or (ii) The Hartford's representatives, a complete copy of any and all of the following information, records or documents relative to

_Julie (Davis) Heimeshoff_     Insured's Name *(Please print.)*

_1961_ (Date of Birth)    ·    _1052_ (Social Security Number)

1. Any and all medical information, including x-ray films, photocopies of medical records, medical histories, physical, mental or diagnostic examinations, and treatment notes. For purposes of this authorization, medical information specifically includes confidential information regarding HIV/AIDS, communicable diseases, alcohol or drug abuse, and mental health, as such information may relate to my claim for benefits.

2. Work information and history, including, but not limited to, job duties, earnings and personnel records, client lists, any and all other work-related information for contractual work performed; information on any insurance coverage and claims filed, including all records and information related to such coverage and claims; credit information, including, but not limited to, credit reports and credit applications; other financial information, e.g., Pension Benefits, bank records; business transactions of any kind or description, including billing, invoices or payment records of any kind; and academic transcripts.

3. Information concerning Social Security benefits, including, but not limited to, monthly benefit amounts, monthly payment amounts, entitlement dates, and information from my Master Beneficiary Record.

I understand that the information obtained by use of the Authorization will be used for the purpose of evaluating and administering a claim for benefits. Any information obtained will not be released by The Hartford to any person or organization EXCEPT to reinsuring companies or their representatives, The Index System, physicians who have treated me, or other persons or organizations performing business or legal services in connection with my Claim, or as may be otherwise lawfully required, or as I may further authorize, or as may be necessary to prevent or to detect the perpetration of a fraud.

I know that I may request to receive a copy of this Authorization.

This Authorization is given in connection with a claim for benefits. I intend that it be valid for the duration of the claim.

A photocopy or facsimile of this authorization shall be valid as the original.

_____          _____
Signature of Insured or Guardian          Relationship to Insured *(if signed by Guardian)*

_8·22·2005_
Date

LC-4571-16 (Rev 04/03)        (7)

**JOINT APPENDIX 147**

APP' \TION FOR LONG TERM DISABILITY INCO! ;ENEFITS

## F. Other Income

Check the other income benefits you have received/are receiving, or are eligible to receive during your disability *(complete the information requested).*

| Source of Income | Amount(week /month) | Date Claim was filed | Date Payments began | Date Payments ended |
|---|---|---|---|---|
| Social Security/Retirement | $_____ / _____ | | | |
| Social Security/Disability | $_____ / _____ | | | |
| Sick Pay or Salary Continuation | $_____ / _____ | | | |
| Income from Work | $_____ / _____ | | | |
| Workers' Compensation | $_____ / _____ | | | |
| State Disability | $_____ / _____ | | | |
| Pension/Retirement | $_____ / _____ | | | |
| Pension/Disability | $_____ / _____ | | | |
| Short Term Disability | $_____ / _____ | | | |
| Unemployment | $_____ / _____ | | | |
| No-Fault Insurance | $_____ / _____ | | | |
| Other (include Individual or Group benefits) | $_____ / _____ | | | |

## G. Information about Tax Withholding

Federal law requires us to withhold federal income tax from your check *if you request us to do so.* We are also required to send a report to your employer at the end of each calendar year showing your name, total amount of benefits paid to you, total amount withheld, if any, and your social security number. If you want us to withhold tax, please indicate on the line below the dollar amount to be withheld per benefit check. Whole dollars only *(minimum is $87.00 per month):* $ __A__ .00.

LC-4571-16 (Rev 04/03)                    (5)

Hartford Admin. Record 000905

**JOINT APPENDIX 148**

APPLICATION FOR LONG TERM DISABILITY INCOME BENEFITS

## H. Signature

With the exception of any source(s) of income reported above in Section F of this form, I certify by my signature that I have not received and am not eligible to receive any source of income, except for my Hartford Disability Income. Further, I understand that should I receive income of any kind or perform work of any kind during any period The Hartford has approved my disability claim, I must report all details to The Hartford, immediately.

If I receive disability benefits greater than those which should have been paid, I understand that I will be required to provide a lump sum repayment to the insurance company. The insurance company has the option to reduce or eliminate future disability payments in order to recover any overpayment balance that is not reimbursed.

**For residents of all states** *EXCEPT* **California, Florida, New Jersey, Colorado, Pennsylvania, Arkansas, New Mexico, Louisiana, Oregon, and Virginia:** A person commits a fraudulent insurance act if that person knowingly, and with intent to defraud any insurance company or other person, either: (a) files an application for insurance or statement of claim containing any materially false information, or (b) conceals information concerning any material fact in order to obtain an insurance policy or a benefit under an insurance policy. **A fraudulent insurance act is a crime.** The Hartford shall pursue prosecution of any fraudulent insurance act to the fullest extent of the law.

**For residents of Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**For residents of New Jersey, Arkansas, New Mexico, and Louisiana:** Any person who knowingly files a statement of claim containing anyfalse or misleading information is subject to criminal and civil penalties. Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**For residents of Colorado: It is unlawful to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or its agent who knowingly provides false, incomplete, or misleading information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to an insurance settlement or award shall be reported to the Colorado Division of Insurance.**

**For residents of Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects a person to criminal and civil penalties.

**For residents of California: For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.**

The statements contained in this application for Long Term Disabiltiy Income Benefits are true and complete to the best of my knowledge and belief.

X _____    X ___August 22, 2005_____
       *SIGNATURE OF THE EMPLOYEE*                    *DATE*

PLEASE ATTACH A COPY OF YOUR DRIVER'S LICENSE OR ANOTHER DOCUMENT THAT VERIFIES YOUR DATE OF BIRTH.

LC-4571-16  (Rev 04/03)                    (6)

**JOINT APPENDIX 149**

**ATTENDING PHYSICIAN'S STATEMENT OF DISABILITY**

**To be completed by the Employee**

Name of patient _Julie E Heimeshoff_     Social Security Number _1052_  D.O.B _1967_

Address of patient _18 Lulworth Lane     Bella Vista     AR     72715_
          Street          City          State or Province     Zip Code or Postal Code

Employer's name (and division, if applicable) _Wal-Mart Store Inc_

I hereby authorize release of information on this form by the below     Signed (Patient)
named physician for the purpose of claim processing.          _____     Date: _8-22-06_

**To be completed by the Attending Physician** (The patient is responsible for the completion of this form without expense to the Company.)

Patient's condition is the result of:  ☒ Illness     ☐ Injury     ☐ Pregnancy          Height _5'8"_  Weight _165_

If pregnancy, what is the expected date of delivery?   Month _____ Day _____   Year _____

Is condition due to illness or an injury that is work related? ☐ Yes  ☒ No

**DIAGNOSIS**

Primary diagnosis: _SLE_ _____ ICD-9 Code: _710.0_

Secondary diagnosis(es): _Fibromyalgia_ _____ ICD-9 Code(s): _____

Subjective symptoms: _Pain, Fatigue_

Test Results (list all results, or enclose test):

Test: _____ Date: _____ Results: _____

Test: _____ Date: _____ Results: _____

Physical examination findings: _Tender points_

If pregnancy, indicate LMP date:   Month _____ Day _____   Year _____

**TREATMENTS**

Date you first treated this patient: _7-15-2003_   Date you first treated this patient for this condition: _7-15-2003_

Date of onset of this condition: _1991_     Date of most recent treatment: _FE 09 23 05_

How often has patient been seen/treated? _Recurring_          Date of next office visit: _TBD_

Has patient been referred to any other physician? ☒ Yes ☐ No  If "Yes," Date(s): _Traveling to Mayo Clinic in_

Name and address: _Scottsdale, AZ  9-8-05_

_____ Specialty: _____

Nature of treatment for this condition: _____

Has surgery been performed? ☐ Yes ☒ No  If "Yes," Date: _____ Procedure: _____ CPT Code: _____

Was patient hospitalized for this condition? ☐ Yes ☒ No  If "Yes," Date(s) admitted: _____ Date(s) discharged: _____

Name and address of hospital(s): _____

Progress (Please check one.):   ☐ Recovered     ☐ Improved     ☐ Unchanged     ☒ Retrogressed

LC-4571-16  (Rev 04-03)          (8)

**JOINT APPENDIX 150**

ATTENDING PHYSICIAN'S STATEMENT OF DISABILITY *(Side two)*

IMPAIRMENT

If the patient's ability to perform any of the following activities is limited by his/her disorder, please describe the extent of the limitation and its expected duration.

Standing: _Partial ability to do all of these activities in spondi depency on flar - ability to relive._

Walking: _____

Sitting: _____

Lifting/carrying: _____

Reaching/working overhead: _____

Pushing: _____

Pulling: _____

Driving: _____

Keyboard use/repetitive hand motion: _____

If any other activities are limited, please specify the activities and the limitations: _____

If the patient's vision is impaired, please describe the extent of the impairment: _____

Do you believe the patient is competent to endorse checks and direct the use of the proceeds thereof? ☑Yes ☐No
What is the psychiatric impairment (*if applicable*)?

☐ Inadequate information to make assessment.

☐ Essentially good functioning in all areas. Occupationally and socially effective.

☐ Slight difficulty in occupational functioning, but generally functioning well. Has some meaningful interpersonal relationships.

☐ Moderate impairment in occupational functioning. Limited in performing some occupational duties.

☐ Major impairment in several areas--work, family relations. Avoidant behavior, neglects family, is unable to work.

☐ Inability to function in almost all areas.

Date patient became unable to work due to this impairment? Month _June_ Day _8_ Year _2005_

If physical or psychiatric limitations exist, how long do you feel limitations will last? _chronic_

Attending Physician's Name: _Dr Michael Saiha_ Telephone # _479-571-8226_
(Please print or type.)

License No. _E18169_ FAX # _479-571-1304_

SS# or E.I.N.#: _3500_ Degree: _MD_ Specialty: _Rheumatology_

Street Address: _SC51st Center Ton Blvd_ City: _Fayetteville_ State: _AR_ Zip Code: _72703_

Signature: _____ Date signed: _9/23/05_

LC-4571-15 (Rev 04/03) (9)

**JOINT APPENDIX 151**

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2011, a copy of foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

<u>S/ Patrick W. Begos</u>

THE HONORABLE JUDGE ARTERTON

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JULIE HEIMESHOFF,

Plaintiff,

v.

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY, and WAL-
MART STORES AS PLAN SPONSOR OF
THE GROUP LONG TERM DISABILITY
PLAN FOR EMPLOYEES OF WAL-MART
STORES INC.,

Defendants.

NO. 10-01813 JBA

STEVEN P. KRAFCHICK'S
DECLARATION IN SUPPORT OF
PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS

June 23, 2011

**STEVEN P. KRAFCHICK,** declares:

1.      I am lead counsel representing plaintiff Julie Heimeshoff in this ERISA

disability benefits case.

2.      I have been handling and litigating ERISA long term disability cases for over

15 years.

3.      Attached as **Exhibit 1** are true and correct copies of excerpts from the claim

file received on March 31, 2010 from Defendant Hartford, bates stamped as

2010 march HARTFORD CF 00000001, etc, and referenced in Plaintiff's

- 1-  KRAFCHICK DECLARATION IN SUPPORT OF PLAINTIFF
MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE 300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

**JOINT APPENDIX 153**

Memorandum of Law in Opposition to Defendants' Motion to Dismiss as

(CF___).

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

DATED this 23rd of June, 2011 at Seattle, WA.

By:     /s/Steven P. Krafchick
STEVEN P. KRAFCHICK  ct 28509
KRAFCHICK LAW FIRM, PLLC
100 W. Harrison, South Twr, Ste 300
Seattle, WA    98119
Phone: 206-374-7370
Fax: 206-374-7377
Email: klf@krafchick.com

Attorney for Plaintiff

- 2- KRAFCHICK DECLARATION IN SUPPORT OF PLAINTIFF
MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE 300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

**JOINT APPENDIX 154**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Patrick W. Begos, Esq.
BEGOS HORGAN & BROWN LLP
327 Riverside Avenue
Westport, CT  06880

Attorney for Defendants

Mark P. Carey, Esq.
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT  06890

Local Counsel for Plaintiff

By:  /s/Steven P. Krafchick
Steven P. Krafchick

-3- KRAFCHICK DECLARATION IN SUPPORT OF PLAINTIFF MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

KRAFCHICK LAW FIRM PLLC
100 W. HARRISON
SOUTH TOWER, SUITE 300
SEATTLE, WASHINGTON 98119
(206) 374-7370 FAX: (206) 374-7377
KLF@KRAFCHICK.COM

**JOINT APPENDIX 155**

# Exhibit 1

ERISA INFORMATION

THE FOLLOWING NOTICE
CONTAINS IMPORTANT INFORMATION

This employee welfare benefit plan (Plan) is subject to certain requirements of the Employee Retirement Income Security Act of 1974 (ERISA), as amended. ERISA requires that you receive a Statement of ERISA Rights, a description of Claim Procedures, and other specific information about the Plan. This document serves to meet ERISA requirements and provides important information about the Plan.

The benefits described in your booklet-certificate (Booklet) are provided under a group insurance policy (Policy) issued by the Hartford Life Insurance Company or the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions. The Policy is incorporated into, and forms a part of, the Plan. The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

A copy of the Plan is available for your review during normal working hours in the office of the Plan Administrator.

1. **Plan Name**

   Group Long Term Disability Plan for employees of WAL-MART STORES, INC.

2. **Plan Number**

   501

3. **Employer/Plan Sponsor**

   WAL-MART STORES, INC.
   702 Southwest 8th Street
   Bentonville, AR   72716

4. **Employer Tax Identification Number**

   71-0415188

5. **Type of Plan**

   Welfare Benefit Plan providing Group Long Term Disability benefits.

6. **Plan Administrator**

   WAL-MART STORES, INC.
   702 Southwest 8th Street
   Bentonville, AR   72716

19

**JOINT APPENDIX 157**

7. **Agent for Service of Legal Process**

*For the Plan:*

WAL-MART STORES, INC.
702 Southwest 8th Street
Bentonville, AR  72716

*For the Policy:*

Hartford Life and Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be made on a Plan trustee or the Plan Administrator.

---

8. **Sources of Contributions** -- The Employer pays the premium for the insurance, but may allocate part of the cost to the employee.  The Employer determines the portion of the cost to be paid by the employee.

---

9. **Type of Administration** -- The Plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable Plan.

---

10. The Plan and its fiscal records are kept on a Policy Year basis.

---

11. **Labor Organizations**

None

---

12. **Names, Titles and Addresses of the principal place of business for each Trustee of the Plan**

None

---

13. **Plan Amendment Procedure**

The Employer reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.

---

20

**JOINT APPENDIX 158**

## STATEMENT OF ERISA RIGHTS

As a participant in the Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA), as amended. ERISA provides that all Plan participants shall be entitled to:

### 1. Receive Information About Your Plan and Benefits

a) Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

b) Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary Plan description. The administrator may make a reasonable charge for the copies.

c) Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### 2. Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

### 3. Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If the Plan requires you to complete administrative appeals prior to filing in court, your right to file suit in state or Federal court may be affected if you do not complete the required appeals. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

### 4. Assistance with Your Questions

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration (formerly known as the Pension and Welfare Benefits Administration), U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210 . You may also obtain certain publications about your rights and

**JOINT APPENDIX 159**

responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## CLAIM PROCEDURES

The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

### Claim Procedures for Claims Requiring a Determination of Disability

*Claims for Benefits*

If you or your authorized representative would like to file a claim for benefits for yourself or your insured dependents, you or your authorized representative should obtain a claim form(s) from your Employer or Plan Administrator. The applicable section of such form(s) must be completed by (1) you, (2) the Employer or Plan Administrator and (3) the attending physician or hospital. Following completion, the claim form(s) must be forwarded to the Insurance Company's claim representative. The Insurance Company will evaluate your claim and determine if benefits are payable.

The Insurance Company will make a decision no more than 45 days after receipt of your properly filed claim. The time for decision may be extended for two additional 30 day periods provided that, prior to any extension period, the Insurance Company notifies you in writing that an extension is necessary due to matters beyond the control of the Plan, identifies those matters and gives the date by which it expects to render its decision. If your claim is extended due to your failure to submit information necessary to decide your claim, the time for decision may be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to our request. If the Insurance Company approves your claim, the decision will contain information sufficient to reasonably inform you of that decision.

Any adverse benefit determination will be in writing and include: 1) specific reasons for the decision, 2) specific references to the Policy provisions on which the decision is based, 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary, 4) a description of the review procedures and time limits applicable to such procedures, 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal, and 6)(A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the denial, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the denial and that a copy will be provided free of charge to you upon request, or (B) if denial is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Policy to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request.

*Appealing Denials of Claims for Benefits*

On any wholly or partially denied claim, you or your representative must appeal once to the Insurance Company for a full and fair review. You must complete this claim appeal process before you file an action in court. Your appeal request must be in writing and be received by the Insurance Company no later than the expiration of 180 days from the date you received your claim denial. As part of your appeal:

1.   you may request, free of charge, copies of all documents, records, and other information relevant to your claim; and
2.   you may submit written comments, documents, records and other information relating to your claim.

The Insurance Company's review on appeal shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

22

JOINT APPENDIX 160

The Insurance Company will make a final decision no more than 45 days after it receives your timely appeal. The time for final decision may be extended for one additional 45 day period provided that, prior to the extension, the Insurance Company notifies you in writing that an extension is necessary due to special circumstances, identifies those circumstances and gives the date by which it expects to render its decision. If your claim is extended due to your failure to submit information necessary to decide your claim on appeal, the time for decision shall be tolled from the date on which the notification of the extension is sent to you until the date we receive your response to the request.

The individual reviewing your appeal shall give no deference to the initial benefit decision and shall be an individual who is neither the individual who made the initial benefit decision, nor the subordinate of such individual. The review process provides for the identification of the medical or vocational experts whose advice was obtained in connection with an initial adverse decision, without regard to whether that advice was relied upon in making that decision. When deciding an appeal that is based in whole or part on medical judgment, we will consult with a medical professional having the appropriate training and experience in the field of medicine involved in the medical judgment and who is neither an individual consulted in connection with the initial benefit decision, nor a subordinate of such individual. If the Insurance Company grants your claim appeal, the decision will contain information sufficient to reasonably inform you of that decision.

However, any final adverse benefit determination on review will be in writing and include: 1) specific reasons for the decision, 2) specific references to the Policy provisions on which the decision is based, 3) a statement that you have the right to bring a civil action under section 502(a) of ERISA, 4) a statement that you may request, free of charge, copies of all documents, records, and other information relevant to your claim; 5)(A) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the decision on appeal, either (i) the specific rule, guideline, protocol or other similar criterion, or (ii) a statement that such a rule, guideline, protocol or other similar criterion was relied upon in making the decision on appeal and that a copy will be provided free of charge to you upon request, or (B) if the decision on appeal is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the decision on appeal, applying the terms of the Policy to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request, and 6) any other notice(s), statement(s) or information required by applicable law.

## Claim Procedures for Claims Not Requiring a Determination of Disability

*Claims for Benefits*

If you or your authorized representative would like to file a claim for benefits for yourself or your insured dependents, you or your authorized representative should obtain a claim form(s) from your Employer or Plan Administrator. The applicable section of such form(s) must be completed by (1) you, (2) the Employer or Plan Administrator and (3) the attending physician or hospital. Following completion, the claim form(s) must be forwarded to the Insurance Company's claim representative. The Insurance Company will evaluate your claim and determine if benefits are payable.

The Insurance Company will make a decision no more than 90 days after receipt of your properly filed claim. However, if the Insurance Company determines that special circumstances require an extension, the time for its decision will be extended for an additional 90 days, provided that, prior to the beginning of the extension period, the Insurance Company notifies you in writing of the special circumstances and gives the date by which it expects to render its decision. If extended, a decision shall be made no more than 180 days after your claim was received. If the Insurance Company approves your claim, the decision will contain information sufficient to reasonably inform you of that decision.

23

**JOINT APPENDIX 161**

However, any adverse benefit determination will be in writing and include: 1) specific reasons for the decision; 2) specific references to Policy provisions on which the decision is based; 3) a description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary; 4) a description of the review procedures and time limits applicable to such, and 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal our decision and after you receive a written denial on appeal.

*Appealing Denials of Claims for Benefits*

On any wholly or partially denied claim, you or your representative must appeal once to the Insurance Company for a full and fair review. You must complete this claim appeal process before you file an action in court. Your appeal request must be in writing and be received by the Insurance Company no later than the expiration of 60 days from the date you received your claim denial. As part of your appeal:

1. you may request, free of charge, copies of all documents, records, and other information relevant to your claim; and
2. you may submit written comments, documents, records and other information relating to your claim.

The Insurance Company's review on appeal shall take into account all comments, documents, records and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

The Insurance Company will make a final decision no more than 60 days after it receives your timely appeal. However, if the Insurance Company determines that special circumstances require an extension, the time for its decision will be extended for an additional 60 days, provided that, prior to the beginning of the extension period, the Insurance Company notifies you in writing of the special circumstances and gives the date by which it expects to render its decision. If extended, a decision shall be made no more than 120 days after your appeal was received. If the Insurance Company grants your claim appeal, the decision will contain information sufficient to reasonably inform you of that decision.

However, any final adverse benefit determination on review will be in writing and include: 1) specific reasons for the decision and specific references to the Policy provisions on which the decision is based, 2) a statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim, 3) a statement of your right to bring a civil action under section 502(a) of ERISA, and 4) any other notice(s), statement(s) or information required by applicable law.

24

JOINT APPENDIX 162



December 8, 2005

Julie E. Heimeshoff
18 Lulworth Lane
Bella Vista, AR  72715

Policy Holder:   Wal-Mart Stores, Inc.
Associate:       Julie E. Heimeshoff
Policy Number:   GLT024554

Dear Ms. Heimeshoff:

We are writing to you about your claim for Long Term Disability (LTD) benefits. These benefits are under the group insurance policy number GLT024554 for Wal-Mart Stores, Inc.

We have completed our review of your claim for benefits and have determined that you have failed to provide satisfactory Proof of Loss to The Hartford. Therefore, we have determined that you are not eligible for LTD benefits at this time.

On page 14 of the Policy, it states "You will be paid benefits if, while insured under the group policy, you:
  1) become Totally Disabled;
  2) remain Totally Disabled throughout the Elimination Period;
  3) remain Disabled beyond the Elimination Period; and
  4) submit proof of loss satisfactory to The Hartford.

Benefits accrue as of the first day after the Elimination Period and are paid monthly. No benefit will be paid for any day on which you are not under the care of a legally qualified Physician."

On page 20 of the Policy it states "Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, The Hartford may require further written proof you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:
  1) it was not possible to give proof within the required time; and
  2) proof is given as soon as possible; but
  3) not later than 1 year after it is due, unless you are not legally competent.

The Hartford has the right to require, as part of proof of loss:
  1) your signed statement identifying all Other Income Benefits; and
  2) proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

Benefit Management Services
Atlanta Disability Claim Office
P.O. Box 1810
Alpharetta, GA 30023-1810
Facsimile (860)392-0713

2010march HARTFORD CF 00000069

**JOINT APPENDIX 163**

After submitting proof of loss, you will be required to apply for Social Security disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider denial and, if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if proof of loss is satisfactory."

We based our decision to deny your claim on policy language. All the papers contained in your file were viewed as a whole. This included:

1.  LTD application completed by you and dated 08/22/05.
2.  Letters to you dated 11/1/05 and 11/21/05.
3.  Requests to Dr. Saitta for clarification on your functionality sent to him on 10/21/05, 11/1/05, 11/8/05 and 11/21/05.

On 10/21/05, 11/1/05, 11/8/05 and 11/21/05 we sent requests to Dr. Saitta for clarification on your functionality. We also sent you letters on 11/1/05 and 11/21/05. To date we have not received this information. Therefore, it is our determination that you have failed to provide satisfactory Proof of Loss to The Hartford and we are unable to continue evaluating your LTD application.

The following information, not previously submitted, is necessary for a determination of your claim. Specifically, a response from Dr. Saitta to our letter requesting clarification on your functionality. This information is necessary in order for The Hartford to assess your claim and determine if you meet the definition of Totally Disabled from your own occupation at Wal-Mart Stores, Inc. If you would like this information considered, we must receive it as soon as possible. Please send it to the claim office at the address shown on this letterhead.

"We reserve all rights and defenses available to us in making our determination."

The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

2010march HARTFORD CF 00000070

**JOINT APPENDIX 164**

After submitting proof of loss, you will be required to apply for Social Security disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider denial and, if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if proof of loss is satisfactory."

We based our decision to deny your claim on policy language. All the papers contained in your file were viewed as a whole. This included:

1. LTD application completed by you and dated 08/22/05.
2. Letters to you dated 11/1/05 and 11/21/05.
3. Requests to Dr. Saitta for clarification on your functionality sent to him on 10/21/05, 11/1/05, 11/8/05 and 11/21/05.

On 10/21/05, 11/1/05, 11/8/05 and 11/21/05 we sent requests to Dr. Saitta for clarification on your functionality. We also sent you letters on 11/1/05 and 11/21/05. To date we have not received this information. Therefore, it is our determination that you have failed to provide satisfactory Proof of Loss to The Hartford and we are unable to continue evaluating your LTD application.

The following information, not previously submitted, is necessary for a determination of your claim. Specifically, a response from Dr. Saitta to our letter requesting clarification on your functionality. This information is necessary in order for The Hartford to assess your claim and determine if you meet the definition of Totally Disabled from your own occupation at Wal-Mart Stores, Inc. If you would like this information considered, we must receive it as soon as possible. Please send it to the claim office at the address shown on this letterhead.

"We reserve all rights and defenses available to us in making our determination."

The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from your receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

**2010march HARTFORD CF 00000071**

**JOINT APPENDIX 165**

Please send your appeal letter to:

Claim Appeal Unit
Benefit Management Services
Hartford Life Insurance Company
P.O. Box 2999
Hartford, CT 06104-2999

If you have any questions, please feel free to contact our office at (800) 492-5678, x64230. Our office hours are 8:00 AM to 8:00 PM EST, Monday through Friday.

Sincerely,


John Wentworth, Senior Examiner
Hartford Life and Accident Insurance Co.

Benefit Management Services
Atlanta Disability Claim Office
P.O. Box 1810
Alpharetta, GA 30023-1810
Facsimile (860)392-0713

2010march HARTFORD CF 00000072

# JOINT APPENDIX 166



November 29, 2005

Julie E. Heimeshoff
18 Lulworth Lane
Bella Vista, AR  72715

Policy Holder:   Wal-Mart Stores, Inc.
Associate:        Julie E. Heimeshoff
Policy Number:   GLT024554

Dear Ms. Heimeshoff:

We are reviewing your claim for Long Term Disability (LTD) benefits.

We have not received a response from Dr. Saitta to our letter requesting clarification on your functionality requested on 10/21/05, 11/1/05, 11/8/05 and 11/21/05.

We cannot make a claim decision without this information because it is needed to determine if you meet the policy definition of Disabled. This delay is for matters beyond our control. If we get the information requested, we expect to make our decision within 30 days after receiving the information or advise you of the need to further extend the decision period.

If you have any questions, please feel free to contact our office at (800) 492-5678, x64230. Our office hours are 8:00 AM to 8:00 PM EST, Monday through Friday.

Sincerely,

John Wentworth, Senior Examiner
Hartford Life and Accident Insurance Co.

Benefit Management Services
Atlanta Disability Claim Office
P.O. Box 1810
Alpharetta, GA 30023-1810
Facsimile (860)392-0713

2010march HARTFORD CF 00000073

**JOINT APPENDIX 167**



THE
HARTFORD

November 21, 2005

Julie E. Heimeshoff
18 Lulworth Lane
Bella Vista, AR 72715

Policy Holder:   Wal-Mart Stores, Inc.
Associate:       Julie E. Heimeshoff
Policy Number:   GLT024554

Dear Ms. Heimeshoff:

This letter is about your claim for Long Term Disability (LTD) benefits. We need more information to evaluate your claim.

On 10/21/05, 11/1/05, 11/8/05 and 11/21/05 we faxed a request to Dr. Saitta for clarification on your functionality. This will be our last request for the information needed to decide your Long Term Disability (LTD) claim. Your claim decision will be based on information presently in your file if more information is not received. This may result in termination or denial of your claim.

On page 14 of the Policy, it states "You will be paid benefits if, while insured under the group policy, you:
   (1) become Totally Disabled;
   (2) remain Totally Disabled throughout the Elimination Period;
   (3) remain Disabled beyond the Elimination Period; and
   (4) submit proof of loss satisfactory to The Hartford."

On page 20 of the Policy it states "Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, The Hartford may require further written proof you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:
   (1) it was not possible to give proof within the required time; and
   (2) proof is given as soon as possible; but
   (3) not later than 1 year after it is due, unless you are not legally competent.

The Hartford has the right to require, as part of proof of loss:
   (1) your signed statement identifying all Other Income Benefits; and
   (2) proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

Benefit Management Services
Atlanta Disability Claim Office
P.O. Box 1810
Alpharetta, GA 30023-1810
Facsimile (860)392-0713

2010march HARTFORD CF 00000074

**JOINT APPENDIX 168**

After submitting proof of loss, you will be required to apply for Social Security disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider denial and, if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if proof of loss is satisfactory."

Please have your physician return all information that we asked for within twenty one (21) days in order to avoid any delays in processing your claim for benefits.

If you have any questions, please feel free to contact our office at (800) 492-5678, x64230. Our office hours are 8:00 AM to 8:00 PM EST, Monday through Friday.

Sincerely,


John Wentworth, Senior Examiner
Hartford Life and Accident Insurance Co.

Benefit Management Services
Atlanta Disability Claim Office
P.O. Box 1810
Alpharetta, GA 30023-1810
Facsimile (860)392-0713

2010march HARTFORD CF 00000075

**JOINT APPENDIX 169**

# Krafchick Law Firm

Legal Services for Injured People

Steven P. Krafchick
*Attorney at Law*

Kristian Erik Soholm
*Attorney at Law*

September 26, 2007

Julia Busko
Curtis Williams
Nadia Sayah-Sina
*Legal Assistants*

**Via Federal Express**

Claim Appeal Unit
Hartford Life Insurance Company
7 Waterside Crossing, 2nd Floor
Windsor, CT 06095

|  |  |
|---|---|
| Our Client/Your Insured: | Julie E. Heimeshoff |
| Policy No.: | GLT024554 |
| Policy Holder: | Wal-Mart Stores, Inc. |

To Whom It May Concern:

We represent Julie E. Heimeshoff, whose Hartford long-term disability (LTD) claim was denied pursuant to a November 29, 2006 letter from Hartford to Ms. Heimeshoff. In denying Ms. Heimeshoff's LTD benefits, Hartford argues Ms. Heimeshoff did not meet the definition of total disability through and after the elimination period, July 9 - September 8, 2005, and states Ms. Heimeshoff has not shown she lacks the functionality to meet the LTD definition. This letter is an appeal of Hartford's denial of Ms. Heimeshoff's LTD benefits.

Hartford should grant Ms. Heimeshoff's LTD benefits for the following reasons:

1.  Ms. Heimeshoff has strong supporting medical opinion that she is functionally prevented from working full-time due to fibromyalgia and associated pain, fatigue, and cognitive problems. Hartford has sought an opinion regarding Ms. Heimeshoff's functionality from one of Ms. Heimeshoff's providers, Michael Saitta, MD. As he is not an expert in physical capacities evaluation, Dr. Saitta deferred that decision to a physical capacities specialist. Ms. Heimeshoff obtained such an opinion from an internationally renowned physical capacities evaluator, Theodore Becker, Ph.D., whose report addendum is referenced below. But, Hartford deemed it unnecessary to have Ms. Heimeshoff undergo any physical capacities evaluation, or otherwise have her seen in person by any medical or vocational expert.

2.  In its claim file, Hartford repeatedly references a requirement that Ms. Heimeshoff submit "objective evidence" of her illness. But, Hartford may not require "objective" evidence of illness as this is not required in the subject LTD policy. Regardless, federal courts consistently hold that fibromyalgia is objectively diagnosable.

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000111

**JOINT APPENDIX 170**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 2

3.    Hartford's failure to consider Ms. Heimeshoff's chronic pain on her ability to work violates long-standing law that requires insurers to consider the effects of pain on an insured's ability to work and function.

4.    Hartford fails to consider the effects of Ms. Heimeshoff's cognitive deficits from her fibromyalgia on her ability to perform her cognitively demanding occupation. Hartford only considers the physical aspects of Ms. Heimeshoff's job as Senior Public Relations Manager, and not the more important cognitive aspects, which are what are really affected by primary symptoms of fibromyalgia, chronic fatigue and pain.

5.    Hartford's only medical consultant, Norman Bress, MD, has a myopic and false view of fibromyalgia. Dr. Bress's report shows he does not believe that fibromyalgia can be a seriously disabling condition, in spite of the fact that fibromyalgia is a well-established illness with known and potentially disabling symptoms. This is shown by his carefully selected quotes about fibromyalgia, which show that he is picking only statements about fibromyalgia out of context that fit his belief--that fibromyalgia is not disabling. More importantly, Hartford knows well that fibromyalgia can be disabling, as it has on numerous occasions granted LTD claims solely on the basis of fibromyalgia.

### HARTFORD'S FIDUCIARY DUTIES TOWARD MS. HEIMESHOFF

Under ERISA, Hartford is a fiduciary in its relationship with Ms. Heimeshoff. As a fiduciary, Hartford is required to do what it can to ensure it thoroughly evaluates Ms. Heimeshoff's claim, and adjudicate her claim solely with her interests in mind. Under trust law, it is evidence of a conflict of interest when a fiduciary acts contrary to a beneficiary's best interests. If a fiduciary's interests conflict with those of a beneficiary, the beneficiary's interest alone is to be considered; otherwise a conflict of interest exists. Given Hartford's basis for denying Ms. Heimeshoff's claim, Hartford has considered its own interests over those of its beneficiary, and has abused its discretion. This may cause a reviewing court to review Ms. Heimeshoff's claim under a de novo standard, where it disregards Hartford's determination and substitutes its own.

The Ninth Circuit Court of Appeals recently handed down a decision that makes it substantially easier for a LTD claimant to obtain an order of discovery against an insurer. In *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), the court stated:

> We have held that an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest. See *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999) (noting that a conflict of interest exists when an insurer both administers and funds an ERISA plan). On the one hand, such an administrator is responsible for administering the plan so that those who deserve benefits receive them. On the

2010march HARTFORD CF 00000112

### JOINT APPENDIX 171

Ms. Heimeshoff Appeal
September 26, 2007
Page - 3

other hand, such an administrator has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers.

. . .

A subtler question arises when a court must decide how much weight to give a conflict of interest under the abuse of discretion standard. In making that determination, the court may consider evidence outside the record. We have held that the court may consider evidence beyond that contained in the administrative record that was before the plan administrator, to determine whether a conflict of interest exists that would affect the appropriate level of judicial scrutiny. See *Tremain*, 196 F.3d at 976-77 (holding that a court may consider extra-record evidence to determine whether the administrator was plagued by a conflict of interest); see also *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004) holding that a district court may supplement the record in order to decide whether a conflict of interest exists), *cert. denied*, 544 U.S. 1044, 125 S. Ct. 2252, 161 L. Ed. 2d 1079 (2005).

Today, we continue to recognize that, in general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review. That principle is consistent with *Tremain*, 196 F.3d at 976-79, which permits extrinsic evidence on the question of a conflict of interest. The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.

Hartford cannot solely guard Ms. Heimeshoff's interests while guarding its own business interests without engaging in an inextricable conflict of interest. Under *Abatie* and *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 (3d Cir. 2004), a reviewing Federal court is allowed to issue an order granting a Plaintiff discovery as to " . . . the nature, extent, and effect on the decision making process of any conflict of interest." An order of discovery allows a claimant to require a : insurer to answer interrogatories about its claims management practices, and allows depositions of claims managers and others. Such discovery would allow Ms. Heimeshoff to show Hartford's conflicts of interest based on its internal claims procedures, financial information, its financial relationships with its consultants, and more. In accordance with *Abatie's* holding, such discovery is permitted without threshold showings by a Plaintiff as it is directed at the conflict of interest, and not the merits of the case.

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000113

**JOINT APPENDIX 172**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 4

## MATERIAL EVIDENCE OF HARTFORD'S CONFLICT OF INTEREST

- **Hartford Cannot Require Objective Evidence of Illness When That Requirement Is Not In The Policy**

Hartford appears to require that Ms. Heimeshoff must support her claim with objective medical evidence. But, the subject LTD policy has no requirement that illness must be supported by objective evidence, and Hartford cannot adjudicate Ms. Heimeshoff's claim under an objective evidence standard. Hartford cannot rewrite the policy to include terms it did not include when the policy was issued.

Federal courts have examined whether insurers may dismiss claims for lacking objective medical evidence when that standard is not contained in the policy. Many courts consider it arbitrary and capricious for insurers to do so, and thereby an abuse of discretion:

The Ninth Circuit Court of Appeals in *Canseco v. Construction Laborers Pension Trust*, 93 F.3d 600 (9th Cir. 1996) and *Saffle v. Sierra Pacific Power*, 85 F.3d 455 (9th Cir. 1996), held that insurers cannot read new terms into policies not contained in the policy language, and found it an abuse of discretion for insurers to add coverage requirements that conflict with the terms of the plan.

In *Pappas v. Hartford Life Ins. Co.*, 20 F. Supp. 2d 923 (E.D. Va. 1998), the court ruled the ERISA insurer had abused its discretion when requiring "objective medical evidence" of plaintiff's post traumatic migraine disorder, where plan required no such evidence.

In *Saliamonas v. CNA, Inc.*, 127 F.Supp.2d 997, 1000-1001 (N.D. ILL. 2001), CNA notified the claimant that it was denying her claim because of a lack of "objective medical evidence" of disability. But nowhere in the policy did CNA indicate that its decisions will be based only on "objective medical evidence" of disability. Under long-established contract law, the policy is a contract, and CNA cannot simply add new terms to the contract after the parties have ratified it. In *Williams v. Continental Casualty*, 138 F.Supp. 2d 998 (M.D. Tenn. 2001), the court reversed CNA's LTD benefits denial and entered judgment for the claimant based on CNA's erroneous requirement of objective evidence. The court found the policy contained no standard for the type of medical support required, so the insurer could not require the claimant to submit objective evidence of the disabling condition.

In *Durr v. Metropolitan Life Ins. Co.*, 15 F. Supp. 2d 205, 213 (D. Conn. 1998), the court found Hartford showed an actual conflict of interest by requiring objective medical evidence when the plan did not contain that requirement.

Regardless of the standard of review, a plan administrator's decision is arbitrary and capricious where new requirements for coverage are added to those enumerated in the plan. *Florence Nightingale Nursing Service, Inc.*, 41 F.3d at 1484, citing *Helms v. Monsanto Company, Inc.*, 728 F.2d 1416, 1420 (11th Cir. 1984). A plan administrator, therefore, cannot deny a claim for

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

**2010march HARTFORD CF 00000114**

**JOINT APPENDIX 173**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 5

long-term disability benefits based on "lack of objective medical evidence" when the plan does not refer to the objective medical evidence standard nor define that term. *Durr v. Metropolitan Life Insurance Co.*, 15 F. Supp. 2d 205, 212-213 (D. Conn. 1998).

An insurer's requirement that a claimant support a claim for disability benefits with objective evidence may be an added requirement not found in the plan, and is an example of either an abuse of discretion or arbitrary and capricious conduct as a matter of law. As can be seen by the breadth of decisions cited above, this point of law is not novel but something jurisdictions across the country adhere to.

- **Hartford Failed to Have Ms. Heimeshoff Examined by any Medical Professional**

There is a question whether Hartford has laid a proper foundation for its medical opinion regarding Ms. Heimeshoff's condition. Hartford deemed it unnecessary to have Ms. Heimeshoff personally evaluated by medical examiners, a physical capacities evaluator, or a vocational expert. This is critical as Hartford is a fiduciary, and under that term's definition is required to do what it can to ensure it thoroughly evaluates Ms. Heimeshoff's claim and physical capacity.

Hartford's records-reviewing consultant, Dr. Bress, appears to have little actual foundation for his opinion that Ms. Heimeshoff is not disabled by her fibromyalgia, as he did not personally examine her, or have the expertise required to review Dr. Theodore Becker's July 18-19, 2006 physical capacities evaluation. Moreover, it is clear from Dr. Bress's report that he approaches fibromyalgia as a matter of belief, and not as an actual illness that is well-established by the American College of Rheumatology. Dr. Bress's spin is plainly visible, as he seems dismissive of the potentially devastating effects of fibromyalgia, and selectively quotes only a few comments by other rheumatologists to suit his opinion. The result is the appearance that Dr. Bress would be highly unlikely to find anyone disabled by fibromyalgia, no matter what the findings or what any other physician says.

A brief internet search on Lexis-Nexis reveals that Dr. Bress frequently testifies on behalf of insurers. This factor impugns Dr. Bress's credibility, as he has a financial motive for testifying on behalf of insurers that claimants are not disabled: " . . . physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and in order preserve their own consulting arrangements. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). Hartford as the claims administrator " . . . ha[s] a clear incentive to contract with individuals who are inclined to find in its favor that [claimants are] not entitled to . . . LTD benefits." *Calvert v. Firestar Finance, Inc.*, 409 F. 3d 286, 292 (6th Cir. 2005). This factor evidences a clear conflict of interest on Hartford's behalf in adjudicating Ms. Heimeshoff's claim.

The record regarding Dr. Bress's appearance of impartiality leaves much to be desired; not only can he be predicted to be dismissive of fibromyalgia claimants, but an insurer can predict that an opinion from him will be favorable to claims denial or termination.

2701 First Avenue, Suite 340   Seattle, Washington 98121-1123   (206)374-7370   Fax (206)374-7377

2010march HARTFORD CF 00000115

**JOINT APPENDIX 174**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 6

Hartford has a duty to ensure Ms. Heimeshoff's claim is reviewed by one of the great majority of rheumatologists who knows fibromyalgia is a serious and potentially disabling illness with poor prognosis.

These failures do not rise to the level of care required of a fiduciary, and again evidences a conflict of interest. Merely relying on a medical records review in establishing a basis for claim acceptance when so much is at stake for Ms. Heimeshoff does not amount to the care with which Hartford as a fiduciary should be handling the claim.

•    **Fibromyalgia Is an Illness Subject to Objective Diagnosis**

Even if the subject LTD policy contained requirements of objective symptoms or limitations based on self-reported symptoms, which it does not, insurers cannot rely on such language to preclude fibromyalgia. In *Russell v. UNUM Life Ins. Co. of Amer.*, 40 F.Supp. 2d 747, 750 (D.S.C. 1999), the court stated:

> **The essence of UNUM's argument is that fibromyalgia is not an objectively diagnosable disease. The courts disagree.** "Fibromyalgia is a type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression." Lang v. Long-term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 796 (9th Cir. 1997) (citing The Arthritis Foundation, Fibromyalgia, Arthritis Foundation Pamphlet at 1, 5 (1992)). Recognizing the ability to detect and diagnose the condition, several courts have awarded disability benefits under ERISA for fibromyalgia. See e.g., *Lang, 125 F.3d at 799; Godfrey v. BellSouth Telecomm.,Inc., 89 F.3d 755, 759-60 (11th Cir. 1996).* The Godfrey court noted that "fibromyalgia can be severely disabling and can only be diagnosed by an examination of the patient." *Godfrey, 89 F.3d at 758* . . . Physicians can look to objective factors to diagnose fibromyalgia. Dr. Riley points to several articles detailing the condition citing the basis of her "pressure point" test. This diagnostic test is not foreign to the medical profession. The record includes several journal articles detailing the existence of fibromyalgia and the methods used to diagnose the disease.

For further discussion, please see *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, Inc.* 125 F.3d 794, 799 (9th Cir. 1997); *Godfrey v. Bell South Telecommunications, Inc.*, 89 F.3d 755, 758-60 (11th Cir. 1996): "Fibromyalgia can be severely disabling and can only be diagnosed by an examination of the patient." These cases are but a brief subset of the numerous cases available throughout most federal jurisdictions with similar holdings.

2701 First Avenue, Suite 340   Seattle, Washington 98121-1123  (206)374-7370   Fax (206)374-7377

**2010march HARTFORD CF 00000116**

**JOINT APPENDIX 175**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 7

• **Hartford Fails to Consider the Cognitive Requirements of Ms. Heimeshoff's Occupation and the Effects of Her Cognitive Deficits from Her Fibromyalgia on Her Ability to Perform Her Occupation.**

Hartford repeatedly references only the physical demands of Ms. Heimeshoff's usual occupation as Senior Public Relations Manager. That job title requires significant cognitive demands apart from the job's physically sedentary aspects. Hartford's considers only the physical aspects of her job and not the cognitive, as if it entailed only pure manual labor such as stocking shelves, sweeping floors, or stamping envelopes. Since Hartford finds Ms. Heimeshoff can perform sedentary work, then she can perform her usual occupation, without considering her job's demanding cognitive aspects. The bulk of Ms. Heimeshoff's usual occupation requires high cognitive ability, an aspect Hartford fails to consider.

In *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, the court explained that the defendant's medical opinion was "suspect" because it:

> . . . ignored the principal basis of the Plaintiff's claim for benefits and mischaracterized the facts from the Plaintiff's medical history. The crux of Plaintiff's claim for disability benefits **is severe and chronic pain and the cognitive impairments** caused by the pain medication she must take to manage this pain. Plaintiff was employed as an engineer, which may be a sedentary occupation, **but one which requires careful thought and concentration. Simply being able to perform sedentary work does not necessarily enable one to work as an engineer.**

Chronic, intractable pain disables Ms. Heimeshoff from any job. Hartford disregards this issue. While Dr. Bress considered Ms. Heimeshoff's physical restrictions and limitations, he and Hartford disregarded her cognitive limitations.

An insurer cannot consider only the physical aspects of an occupation apart from the cognitive aspects, and must consider all the disabling aspects of a claimants conditions, including cognitive/mental effects, chronic pain, and the effects of medication. *McKoy v. Int'l Paper Co.*, 488 F.3d 221 (4th Cir. 2007). That case is precisely on point with the manner with which Hartford has adjudicated Ms. Heimeshoff's claim. In *McKoy*, the insurer considered only the physical aspects of the claimant's (McKoy) ability to work, and failed to consider the mental/cognitive aspects. The court stated:

> Standing alone, McKoy's physical disability might have allowed him to do sedentary or light work. Indeed, on this basis alone International Paper concluded that McKoy was not disabled. As Dr. Rangaswamy, whose opinion formed the basis for finally denying McKoy's claim, said, "There are no clinical data that document physical limitations that preclude any employment. Therefore, he is not disabled" . . . **In sum, the plan's denial of benefits rested on an unreasonable failure to determine McKoy's mental condition, resulting in an unreasonable**

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000117

**JOINT APPENDIX 176**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 8

>            application of the plan's definition of "disability."

*McKoy,* at 224.

Note Dr. Rangaswamy's statement that there are no **physical** limitations that preclude McKoy from employment. This statement is mirrored by those of Dr. Bress in his November 20, 2006 report to Hartford:

- "It is my opinion that the insured was able to perform the activities of her sedentary occupation since 06/08/2005 through the present, **on a physical basis,**"

- "It is my opinion that the insured is currently able to work full time in a sedentary capacity, **on a physical basis,**" and

- "Prognosis is good from a **physical** point of view."

As a rheumatologist, Dr. Bress is not qualified to render expert opinions of a person's physical ability to work. Such opinion falls within the purview of a physical capacities examiner. Dr. Bress can only state whether Ms. Heimeshoff's fibromyalgia and symptoms prevent her from working, and since he does not think fibromyalgia can ever be disabling, his biases prevent him from rendering an opinion meaningful to this matter: "Rheumatologist Dr. Warren Blackburn states that 'there is no evidence that fibromyalgia is a crippling or incapacitating disorder or is a prodrome for more serious illness'." Not only is this statement nonsense, but Hartford knows that fibromyalgia can be disabling, as it has approved many LTD claims on the basis of fibromyalgia. Thus, Hartford finds itself in the situation where it endorses a statement that fibromyalgia is not disabling, while knowing that it has determined frequently that fibromyalgia is disabling by approving claims for LTD based on fibromyalgia. This situation is the definition of a conflict of interest.

- **Hartford Must Consider The Effects Of Ms. Heimeshoff's Chronic Pain**

Hartford's denial of Ms. Heimeshoff's benefits gives little weight to her chronically painful fibromyalgia. Hartford is required to consider the effects of chronic pain on Ms. Heimeshoff's ability to work. It is established that chronic pain alone, even without objective manifestations of physical limitations, can suffice to render a claimant unable to work. The court in *Willis v. Baxter International, Inc.,* 175 F. Supp. 2d 819 (W.D.N.C. 2001) affirmed that if a claimant has an objectively diagnosable impairment that reasonably could be expected to cause pain, the ERISA plan administrator must evaluate the effects of a disability claimant's pain even though its intensity or severity is shown only through subjective evidence (citing *Hyatt v. Sullivan,* 899 F. 2d 329 (4th Cir. 1990); *Austin v. Continental Casualty Co.,* 216 F. Supp. 2d 550 (W.D.N.C. 2002). Fibromyalgia is an objectively diagnosable illness that is known to be painful. Hartford must consider the effects of Ms. Heimeshoff's chronic pain on her ability to work.

The law is clear, as is the absence in Hartford's records of any regard to how Mr. Ms.

2010march HARTFORD CF 00000118

**JOINT APPENDIX 177**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 9

Heimeshoff's pain affects her ability to work. This aspect of the claims adjudication indicates a conflict of interest that may allow a court to review the claim de novo, and overturn Hartford's claim termination.

Hartford stated in its November 29, 2006 denial letter that Ms. Heimeshoff did not meet the definition of total disability throughout and beyond the elimination period, July 9 - September 8, 2005, and that Ms. Heimeshoff has not shown she does not have the functionality to meet the above definition.  But, Hartford possesses medical records from Ms. Heimeshoff's providers that support her inability to work due to fibromyalgia and attendant symptoms of chronic pain, fatigue, and cognitive deficits. Hartford's statement raises questions about whether Hartford has properly discharged its fiduciary duties under ERISA.  Again, this duty requires Hartford to do what it can to help Ms. Heimeshoff get her claim approved. Hartford's reasoning breaches this duty. This may be an innocent mistake, but a reviewing court may not see it that way, and determine Hartford has seriously breached its fiduciary duties toward Ms. Heimeshoff.

• **Hartford Selectively Chooses Which of Ms. Heimeshoff's Supporting Medical Information to Use to Support Claims Denial**

Federal courts do not view claims administrators favorably who selectively choose medical information from a claimant's file in order to support claims termination or denial. This becomes obvious if a claims administrator ignores concurring majority medical opinion, and instead picks minority opinions that oppose the majority opinion in order to bolster its case for claims denial or termination. Here, Hartford favors the lone opinion of Dr. Bress who only reviewed medical records and refuses to acknowledge that fibromyalgia can be disabling, and ignores the opinions of Ms. Heimeshoff's providers who have personally examined her, and who support that she does have fibromyalgia that renders her unable to work in any capacity. In *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006), the court stated:

> Here, the administrator, in reviewing the insured's medical records, focused on slivers of information that could be read to support a denial of coverage and ignored--without explanation--a wealth of evidence that directly contradicted its basis for denying coverage. Such a decision-making process is not deliberate or principled, and the explanation provided was far from reasoned, as it failed to address any of the contrary evidence. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170-71 (6th Cir. 2003) ("[t]he mere possibility" of a particular conclusion, notwithstanding "overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny" a claim); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005) (abuse of discretion when administrator relies on opinion of physician who fails to explain basis for rejecting other physicians' conclusions). Instead, MetLife supported its decision to rescind only by its cherry-picking symptoms from Conger's medical records, and then reverse-engineering a diagnosis. This is not the hallmark of a reasoned explanation. *Moon*, 405 F.3d at 381 (requiring a reasoned explanation "consistent with the quantity and quality of the medical evidence" (internal

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000119

**JOINT APPENDIX 178**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 10

quotation omitted)). For these reasons, we conclude that MetLife abused its discretion by concluding that Conger's answer to Question 5 was inaccurate, and MetLife's claim for rescission fails.

## FIBROMYALGIA IS A SEVERE, CHRONIC, DISABLING, AND ORGANIC ILLNESS SUBJECT TO OBJECTIVE DIAGNOSIS BASED ON DEFINED CRITERIA

Exhibit 1 is an abbreviated cross section of important fibromyalgia research. Please reference these materials carefully.

In 1990, the American College of Rheumatology (ACR), America's primary organization for rheumatologists, established criteria defining fibromyalgia as widespread pain for more than three months in combination with tenderness at 11 or more of 18 specific body sites. According to the ACR, widespread pain existed when the following were present: Pain on the left side of the body, pain on the right side of the body, pain above the waist, and pain below the waist.

In addition, exoskeletal pain (cervical spine or anterior chest or thoracic spine or low back) had to be present. In this definition, left or right shoulder and buttock pain was considered as pain for each involved side. Low back (lumbar) pain was considered lower segment pain. Thus, pain in three sites (e.g. right shoulder, left buttock, thoracic spine) qualifies as widespread pain.
The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, *Report of the Multicenter Criteria Committee*, Wolfe, et al.; Arthritis and Rheumatism, Vol.33, No.2, February 1990 at 163.

In addition to widespread pain, the 1990 Multicenter Study explored other discriminating criteria for diagnosing fibromyalgia. After considerable study, although many other symptoms frequently occur with patients who have fibromyalgia, the Committee identified 18 specific body sites which, when palpated with up to 9 pounds of pressure, hurt in persons with fibromyalgia, but which did not hurt in control persons. Patients may hurt at many other sites, but the 18 identified sites provided the best consistent accuracy. If a patient had 11 of 18 of these tender points with any report of pain on palpation, then that patient would have fibromyalgia if the patient also met criteria for widespread pain. The tender points were not points that necessarily hurt without being touched. They differ from trigger points in that the pain does not usually radiate, but is specific to the point. Any point where there is any positive report of pain is a positive point for the diagnosis of fibromyalgia. The tenderness scoring typically can be made with (0) equaling no pain report or no grimace response; (1) equaling positive pain report and no grimace response; (2) equaling positive pain report and positive flinch or grimace response; (3) positive pain report and dramatic flinch or grimace response; and (4) patient is untouchable at that site. A report of at least level (1) tenderness makes for a positive tender point.

The Multicenter Study looked at a number of other symptoms typically associated with fibromyalgia. The list of symptoms includes:

2010march HARTFORD CF 00000120

## JOINT APPENDIX 179

Ms. Heimeshoff Appeal
September 26, 2007
Page - 11

- Widespread pain;
- Sleep disturbance;
- Fatigue;
- Morning stiffness;
- Anxiety;
- Irritable bowel syndrome;
- Irritable bladder;
- Headaches;
- Cold hands and/or feet;
- Dry mouth, eyes;
- Depression;
- Numbness, tingling;
- Allergies;
- Hypoglycemia;
- Excessive mucus;
- Fluid retention;
- PMS;
- Painful menstruation;
- Adversely affected by heat or cold;
- Adversely affected by weather change;
- Recurring family stress regarding symptoms;
- Family history of similar symptoms.

Fibromyalgia is not a diagnosis of exclusion, but one that can coexist with other conditions. This distinguishes fibromyalgia from chronic fatigue syndrome, which is a diagnosis of exclusion.

Patients who have fewer than the required number of tender points may also be diagnosed with fibromyalgia if they have widespread pain and many of the characteristic symptoms of the syndrome. These symptoms include fatigue, sleep disturbance, mood disturbance, headache, irritable bowel symptoms, among others. Tenderness in sites not specified by the ACR criteria does not exclude diagnosis. Fibromyalgia may be associated with concurrent medical or psychiatric illness, but the diagnosis of one disorder does not exclude the other. *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability*, Wolfe, The Journal of Rheumatology 1996; 23:3 at 536.

Research continues and there may be objective tests to document changes in patients with fibromyalgia. These were discussed recently in Mohammed B. Yunus, et al., *Fibromyalgia Consensus Report: Additional Comments*, Journal of Clinical Rheumatology, Vol.3, No. , December 1997 at 325. Dr. Yunus is an internationally recognized fibromyalgia expert:

> While no specific laboratory testing is currently available in fibromyalgia (as in many other rheumatologic diseases), objective laboratory abnormalities often do exist in this condition. Abnormal sleep electro-encephalographic test, a three fold increase in cerebral spinal fluid substance P, a reproducible abnormality and

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000121

**JOINT APPENDIX 180**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 12

serum serotonin, decreased imipramine bindings on platelets as compared with depression, a highly significant decrease IGF-1 (somatomedin C) and a decrease in cerebral blood flow in the hypothalamus and the caudate nucleus of the brain by single-photon-emission-computed tomography (SPECT) are examples. These abnormal tests also provide important information on the biophysiological mechanisms in fibromyalgia. We agree that these tests should not be routinely ordered, but in the presence of suspected concomitant or associated conditions (such as a sleep disorder), some of the laboratory or imaging tests mentioned in the report may be indicated. Yunus *et al.* at 325.

Two recent publications regarding fibromyalgia confirm it is a physical condition with a wide range of symptoms that has a very poor prognosis. The first is in the *Clinical Primer of Rheumatology*, the chapter by Graciella Alarcon, M.D. published in 2003, cited above. Dr. Alarcon writes: "Fibromyalgia is a chronic musculoskeletal disorder characterized by generalized pain and tenderness at specific anatomic sites, called tender points. Patients with fibromyalgia commonly have other clinical manifestations, including fatigue, altered sleep, headache, and irritable bowel syndrome." Dr. Alarcon discusses many aspects of fibromyalgia including musculoskeletal manifestations, other clinical manifestations, epidemiology, etiopathogenesis, peripheral factors, and central factors. The discussion's central factors includes identification of neuroendocrine abnormalities, neuropeptide abnormalities, and abnormalities in functional brain activity shown on functional MRI's and SPECT scanning. While the studies of central abnormalities are not proposed for diagnosis, they clearly establish that there are significant objective physical abnormalities identifiable in patients with fibromyalgia compared to controls.

Dr. Alarcon also comments on current treatment efficacy: "Given that we are just beginning to understand this disorder, it should not come as a surprise that we lack effective therapies or the data to support many of the ones that are advocated." Dr. Alarcon also recognizes: "Although fibromyalgia patients do not develop obviously physical deformities or impairments, this disorder can impact several domains of their lives (pain, iatrogenesis, employment, and financial and family stability)." It is not surprising that she observes: "Patients who remain employed, physically active, and trim; take few medications; and have adequate coping skills and a supportive family tend to do better than those who are physically inactive, unemployed, overweight, and already taking many medications."

A recent textbook collects much of the current knowledge regarding fibromyalgia. *Fibromyalgia & Other Central Pain Syndromes*, Wallace and Clauw, editors, Lippincott, Williams and Wilkins (2005). In the *Introduction to Fibromyalgia and Related Problems*, Hugh A. Smythe writes:

What is fibromyalgia? It seems that many rheumatologists do not know the answer! Yet it is so simple in all its fundamental aspects--fibromyalgia is referred pain and amplifying factors. The illness is of deep, somatic origin. The areas where the referred pain is perceived are innocent, and the source of the pain is unknown to the patient and to many health professionals too. There are many

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000122

**JOINT APPENDIX 181**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 13

referred pain syndromes, and the subgroup labeled fibromyalgia is at the more severe end of the pain spectrum and is complicated further by fatigue, physical de-conditioning, and other symptoms. If you understand referred pain, you know 90% of fibromyalgia pathogenesis, assessment, and treatment. If you understand the amplifying factors, you know 50% of fibromyalgia pathogenesis, but only 20% of that needed for effective treatment. Referred pain interacts with amplification factors.

Dr. Yunus recognizes fibromyalgia as a central sensitivity syndrome resulting from a common mechanism known as central sensitization. Fibromyalgia is but one of these central sensitivity syndromes which also include chronic headaches, irritable bowel syndrome, chronic fatigue syndrome, myofascial pain syndromes, restless leg syndromes, periodic limb movement disorder, temporomandibular joint disorder, multiple chemical sensitivity, female urethral syndromes, interstitial cystitis, primary dysmenorrhea/chronic pelvic pain, among others. *Id.* Yunus, Chapter 4. Dr. Yunus also confirms the recognized symptoms of fibromyalgia in a subsequent chapter:

> Although fibromyalgia is defined on the basis of pain and tenderness, studies among various ethnic groups have shown a consistent pattern of multiple symptoms, that include widespread pain and stiffness, fatigue, poor sleep, morning fatigue, paresthesia, dizziness, a subjective swollen feeling, cognitive difficulties, psychological distress, and sensitivity to environmental factors such as weather or noise, as well as many associated conditions, for example, headaches, irritable bowel syndrome and restless leg syndrome.

*Id.* Yunus, Chapter 11, p. 130.

Many of the textbook chapters extend beyond what is quoted here to describe in detail the physical abnormalities found in patients with central pain syndromes, including fibromyalgia. Dr. Bennett describes the neurologic features in fibromyalgia in a chapter he wrote, including restless leg syndrome (which, despite its name, produces symptoms anywhere in the body), paresthesias, auditory symptoms (sensitivity to loud noises), visual symptoms (blurred vision), autonomic dysfunction (dry eyes and mouth, increased cold sensitivity, neurally mediated hypotension, and impaired variation of the R-R interval on electrocardiography), dizziness, radiculopathy, motor weakness, and headaches). *Id.* Bennett, Chapter 12.

Numerous studies document the disabling affects of fibromyalgia. The recent text by Wallace and Clauw also provides a chapter that addresses prognosis for people with fibromyalgia. Written by Horizon and Weisman, the chapter evaluates and reviews the studies that have been completed addressing the issue of prognosis. The authors state: "Despite the aforementioned study limitations, studies generally indicate that complete remission of fibromyalgia with complete resolution of chronic pain is rare. Nevertheless there may be reasons for limited optimism."
In the longest follow-up study to date, a 10-year prospective study of 39 clinic patients with fibromyalgia in Boston Massachusetts, there are no cases of complete remission, with all subjects

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000123

**JOINT APPENDIX 182**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 14

reporting some fibromyalgia symptoms at study's end. In fact, most patients still experienced difficulties by study's end – moderate to extreme fatigue in 59% of subjects, moderate to severe pain or stiffness in 55%, and moderate to severe sleep difficulty in 48%. However at the 10-year follow-up, 66% of the subjects felt they were a little to a lot better than when first diagnosed; 55% felt well or very well, and only 7% felt poor.

The only other long-term fibromyalgia follow-up study was an 8-year Swedish study of 49 subjects that described remissions as "rare." Furthermore, a larger 4-year British study of 72 patients reported that 97% of patients had continued symptoms for the duration of observation and that 60% were worse, with only 26% improvement noted over baseline.

Recently, Baumgartner et al. completed a 6-year prospective study of a cohort of fibromyalgia patients in a family practice setting. Of the 45 patients that completed the repeat evaluation, 20 (44%) of the patients indicated more pain, 17 (38%) patients did not notice a change in pain, and 8 (18%) reported improvement after 6 years of treatment.

*Id.* at 401-402.

There are even more studies that establish the long term disabling effects of fibromyalgia. The results of the Six Center Longitudinal Study were reported in September 1997. This study concludes:

> This study shows that the prognosis and outcome of fibromyalgia are unsatisfactory. Patients with fibromyalgia have substantial and clinically significant abnormalities and all important outcome measures. These results are in accordance with the finding of continuing high rates of service utilization and work disability and we have shown in other analyses from this longitudinally studied cohort.

*Health Status and Disease Severity in Fibromyalgia*, Wolfe, *et al.*, Arthritis & Rheumatism, Vol.40, No.9, September 1997 at 1577-1578.

The occupational environment study by Waylonis is particularly useful in looking at the types of work activities that cause problems for people with fibromyalgia. Waylonis, MD George, *et al.*, *A Profile of Fibromyalgia in Occupational Environments*, American Journal of Phys. Medicine Rehabilitation, Vol. 73, No. 2, April 1994.

Apart from pain with activity, profound fatigue frequently prevents fibromyalgia sufferers from working. It can be described as a severe flu, but not the type of flu where the sufferer can tough it out and go to work. It is more like the flu that keeps the sufferer from getting out of bed. In addition, the other symptoms in combination with the widespread pain can prevent routine work activity and interfere with daily living activities. Most important, repetitive tasks cause problems. On any given day, a fibromyalgia patient may be able to do a given task. It is then necessary to look at the effect of doing that task over the next couple of days. Typically, the

2010march HARTFORD CF 00000124

**JOINT APPENDIX 183**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 15

fibromyalgia patient will push to do the task on a given day, but will then need to spend the next several days in bed. The unpredictability of symptoms, the waxing and waning of symptoms, and adverse effects of changes in weather or temperature or degree of activity make it very difficult for someone with severe fibromyalgia to maintain any employment and to participate in life as they had before developing fibromyalgia.

There is no cure for fibromyalgia. Once people develop fibromyalgia, they have it for the rest of their lives. The symptoms seem to plateau, meaning once they stabilize, absent some other trauma or other intervening event, the symptoms remain about the same. There are typically good days and bad days, but the symptoms wax and wane around the plateau.

Since treatment cannot cure fibromyalgia, it is designed to mitigate the symptoms, increase the number of good days, and decrease the number of bad days and the variance in symptoms around the plateau. One of the most important elements of treatment is for the individual to understand that pacing life becomes necessary. People with fibromyalgia are frequently high achievers before the condition sets in. They have a hard time letting go of life as well as difficulty with their adjustment to life as they can do it. Finally, their bodies require them to change their lifestyle.

In addition, a variety of other modalities are offered. None of these modalities has been proven in double blind testing to create a significant difference. However, these modalities are used on a patient by patient, case by case basis. Physicians experienced in managing patients with fibromyalgia look at multi-disciplinary treatment and encourage a variety of treatment modalities including prescription drugs, physical therapy, massage therapy, acupuncture, biofeedback, hot tubbing, and light exercise.

Health care providers often miss the diagnosis of fibromyalgia. We have seen it take up to five years to make the diagnosis even though symptoms have been present throughout that time.

In addition, the Social Security Administration (SSA) recognizes the objective and disabling effects of fibromyalgia. In the ruling, SSR 99-2P, the SSA acknowledges the disabling effects of fibromyalgia, particularly when it is combined with chronic fatigue, as is the case with Ms. Schneider.

The primary focus on the rule is chronic fatigue syndrome cases, but Footnote 3 in SSR 99-2p states:

> There is considerable overlap of symptoms between chronic fatigue syndrome and fibromyalgia Syndrome (fibromyalgia), but individuals with chronic fatigue syndrome who have tender points have a medically determinable impairment. Individuals with impairments that fulfill the American College of Rheumatology criteria for fibromyalgia (which includes a minimum number of tender points) may also fulfill the criteria for chronic fatigue syndrome . However, individuals with chronic fatigue syndrome who do not have the specified number of tender

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000125

**JOINT APPENDIX 184**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 16

points to establish fibromyalgia, will still be found to have a medically
determinable impairment.

SSR 99-2p fn 3 (1999).

## MEDICAL SUPPORT

**Sheila Bastien, Ph.D.**
Neuropsychologist

Dr. Bastien has an extensive background in evaluating chronic illnesses' effects on
neurocognitive functioning, and her credentials are beyond reproach. For an overview of Dr.
Bastien's credentials, please see her abbreviated curriculum vitae at the end of her updated
report, attached hereto as Exhibit 2. Ms. Heimeshoff presented to Dr. Bastien for a two-day
neurocognitive evaluation on August 29 and 30, 2007. Dr. Bastien reviewed extensive medical
records and expert reports, as noted in her report. As Dr. Bastien's report is extensive, please
read it carefully for detail, as only excerpts are included here. Dr. Bastien states:

> 1. Julie Heimeshoff is a 39-year old woman who worked at Wal-Mart Inc. for
> over 20 years. Her last position was as a Senior Public Relations Manager. She
> developed fibromyalgia symptoms and problems in the early 1990s, which
> have continued and worsened over time. The medical records show that she
> was very reluctant to leave her employment but finally conceded. I have
> reviewed extensive medical records which have documented her chronic pain
> syndrome, fibromyalgia, irritable bowel syndrome, TMJ, interstitial cystitis,
> allergies, and recurrent sinusitis.

> 2. She currently has uneven intellectual functioning with a Verbal IQ in the very
> superior range, and Full-Scale IQ just barely in the Superior range.
> Performance IQ is average. There is a great deal of scatter in her scaled scores
> suggesting multiple areas of weakness. She was placed in high-potential
> classes and was evaluated with an IQ test in high school, which she reports was
> 127, but easily could have been 130. In any case, the high school placed her in
> advanced classes based on her IQ test, and that is usually for very superior IQ.
> Since her verbal IQ is in the very superior range currently, I would not doubt
> that. She evidenced confusion on arithmetic, and problems with short-term
> memory and concentration. There was some difficulty with remote memory.
> Her processing speed was compromised, and tests of perceptual organization
> were performed somewhat slowly.

> 3. On the Halstead-Reitan Neuropsychological Battery (HRNB), she had
> problems in sequencing and shifting sets. Her performance is quite slow, and
> places her in the moderate to severe range of functioning, indicating a slowed

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

**2010march HARTFORD CF 00000126**

**JOINT APPENDIX 185**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 17

processing speed. This can comprise executive functioning. She had problems on two of the indicators on the tactual performance test. One of the most notable problems on the HRNB were the abnormal motor findings. She is bilaterally impaired on a test of motor speed and persistence. Her left hand is slightly weaker than expected, and she is moderately impaired, bilaterally on a test that measures speed, fine-motor control, and dexterity. I noticed a bilateral fine tremor, worse on her left hand.

4. An additional motor test was given, the Purdue Pegboard Test, where she has very poor scores. In fact, her score on both hands together is so low that it would likely indicate, or at least suggest, an organic/neurologic problem. Fine motor speed and dexterity are required for most jobs in the national economy; her scores are too low.

5. On auditory verbal memory, her performance is mild to moderate. **After a four hour delay, she has problems remembering a sufficient number of items and scores in the severe range.** Even on figural memory she has problems. On initial figural learning, she is mild to moderately impaired. On delayed, she is moderately impaired. She has some problems in short term memory and some minor problems in remote memory, as well as being below average on incidental memory, and mildly impaired on memory for spatial localization.

6. **On the Thurstone Verbal Fluency Test, her raw score is 43; 45 is the cutoff for brain damage - so her score places her in the brain damage range. This is very unexpected.** This test is compromised when there are frontal lobe problems, particularly the left-frontal lobe. This affects executive functioning. From the tests it is clear that there are other areas of the brain that are affected as well.

7. **On the Differential Aptitude Test, three of the aptitude/ability areas are too low for her work as a Senior Public Relations Manager.** Numerical ability and abstract reasoning are below what is required, however, the most notable of all is the very low score, in the 10th percentile in Clerical Speed and Accuracy. **This score is so low that one could not function in any job requiring paper work or quick processing of numbers and symbols.**

8. **There is no evidence of malingering.**

9. No significant depression was noted during my evaluation nor was there any significant anxiety present.

10. A performance-based physical capacity evaluation, signed by Theodore J. Becker, PhD on 07/19/07, gives an opinion that the examinee should be considered work intolerant. His opinion is that physiological response shows that competitive and predictable sustained work is absent for all levels of

2010march HARTFORD CF 00000127

**JOINT APPENDIX 186**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 18

category, according to the Dictionary of Occupational Titles.

11. **Ms. Heimeshoff, in my opinion, is not able to function in the workplace at this time or the foreseeable future in any area for which she has reasonable training and experience, and this has been so since 06/07/05. In fact, some of her scores are so low that she could not even function at entry-level office work, given her pain and medical problems.**

**Stephen Goss, MD**
Internist

Dr. Goss has been one of Ms. Heimeshoff's treating physicians since 2002, and is very familiar with her medical chart. He has reviewed all the recent reports submitted with this letter, and is clear in his opinion that Ms. Heimeshoff is totally disabled and unable to work due to the chronic pain and fatigue she experiences as a result of her fibromyalgia. His report is attached as Exhibit 3. Dr. Goss states:

> This letter is in follow up to a correspondence from myself dated September 19, 2006 regarding Julie Heimeshoff referenced above. This has had to do with Ms. Heimeshoff's long term disability benefits through the Hartford Company. This letter serves to update my previous correspondence including her update medical status as well as incorporating some new evaluations.

> **Ms. Heimeshoff has continued to have chronic pain especially in her hips and lower extremities but having variable muscular discomfort at almost all times.** She also is bothered by headaches occasionally that are relatively severe and I think are migraine in nature and continues to have difficulty with organizing her day and her condition. Her pain finally got to the point that we had no choice but to go to some chronic narcotic therapy and she now takes OxyContin and Oxycodone on a regular basis . She has shown no tendency to try to abuse these medications and is on a stable monthly dosing.

> Since the last letter was written and before staring her on narcotic therapy she did undergo a psychiatric evaluation with Dr. Stephen Dollins who diagnosed her as a cognitive disorder not otherwise specified. We also had her see Dr. Cannon, a local pain specialist, who recommended increasing her dose of Lyrica but was supportive of narcotic therapy. Also during this time I have seen where Dr. Theodore Becker gave a strong rebuttal to the Hartford doctor's evaluation of Ms. Heimeshoff. That rebuttal was dated September 04, 2007. In addition, I have reviewed a neuropsychological assessment performed by Dr. Sheila Bastien dated September 13, 2007. Dr. Bastien's assessment fits well with Ms. Heimeshoff's situation again showing a cognitive disorder of a relatively severe degree.

> In addition, I believe Ms. Heimeshoff has undergone another evaluation in regards

2701 First Avenue, Suite 340 Seattle, Washington 98121-1123 (206)374-7370 Fax (206)374-7377

**2010march HARTFORD CF 00000128**

**JOINT APPENDIX 187**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 19

to exercise tolerance. I do not have that report but understand it again revealed significant decreases in tolerance. Again this, as well as the above evaluations, continue to fit with the clinical picture that I see on at least a monthly basis in my clinic. Ms. Heimeshoff continues to struggle with discomfort that is difficult to control, is relatively functional at home but only for brief periods of time, and given some of the cognitive dysfunction that's well outlined in these other reports it would certainly be difficult for her to hold down a job even a sedentary one since she does struggle even at home with maintaining her own household.

Although it would be very natural for Ms. Heimeshoff to be depressed none of her evaluations have ever shown her to be significantly depressed. Depression has even been empirically treated without any significant improvement in her situation in the past.

To recap, I have routinely seen Ms. Heimeshoff since July of 2002. In light of the corroborating assessments that have more recently been done coupled with the previous assessments and my week-to-week, month-to-month clinical impression that is no different than the previous evaluations, I do not think Ms. Heimeshoff is capable of employment even if in a sedentary job. **Since June 8, 2005 she has been unable to work in any occupation on a regular full-time basis with any day-to-day or week-to-week regularity all related to the above findings of fatigue, chronic pain, and cognitive problems related to her fibromyalgia.** I think she is so incapacitated due to muscular discomforts that even if it only required getting up and down on rare occasions and carrying only very light loads of files she could not do it. In addition, I do not think the cognitive dysfunction will allow her to function even if her muscular pain and fibromyalgia was completely controlled as well as her having relatively significant occasional to frequent headaches.

**Michael Saitta, MD**
Rheumatologist

Dr. Saitta has been Ms. Heimeshoff's primary treating rheumatologist for a number of years. Hartford has on several occasions sought functional capacities evaluations from him, hoping to establish Ms. Heimeshoff's level of physical functionality to see if she is physically unable to work a regular, full-time job. Dr. Saitta declined Hartford's request, noting that he does not feel comfortable with performing a functional evaluation as that is outside his specialty. Therefore, Dr. Saitta has deferred that responsibility to the proper authority on functional capacity, a physical capacities expert, such as Theodore Becker, Ph.D. Please see Dr. Saitta's note attached hereto as Exhibit 4.

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000129

**JOINT APPENDIX 188**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 20

**Theodore Becker, Ph.D.**
Performance Based Physical Capacities Evaluator

Dr. Becker is a preeminent physical capacities evaluator. Hartford was already sent Dr. Becker's first full report on October 2, 2006, but did not seem to pay much attention to his findings. Hartford should carefully read both Dr. Becker's full report and the addendum thereto, Exhibit 5, as it contains valuable information related to Dr. Bress's inability to properly evaluate matters involving physical capacities. Dr. Becker reviewed Dr. Bress's November 20, 2006 report, and states:

> In regards to the letter of Dr. Norman M. Bress, M.D., FACP, FACR in which he states the following: "I therefore find no support for Dr. Becker's contention that the insured needs 'continuing medical supervision'. In addition there is no support for Dr. Becker's assertion that work rehabilitation is risky because of heart rate elevation. It is stated in insured's record that she does not exercise. Because of her deconditioning, it is not surprising that her heart rate increases with activities, even minimal exercise. It is therefore my opinion that the increase in her heart rate during the PCE is of no diagnostic relevance".

> **Dr. Norman Bress comments are the most unprofessional and irrelevant comments I have ever encountered in over 35 years of experience in clinical work and exercise physiology testing.** Dr. Bress's professional accreditation is in rheumatology and NOT IN WORK OR EXERCISE PHYSIOLOGY. I have achieved a certification through the American College of Sports Medicine (ACSM) as a provider of exercise testing, and having been applying those principles for over 31 years. **I am published in both textbooks and professional publications on the interpretation of work tolerance.** My most recent publication, 'Applications of Work Physiology Science to Capacity Test Prediction' includes 105 bibliographic citations and was three years in preparation and has been scientifically peer reviewed. (See my previously provided professional resume).

> · Furthermore, **I was on faculty at the Southwestern Medical School, University of Health Science Center at Dallas when our research team coined the term 'deconditioning',** which is short for involuntary biomechanically restricted deconditioning. Dr. Bress has absolutely no idea what he is talking about concerning 'heart rate that increases with activities, even minimal exercise'. In this case we are not talking about 'EXERCISE', the testing refers to work task exposure which simulates actual requirements of postures and positions. If Dr. Bress knew anything at all about work 'physiological' response he would know that there are exacting expectations about response to work tasks and that 'EVEN MINIMAL EXERCISE does not normally elevate physiological response, and does not cause excessively long recovery to resting responses. Dr. Bress was 'SHOOTING FROM THE HIP', and **provided absolutely no proof of his**

2701 First Avenue, Suite 340   Seattle, Washington 98121-1123   (206)374-7370   Fax (206)374-7377

**2010march HARTFORD CF 00000130**

**JOINT APPENDIX 189**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 21

opinions and provided absolutely no scientific explanation for his opinion. If his opinion were reviewed by a scientific committee he would be considered to have provided nothing but a 'JUNK SCIENCE OPINION'. According to Bassey, MacDonald and Patrick, 1982, (from the European Journal of Applied Physiology) reported that the individual's physical tolerance to work as reflected heart rate was directly proportional to their physical need for oxygen consumption. This remains a basic widely accepted principle today. When a worker's condition was tolerant to standard intensity of work, there was a sustainable physiological response, which is measurable by heart rate. However, when the requirement of the work exceeds the tolerance of the individual, the heart rate elevated over time while the work function decreased symbolizing a decrease in oxygen delivery and the onset of physiological fatigue. Furthermore, Davies, 1966, pointed out the main barrier of physician understanding in work physiology was a lack of understanding of the significant difference between exercise and work physiological testing and a failure to appreciate the underlying physiological principles upon which work is based. Clearly, from the statements of Dr. Bress it is understood that he has 'ABSOLUTELY NO UNDERSTANDING OF WORK PHYSIOLOGY', and the ongoing validity of the 1966 observation by Davies.

**To state, as Dr. Bress has, that 'heart rate has no diagnostic relevance' is as stupid a statement as any I have ever encountered in my years of practice.** The American College of Sports Medicine has a text, Guidelines for Exercise Testing, revised more than seven times, which is detailed in the examination of heart rate as a diagnostic tool regarding pathology, physiological tolerance, and indication regarding exercise rehabilitation. One of the contraindications to stress induced exercise for rehabilitation is an excessively elevated heart rate response with an excessively long recovery to resting, like that of Ms. Hemishoff. In the presentation of the contraindicated systemic physiological response the professional approach is to seek medical intervention from a provider with appropriate credentials. **I do not see where any of Dr. Bress credentials are worthy of consideration for interventions related to systemic physiological disorders.** Therefore, Dr. Bress's contention that 'there is no support for work rehabilitation because it is risky business because of heart rate elevation' only goes to indicate how insignificant his knowledge is concerning the relationship of task exposure and work tolerance.

To the readers of his correspondence I would point out that **Dr. Bress provided absolutely no scientific foundation for his opinion, and absolutely no scientific rebuttal to the data in the PCE evaluation, yet he boldly stated, '...the PCE is of no diagnostic relevance.** Dr. Bress's opinion is rubbish. My opinions stand on the science of work physiology stretching back to the work of A.V. Hill, 1927, as applied to the PCE report and opinions. This 1927 work remains accepted today as the basis for evaluating human performance and

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123 (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000131

**JOINT APPENDIX 190**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 22

physical capacity testing.

Hartford would be well advised to re-read Dr. Becker's report, as his findings regarding Ms. Heimeshoff's ability to work stand, and remain unrebutted.

**Staci R. Stevens, MA**
**J. Mark VanNess, Ph.D.**
Cardiopulmonary Exercise Evaluation

Cardiopulmonary exercise (CPX) evaluation is a close cousin of the typical physical capacities evaluation such as Dr. Becker's, but one where pulmonary and cardiovascular responses to exercise are monitored to eradicate concerns of malingering and to precisely discern the level of cardiopulmonary capacity, and the effects of illness thereon, if any. Ms. Stevens and Dr. VanNess are the principals of Pacific Fatigue Laboratories, and are renowned in the field. Their report and CV are attached hereto as Exhibit 6. CPX is a precise and neutral arbiter of physical dysfunction, as effort and malingering are quickly detected. Ms. Heimeshoff presented for her CPX evaluation on August 27 and 28 of 2007, performing two complete days of testing to evaluate fatigue responses on the second day after the first day's testing. In that manner, fatigue responses to work is evaluated and properly documented.

The evaluators write:

> 1. Assessment of Maximal Effort: The subject was cooperative and gave very good effort during both exercise tests. **The test results do not reflect malingering. Cardiopulmonary exercise testing provides objective measures that cannot be cheated.**
>
> 2. Lung Function: Pre-exercise pulmonary function testing showed no abnormalities, both static and dynamic lung volumes were normal. **The pulmonary response to exercise on test 2 was significantly blunted,** especially at maximal workloads. This indicates that prior physical activity will interfere with normal lung function in this particular patient.
>
> 3. Metabolic Responses: The peak exercise values for oxygen consumption on test 1 were low reflecting moderate impairment of the metabolic system. **The 16.2% fall in oxygen consumption from test 1 to test 2 demonstrates profound post-exertional impairment of metabolic processes.** This difference is greater than is expected (variability of 8% or less) for other pathological conditions such as heart failure, respiratory disease or cardiac abnormalities. The biggest decrements between test 1 and test 2 were observed at the anaerobic threshold. **Anaerobic threshold is an important index of the amount of work that can be sustained before the body relies more heavily on anaerobic metabolism.** Work intensities above anaerobic threshold require energy production derived from anaerobic sources and limits the duration at which such

2010march HARTFORD CF 00000132

**JOINT APPENDIX 191**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 23

intensities of effort can be sustained. **Most activities of daily living (reading, normal speed walking, computer use, office-type work, etc.) are aerobic in nature and healthy individuals are able to perform such activities for prolonged periods of time and with no meaningful physical fatigue.** Work at intensities above anaerobic threshold cause cumulative fatigue. If anaerobic threshold occurs at a low work rate completion of normal daily activities may exceed the energy demands that can be met through oxidative metabolism, thus requiring anaerobic metabolism to provide energy. This results in early onset fatigue. For most individuals, physical demands are considered appropriate if the 8-hour energy expenditure requirement averages less than or equal to 50% of maximal oxygen consumption. **The fall in Ms. Heimeshoff's anaerobic threshold of 36% test 1 to test 2 not only indicates metabolic dysfunction, it indicates dramatic fluctuations in energy availability that make managing difficult within a structured work environment. This is both a demonstration of post-exertional malaise and a quantifiable limitation of her ability to function.**

4. Cardiovascular Responses: The subject demonstrated a normal hemodynamic and ECG response during the transition from rest to exercise, but as exercise intensity increased there was a blunting of the heart rate and blood pressure responses on both exercise tests.

. . .

9. Recovery Response: The reported symptoms indicate atypical and poor recovery. The increase in symptoms and lack of recovery within one day indicate abnormal recovery response.

10. Reproducibility: Cardiopulmonary test-retest variability should be less than 8% for healthy individuals, and even in pathological states such as cardiovascular and pulmonary diseases despite absolute values that may be abnormal, variability should still be less than 8%. In the present report, the inability to reproduce test results for pulmonary or metabolic values on consecutive days indicates a unique pathology and inability to function on subsequent days. This percent decline in peak oxygen consumption of 16.2%, and the decline in peak ventilation of 18.6% are each greater than expected. Additionally, the large variability in values at the anaerobic threshold, 36 % decline for oxygen consumption and 42% in watts, are indicative of the fluctuations in physiological function that make structured work habits difficult to maintain. These findings provide objective evidence of post-exertional malaise and demonstrate metabolic and pulmonary dysfunction.

Summary

**The findings indicate diminished functional capacity, inability to sustain work, inability to recover and maintain physical function due to metabolic**

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

**2010march HARTFORD CF 00000133**

**JOINT APPENDIX 192**

Ms. Heimeshoff Appeal
September 26, 2007
Page - 24

and pulmonary dysfunction. Any physical work, sustained for more than a few minutes, will elicit a significant fatigue response.

**Lay Witness Testimonies**

Attached as Exhibit 7 are copies of testimonies by Ms. Heimeshoff's family members and friends. These statements clearly evidence that she is not malingering or otherwise seeking secondary gain.

There are statements by:

- Julie Heimeshoff;
- Volker Heimeshoff, husband;
- Sherli Burns, sister;
- Paula Stimmel, sister;
- Kaylynn Jordan, friend;
- Carla Murray, work friend.

## CONCLUSION

Ms. Heimeshoff's treating and consulting physicians all agree she cannot work due to fibromyalgia and associated symptoms of chronic pain, fatigue, and cognitive problems. These opinions are solidly documented and based on either exhaustive in-person testing over several days or long-term patient-physician relationships. Hartford cannot in good faith ignore this without being in serious breach of its duties toward Ms. Heimeshoff.

It appears Hartford paid little or no attention to Dr. Becker's report originally sent to Hartford on October 2, 2006, in spite of repeatedly requesting a functional report from Dr. Saitta. Now, Hartford not only has a proper physical capacities evaluation from Dr. Becker, but also a full two-day pulmonary exercise evaluation (Exhibit 6) showing inability to work in any occupation.

Similarly, Hartford cannot require Ms. Heimeshoff to support her illnesses with objective evidence, as that requirement is not contained in the policy.

The evidence shows beyond any reasonable doubt that Ms. Heimeshoff suffers from severe fibromyalgia and related symptoms including chronic fatigue, pain and cognitive problems, and that she has been unable to work since before June 8 of 2005. Given this evidence and Hartford's potentially serious issues in failing to adequately investigate Ms. Heimeshoff's claim, we respectfully ask that you approve her LTD benefits.

We are confident of success if this matter proceeds to court given the high quality and quantity of medical and lay testimony that supports Ms. Heimeshoff's claim, and Hartford's breaches of its duties toward Ms. Heimeshoff.

2701 First Avenue, Suite 340  Seattle, Washington 98121-1123  (206)374-7370  Fax (206)374-7377

2010march HARTFORD CF 00000134

## JOINT APPENDIX 193

Ms. Heimeshoff Appeal
September 26, 2007
Page - 25

Please let us know immediately if you require further information to process this appeal.  Thank
you.

Very truly yours,

KRAFCHICK LAW FIRM

Kristian E. Soholm

Encl.
cc:    Julie Heimeshoff

2010march HARTFORD CF 00000135

**JOINT APPENDIX 194**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Julie Heimeshoff,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Hartford Life & Accident Insurance Co. and<br>Wal–Mart Stores Inc.,<br>    *Defendants.* | Civil No. 3:10cv1813 (JBA)<br><br><br>January 16, 2012 |

**RULING ON DEFENDANTS' MOTION TO DISMISS**

On November 18, 2010, Plaintiff Julie Heimeshoff filed a Complaint against Defendants Hartford Life and Accident Insurance Company ("Hartford") and Wal–Mart Stores, Inc. ("Wal–Mart"), claiming Defendants violated the provisions of the Employee Retirement Income Security Act ("ERISA") by failing to provide long–term disability benefits to which she was entitled under the employee benefit plan issued by Defendants. Defendants move [Doc. # 29] to dismiss the Complaint, arguing that it is time–barred under the terms of the employee benefit plan. For the reasons that follow, Defendants' motion to dismiss will be granted.

**I.    Factual Background**

**A.    Plaintiff's Allegations**

Ms. Heimeshoff alleges as follows in her Complaint. She worked for Wal–Mart from April 29, 1986 to June 8, 2005, holding the position of Senior Public Relations Manager at the time she left Wal–Mart. (Compl. [Doc. # 1] ¶¶ 11, 15.) During her time at Wal–Mart, she became eligible for its Group Long Term Disability Plan for Employees ("Plan"), administered by Hartford. (*Id.* ¶¶ 6, 12.) In January 2005, she began suffering from pain and fatigue due to fibromyalgia; she also suffered from chronic pain, "likely Irritable Bowel

**JOINT APPENDIX 195**

Syndrome and possible Restless Leg Syndrome, Allergies, and strong past history of lupus," and in May 2005 her "pain, fatigue, and other disabling symptoms increased." (*Id.* ¶¶ 13–14.) Ms. Heimeshoff "tried to continue working despite her medical conditions," but "due to her significant pain, extreme fatigue, and cognitive impairment, she had to stop working on or about June 8, 2005," and has since been unable to sustain full–time employment due to her conditions. (*Id.* ¶¶ 15–16.)

Ms. Heimeshoff further alleges that she meets the definition of "total disability" contained in the Plan, which reads:

> Total Disability or Totally Disabled means You are prevented from performing the Essential Duties of:
> 1) Your Occupation or a Reasonable Alternative Job offered to You by the Employer during the Elimination Period and for the 12 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 20% of Your Pre–disability Earnings; and
> 2) after that, Any Occupation

(*Id.* ¶¶ 18–20.) Hartford sent her a letter dated August 19, 2005 which stated: "Our records indicate that your disability may extend beyond the 90 day Salary Continuation period. In order to determine your eligibility for Long Term Disability (LTD) benefits, please complete and return the enclosed Group Claim forms." (*Id.* ¶ 21.) On August 22, 2005, Ms. Heimeshoff filed a claim for LTD benefits with Hartford, "listing extreme fatigue, significant pain, and difficulty in concentration," and supported by an Attending Physician Statement by her rheumatologist, Dr. Michael Saitta, with a diagnosis of Systemic Lupus Erythematosis ("SLE") and fibromyalgia. (*Id.* ¶¶ 22–23.)

On November 29, 2005, Hartford notified Mr. Heimeshoff via letter that it had not received a response from Dr. Saitta regarding her functionality, that it therefore could not

2

**JOINT APPENDIX 196**

make a claim determination, but that if it received that information it expected to make a claim decision within 30 days. (*Id.* ¶¶ 26–27.) By letter dated December 8, 2005, Hartford denied Ms. Heimeshoff's claim for LTD benefits for failure to "provide satisfactory Proof of Loss," citing a lack of response from Dr. Saitta and advising her that if she "would like this information considered, we must receive it as soon as possible." (*Id.* ¶ 28.) Ms. Heimeshoff obtained counsel in May 2006 "to assist her in acquiring the 'satisfactory Proof of Loss' the Hartford was requesting," and was informed by Hartford "that no formal appeal was necessary and that if Hartford received clarification of Ms. Heimeshoff's functionality, they would re-open the claim." (*Id.* ¶¶ 29–30.)

Ms. Heimeshoff underwent "a two-day Performance-Based Physical Capacity Evaluation ("PCE") on July 18 and 19, 2006" to provide Hartford with the requested functionality information, after which Dr. Becker concluded that "[t]he deficits identified in the objective testing and physiological screening shows application barriers which will negatively [a]ffect vocational options, avocational interests, and options undertaken in quality of life functions." (*Id.* ¶ 32.) Dr. Becker further concluded: "The physiological profiles show that the examinee should be considered work intolerant. The physiological response shows that competitive and predictable sustained work is absent for all levels of category according to the Dictionary of Occupational Titles." (*Id.*) On October 2, 2006, Ms. Heimeshoff's counsel forwarded Dr. Becker's PCE to Hartford, along with a report from her primary treating physician, Dr. Stephen Goss, confirming her disability. (*Id.* ¶¶ 34–35.)

Hartford retained Dr. Norman Bress, a rheumatology consultant, who reviewed the PCE and spoke with Dr. Saitta, and issued a report on November 20, 2006 concluding that Ms. Heimeshoff "was able to perform the activities of her sedentary occupation." (*Id.*

3

**JOINT APPENDIX 197**

¶¶ 36–38.) On November 29, 2006, Hartford denied Ms. Heimeshoff's claim. (*Id.* ¶ 39.) On September 26, 2007, she appealed the denial, relying on the conclusions of Drs. Becker, Goss, and Saitta, along with a Cardiopulmonary Exercise Evaluation by Dr. VanNess and a neuropsychological evaluation by Dr. Sheila Bastien. (*Id.* ¶¶ 40–44.) Dr. Tanya Lumpkins, retained by Hartford, concluded after reviewing her records, that "[t]here is no support in the records that the claimant would not tolerate, with adequate effort and training, a work hardening program to improve conditioning, and thereby work capacity." (*Id.* ¶ 45.) Dr. Alexander Chervinsky, also retained by Hartford, concluded that "[i]nfluences of medication, emotional problems, or motivation for secondary gain may account for the findings." (*Id.* ¶ 46.)

Ms. Heimeshoff alleges that Hartford issued "its last and final denial letter" on November 26, 2007. (*Id.* ¶ 47.)

**B.      Plan Deadlines**

Under the Plan, if a claim is approved, benefits become payable after an Elimination Period—the period an employee must be totally disabled before benefits become payable—of 90 days, or the end of Wal–Mart's salary continuation payments, whichever is longer. (Policy, Ex. A to Begos Decl. [Doc. # 28] at 000011–13.) The Plan policy also requires that "[w]ritten proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, The Hartford may require further written proof that you are still Disabled." (*Id.* at 000027.) The Plan policy also provides that "[l]egal action cannot be taken against The Hartford . . . after the shortest period allowed by the laws of the state where the policy is delivered. This is 3 years after the time written proof of loss is required to be furnished according to the terms of the policy." (*Id.* at 000029.)

4

**JOINT APPENDIX 198**

## II.   Applicable Legal Standard

Plaintiff argues that because Defendants raise an affirmative statute of limitations defense in their motion and rely on materials outside the Complaint—the Plan policy and the Administrative Record of Ms. Heimeshoff's claim for benefits—the Court should treat Defendants' motion to dismiss as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Opp'n [Doc. # 30] at 13–15.) Defendants argue that because Ms. Heimeshoff expressly incorporates the Plan policy and the claim file into her Complaint, the Court may therefore consider these written instruments in deciding the motion to dismiss without treating the motion as a motion for summary judgment. (Reply [Doc. # 37] at 1–2.)

Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." However, pursuant to Rule 10(c),[1] a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). Accordingly, "[i]n determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). In ruling on a Rule 12(b)(6) motion, the Court may consider materials incorporated by reference and integral to a

---

[1] Rule 10(c) reads: "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."

5

**JOINT APPENDIX 199**

complaint notwithstanding the Rule 12 conversion requirement. *Global Network Commc'n, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (citing *Cortec*, 949 F.2d at 47–48).

Plaintiff's Complaint expressly incorporates the documents relied on by Defendants in their motion to dismiss, stating: "Ms. Heimeshoff incorporates the entirety of the claim file Hartford produced in connection with her claim for long–term disability benefits as if annexed hereto." (Compl. ¶ 5 n.1.) Throughout her Complaint, Ms. Heimeshoff cites to portions of the Plan policy and the administrative record. (*See id.* ¶¶ 11–15, 18, 21–33, 35–47.) The Plan policy incorporated and cited by Ms. Heimeshoff in her Complaint includes the limitations period upon which Defendants rely (*see* Policy at 000029) and she includes in her Complaint the dates relevant to Defendants untimeliness argument, including the date from which she was unable to work, June 8, 2005 (Compl. ¶ 15)and the date from which she demanded benefits, June 7, 2005 (*id.* ¶ 81). The Court will therefore consider Defendants' untimeliness argument on their motion to dismiss, will consider the Plan policy and claim record expressly incorporated in Complaint, and will not convert Defendants' motion to dismiss into a motion for summary judgment.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kuck v. Danaher*, 600 F.3d 159, 162–63 (2d Cir. 2010). A complaint will not survive a motion to dismiss if it relies on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or if "the well–pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S. Ct. at 1949–50.

**JOINT APPENDIX 200**

III.    Discussion

Defendants argue that Plaintiff's action is time–barred by the three–year limitations period set out in the Plan policy.  In her Opposition, Ms. Heimeshoff argues that her action is not time–barred because the Plan policy is ambiguous with respect to when proof of loss is actually due, because Hartford did not provide notice of the three–year limitations period in its denial of her claim, and because the Plan SPD was misleading.

ERISA does not prescribe a limitations period for actions under 29 U.S.C. § 1132, "[t]herefore the applicable limitations period is that specific in the most nearly analogous state limitations statute." *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009).  Under Connecticut law, insurance carriers may contract for a limitations period in which a claim may be filed, as long as that period is not less than one year. *Voris v. Middlesex Mut. Assurance Co.*, 297 Conn. 589, 596 (2010); *see also* Conn. Gen. Stat. § 38a-290.  A limitations period that begins to run before a claimant may bring legal action is enforceable. *Burke*, 572 F.3d at 79–81 (upholding three–year limitations period in insurance contract that prohibited claimant from bringing legal action "more than three years after the time written Proof of Loss is required to be furnished").

The Plan policy here states that "[l]egal action cannot be taken against The Hartford . . . 3 years after the time written proof of loss is required to be furnished according to the terms of the policy." (Policy at 000029.)  The policy also states that proof of loss "must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment." (*Id.* at 000027.)  Ms. Heimeshoff argues that this provision is ambiguous because it continues: "If proof is not given by the time it is due, it will not affect the claim if: (1) it was not possible to give proof within the required time; and (2) proof is given as soon as possible;

7

but (3) not later than 1 year after it is due, unless you are not legally competent." (*Id.*) In her Complaint, Ms. Heimeshoff claims that she was unable to perform the essential duties of her occupation as of June 6, 2005 (Compl. ¶ 19), is entitled to long–term disability benefits from June 7, 2005 (*id.* ¶ 81), and had to stop working on June 8, 2005 (*id.* ¶ 15). Therefore, according to the Complaint, at the latest, the period for which Hartford would have owed payment began on June 8, 2005, and written proof of loss would have been due on September 6, 2005 at the latest.

Ms. Heimeshoff's counsel contended at oral argument, however, that this could not have been the due date for written proof of loss, because Hartford requested, and Ms. Heimeshoff provided, additional information regarding her medical condition and loss throughout the claim and appeal process. The administrative record reflects that in preparing her appeal, Ms. Heimehoff's counsel requested by letter dated May 24, 2007 that Hartford "provide until September 30, 2007 to submit additional materials." (Admin. R., Ex. B to Begos Decl. at 000095.) The Appeal Unit at Hartford responded on June 5, 2007: "[W]e will grant an extension ending on September 30, 2007. If we do not receive additional information by that time, we will evaluate your appeal using the information currently in your file." (*id.* at 000096.) Even if, as Ms. Heimeshoff argues, the Plan policy is ambiguous given her additional submissions throughout the claim and appeal process, pursuant to the June 5 letter from Hartford, written proof of loss was due, at the latest, on September 30, 2007.

The Plan unambiguously disallows legal action more than three years after the time written proof of loss is required to be furnished. (*See* Policy at 000029.) Therefore, even crediting Ms. Heimeshoff's argument regarding the uncertainty of written loss due dates, she

8

could not take legal action any later than September 30, 2010. She filed her Complaint on November 18, 2010, and it is therefore untimely under the terms of the Plan policy.

Ms. Heimeshoff nevertheless argues that this case is not time-barred because Hartford did not include in its denial letter notice of the limitations period as required by ERISA. Ms. Heimeshoff relies entirely on the Southern District of New York's decision in *Novick v. Metropolitan Life Insurance Co.*, 764 F. Supp. 2d 653 (2011), which she claims stands for the proposition that "an initial adverse determination letter must state the limitations period for judicial review imposed by an SPD." (Opp'n at 22.)

In *Novick*, after initially approving plaintiff Karen Novick's short-term disability benefits due to her lyme disease symptoms, defendant Metropolitan Life Insurance Company terminated those benefits and denied her long-term benefits claim in a letter that informed her that she could appeal the termination internally, and if her appeal were denied, she could bring a civil action. 764 F. Supp. 2d at 656–57. "The letter did not mention any limitations period for bringing that action." *Id.* at 657. Metropolitan later denied her appeal in a letter, which "[l]ike the initial termination letter, . . . did not mention any time limits applicable to any civil action." *Id.* at 658. The court found that in failing to state the limitations period applicable to any civil action in the initial termination letter, Metropolitan violated the Department of Labor's regulations governing ERISA, and therefore the six-year limitations period under New York law, rather than the limitations period in the SPD, which was 6 months following the issuance of the final written decision on appeal, applied to Plaintiff's action. *Id.* at 664. It interpreted the DOL's regulation governing ERISA claim procedures at 29 C.F.R. § 2560.503–1(g)(1)(iv)—which requires that notification of adverse benefit determination contain "[a] description of the plan's review procedures and the time

9

limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review"—to include within the "review procedures" for which time limits must be described any civil action initiated after the appeal. *Id.* at 660–662.

*Novick*'s outcome notwithstanding, 29 C.F.R. § 2560.503–1(g)(1)(iv) unambiguously requires that the notification of benefit determination include "a statement of the claimant's *right* to bring a civil action," whereas its description of the necessary notification for claim review procedures requires "[a] description of the plan's review procedures and the time limits applicable to such procedures." That the regulation requires notification of time limits for plan review procedures but says nothing about time limits with respect to civil actions suggests that the DOL did not intend to require such a time limit notification in the benefit determination. The court in *Novick* found that because the limitations period for seeking judicial review "is established by the plan itself, and not by law, judicial review must be a part of and governed by *the plan's* review procedures," 764 F. Supp. 2d at 661 (emphasis in original); however, while the time period for commencing a civil action is established by the plan, the judicial review process itself is not subject to the plan. A civil action seeking remedies under the plan is a separate and distinct review process from those contemplated in the claim proceedings under a benefits plan.

The court in *Novick* also relies on *Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 726–27 (9th Cir. 2000), in which the Ninth Circuit held that post–denial arbitration of ERISA claims was a part of the claims procedure, and that therefore benefits denials letters would have to include time limits applicable to the arbitration. Arbitration is a different review process than a civil action in a district court, however, and particularly given the

10

requirement in the DOL regulation that states only a statement of the claimant's right to a civil action must be included in the denial letter, it is unclear how this bears on the limitations period for a civil action. The Court therefore declines to follow *Novick*. Hartford was not required to inform Ms. Heimeshoff of the Plan's limitations period for legal action in its benefits determination letter, thus its failure to do so does not affect the untimeliness of Ms. Heimeshoff's Complaint.

## IV.    Conclusion

For the reasons stated above, Defendants' motion [Doc. # 29] to dismiss is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of January, 2012.

11

**JOINT APPENDIX 205**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JULIE HEIMESHOFF

v.                                                      Civil No.  3:10CV1813(JBA)

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY
WAL-MART STORES, INC.

### JUDGMENT

This matter came on for consideration on defendants' motion to dismiss before the Honorable Janet Bond Arterton, United States District Judge.

The Court has reviewed all of the papers filed in conjunction with the motion and on January 20, 2012 , a Ruling entered granting the relief.

It is therefore ORDERED and ADJUDGED that judgment is entered for the defendants and the case is closed.

Dated at New Haven, Connecticut, this 23rd day of January, 2012.

ROBERTA D. TABORA, CLERK


BY_____/s/_____
Betty J. Torday
Deputy Clerk

EOD_____

**JOINT APPENDIX 206**

**Federal Rules of Appellate Procedure Form 1.   Notice of Appeal to a Court of Appeals From a Judgment or Order of a District Court.**

United States District Court for the District of
CONNECTICUT

File Number 10-1813 JBA

| | | |
|---|---|---|
| Julie Heimeshoff | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Notice of Appeal |
| | ) | |
| Hartford, et al. | ) | |
| *Defendant.* | ) | |

Notice is hereby given that Plaintiff Julie Heimeshoff                        , (plaintiffs) (defendants) in the above-named case*, hereby appeal to the United States Court of Appeals for the Second        Circuit (from the final judgment) (from an order (describing it)) entered in this action on the 20th      day of January            , 19 2012 .

/s/
Steven P. Krafchick

Attorney for
100 W. Harrison, S Tower, #300

Address:
Seattle, WA  98119

*See Rule 3(c) for permissible ways of identifying appellants

## U.S. District Court
### United States District Court for the District of Connecticut (New Haven)
### CIVIL DOCKET FOR CASE #: 3:10-cv-01813-JBA

Heimeshoff v. Hartford Life and Accident Insurance Company et al

Assigned to: Judge Janet Bond Arterton

Cause: 29:1001 E.R.I.S.A.: Employee Retirement

Date Filed: 11/18/2010
Date Terminated: 01/23/2012
Jury Demand: Plaintiff
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**Plaintiff**

**Julie Heimeshoff**                    represented by **Mark Paul Carey**
Mark P. Carey, P.C.
71 Old Post Road Suite One
Southport, CT 06890
203-255-4150
Fax: 203-255-0380
Email: mcarey@capclaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven P Krafchick**
Krafchick Law Firm, PLLC
100 W. Harrison St, South Tower
Suite 300
Seattle, WA 98119
206-374-7370
Email: klf@krafchick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Hartford Life &Accident Insurance Company**
*Connecticut Corporation*

represented by **Patrick Walter Begos**
Begos Horgan &Brown LLP
327 Riverside Ave.
Westport, CT 06880
203-226-9990
Fax: 203-222-4833
Email: pwb@begoshorgan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wal-Mart Stores, Inc.**
*Arkansas Corporation and plan sponsor of the Group Long Term Disability Plan for Employees of Wal-Mart Stores, Inc.*

represented by **Patrick Walter Begos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2010 | 1 | COMPLAINT against Hartford Life and Accident Insurance Company, Wal-Mart Stores, Inc., filed by Julie Heimeshoff.(Fazekas, J.) (Entered: 11/22/2010) |
| 11/18/2010 | | Filing fee received from Krafchick Law Firm: $350.00, receipt number B020640. (Fazekas, J.) (Entered: 11/22/2010) |
| 11/18/2010 | 2 | Order on Pretrial Deadlines: Motions to Dismiss due on 2/18/2010. Amended Pleadings due by 1/17/2011. Discovery due by 5/20/2011. Dispositive Motions due |

## JOINT APPENDIX 208

| | | |
|---|---|---|
| | | by 6/19/2011. Signed by Judge Janet Bond Arterton on 11/18/2010. (Fazekas, J.) (Entered: 11/22/2010) |
| 11/18/2010 | 3 | STANDING PROTECTIVE ORDER. Signed by Judge Janet Bond Arterton on 11/18/2010. (Fazekas, J.) (Entered: 11/22/2010) |
| 11/18/2010 | 4 | ELECTRONIC FILING ORDER -- PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Janet Bond Arterton on 11/18/2010. (Fazekas, J.) (Entered: 11/22/2010) |
| 11/18/2010 | 5 | NOTICE TO COUNSEL: Counsel initiating or removing this action is responsible for serving all parties with attached documents and copies of 1 Complaint filed by Julie Heimeshoff, 4 Electronic Filing Order, 2 Order on Pretrial Deadlines, 3 Standing Protective Order. Signed by Judge Janet Bond Arterton on 11/18/2010. (Fazekas, J.) (Entered: 11/22/2010) |
| 11/22/2010 | 6 | Summons Issued as to Hartford Life and Accident Insurance Company, Wal-Mart Stores, Inc.. Counsel receiving this electronic notice should download the attached summons for service in accordance with Fed.R.Civ.P. 4 and LR 4. (Fazekas, J.) (Entered: 11/22/2010) |
| 12/09/2010 | 7 | NOTICE of Appearance by Patrick Walter Begos on behalf of Hartford Life and Accident Insurance Company (Begos, Patrick) (Entered: 12/09/2010) |
| 12/10/2010 | 8 | CERTIFICATE OF SERVICE by Hartford Life and Accident Insurance Company re 7 Notice of Appearance (Begos, Patrick) (Entered: 12/10/2010) |
| 01/12/2011 | 9 | NOTICE of Appearance by Patrick Walter Begos on behalf of Wal-Mart Stores, Inc. (Begos, Patrick) (Entered: 01/12/2011) |
| 01/13/2011 | 10 | CERTIFICATE OF SERVICE by Hartford Life and Accident Insurance Company, Wal-Mart Stores, Inc. re 9 Notice of Appearance (Begos, Patrick) (Entered: 01/13/2011) |
| 01/13/2011 | 11 | WAIVER OF SERVICE Returned Executed as to Hartford Life and Accident Insurance Company waiver sent on 12/22/2010, answer due 2/20/2011. filed by Julie Heimeshoff. (Krafchick, Steven) (Entered: 01/13/2011) |
| 01/14/2011 | 12 | NOTICE of Appearance by Steven P Krafchick on behalf of Julie Heimeshoff (Krafchick, Steven) (Entered: 01/14/2011) |
| 01/18/2011 | 13 | CERTIFICATE OF SERVICE by Julie Heimeshoff re 12 Notice of Appearance (Attachments: # 1 Notice of Appearance)(Krafchick, Steven) (Entered: 01/18/2011) |
| 01/21/2011 | 14 | ENTERED IN ERROR: AFFIDAVIT of Service for Summons, Complaint, Order on Pretrial Deadlines, Standing Protective Order, Electronic Filing Order in Civil Cases, Notice to Counsel and Pro Se Parties served on Karen Moore of The Corporation Company, registered agent for Wal-Mart Stores, Inc. on January 12, 2011, filed by Julie Heimeshoff. (Attachments: # 1 Certificate of Service)(Krafchick, Steven) Modified on 1/24/2011: incorrect event and no answer deadline set. (Kelsey, N.). (Entered: 01/21/2011) |
| 01/21/2011 | 15 | SUMMONS Returned Executed by Julie Heimeshoff. Wal-Mart Stores, Inc. served on 1/12/2011, answer due 2/2/2011. Document No. 14 redocketed to use correct event in order to set answer deadline. (Kelsey, N.) (Entered: 01/24/2011) |
| 01/25/2011 | 16 | MOTION for Extension of Time until February 22, 2011 Respond to Complaint 1 Complaint by Wal-Mart Stores, Inc.. (Begos, Patrick) (Entered: 01/25/2011) |
| 01/26/2011 | 17 | ORDER granting 16 MOTION for Extension of Time until February 22, 2011 Respond to 1 Complaint. Signed by Clerk on 1/26/2011. (Kelsey, N.) (Entered: 01/26/2011) |
| 01/26/2011 | | Answer deadline updated for Wal-Mart Stores, Inc. to 2/22/2011. (Kelsey, N.) (Entered: 01/26/2011) |
| 02/09/2011 | 18 | NOTICE TO COUNSEL/PARTIES: Pursuant to D. Conn.L. Civ. R. 26(f), the parties have until 2/22/11 to file their 26(f) Planning Report or this case may be |

**JOINT APPENDIX 209**

| | | |
|---|---|---|
| | | dismissed. This is the only notice the court shall issue.. Signed by Clerk on 2/9/11. (Torday, B.) (Entered: 02/09/2011) |
| 02/09/2011 | | Set Deadlines/Hearings: Rule 26 Meeting Report due by 2/22/2011 (Torday, B.) (Entered: 02/09/2011) |
| 02/09/2011 | 19 | MOTION for Pre−filing Conference *for Motion to Dismiss* by Hartford Life and Accident Insurance Company, Wal−Mart Stores, Inc.. (Begos, Patrick) (Entered: 02/09/2011) |
| 02/11/2011 | 20 | ORDER granting 19 Motion for Pre−Filing Conference. A telephonic pre−filing conference will be held on March 22, 2011 at 4:30 p.m. Attorney Begos shall initiate the conference call to chambers: 203−773−2456. Signed by Judge Janet Bond Arterton on 2/11/11. (Tooker, A.) (Entered: 02/11/2011) |
| 02/11/2011 | | Set Deadlines/Hearings: Telephonic Pre−Filing Conference set for 3/22/2011 4:30 PM before Judge Janet Bond Arterton (Tooker, A.) (Entered: 02/11/2011) |
| 02/17/2011 | 21 | Joint REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Supplement Statement Regarding Late Filing)(Begos, Patrick) (Entered: 02/17/2011) |
| 02/22/2011 | 22 | First RESPONSE re 20 Order on Motion for Conference, 19 MOTION for Pre−filing Conference *for Motion to Dismiss by Defendants* filed by Julie Heimeshoff. (Krafchick, Steven) (Entered: 02/22/2011) |
| 02/22/2011 | 23 | Second RESPONSE re 20 Order on Motion for Conference, 19 MOTION for Pre−filing Conference *for Motion to Dismiss,* 22 Response *w* filed by Julie Heimeshoff. (Krafchick, Steven) (Entered: 02/22/2011) |
| 02/23/2011 | 24 | AFFIDAVIT */Certificate of Service of Plaintiff's 23 Response to Defendant's Motion for Prefiling Conference* Signed By Steven P. Krafchick filed by Julie Heimeshoff. (Krafchick, Steven) Modified on 2/24/2011 to create link to underlying document (Kelsey, N.). (Entered: 02/23/2011) |
| 02/24/2011 | | A telephonic scheduling conference will be held during the parties' pre−filing conference set down for 3/22/11 at 4:30 p.m. (Tooker, A.) (Entered: 02/24/2011) |
| 03/25/2011 | | Set Deadlines/Hearings: Telephonic Pre−Filing Conference and Scheduling Conference rescheduled for 5/5/2011 02:00 PM before Judge Janet Bond Arterton. (Tooker, A.) (Entered: 03/25/2011) |
| 04/21/2011 | | The parties' telephonic scheduling/pre−filing conference is rescheduled to May 3, 2011 at 8:45 a.m. (Tooker, A.) (Entered: 04/21/2011) |
| 04/25/2011 | | The parties' telephonic pre−filing/scheduling conference is rescheduled to May 13, 2011 at 4:30 p.m. (Tooker, A.) (Entered: 04/25/2011) |
| 05/11/2011 | | The parties' telephonic pre−filing &scheduling conference has been rescheduled to May 17, 2011 at 4:00 p.m. before Judge Janet Bond Arterton. (Tooker, A.) (Entered: 05/11/2011) |
| 05/17/2011 | 26 | Minute Entry for proceedings held before Judge Janet Bond Arterton: Telephone PreFiling &Scheduling Conference held on 5/17/2011. 30 minutes(Court Reporter S. Montini.) (Torday, B.) (Entered: 05/26/2011) |
| 05/25/2011 | 25 | SCHEDULING ORDER: Motion to Dismiss due by 6/3/2011; Trial Ready Date 5/1/2012. See attached order for additional deadline information. Signed by Judge Janet Bond Arterton on 5/24/2011. (Kelsey, N.) (Entered: 05/25/2011) |
| 06/02/2011 | 27 | MOTION to Dismiss by Hartford Life and Accident Insurance Company, Wal−Mart Stores, Inc..Responses due by 6/23/2011 (Begos, Patrick) (Entered: 06/02/2011) |
| 06/02/2011 | 28 | AFFIDAVIT re 27 MOTION to Dismiss Signed By Patrick W. Begos filed by Hartford Life and Accident Insurance Company, Wal−Mart Stores, Inc.. (Begos, Patrick) (Entered: 06/02/2011) |
| 06/02/2011 | 29 | Memorandum in Support re 27 MOTION to Dismiss filed by Hartford Life and Accident Insurance Company, Wal−Mart Stores, Inc.. (Begos, Patrick) (Entered: |

**JOINT APPENDIX 210**

| | | |
|---|---|---|
| | | 06/02/2011) |
| 06/23/2011 | 30 | Memorandum in Opposition re 27 MOTION to Dismiss filed by Julie Heimeshoff. (Krafchick, Steven) (Entered: 06/23/2011) |
| 06/23/2011 | 31 | AFFIDAVIT re 30 Memorandum in Opposition to 27 Motion to Dismiss Signed By Steven P. Krafchick filed by Julie Heimeshoff. (Attachments: # 1 Exhibit part two)(Krafchick, Steven) Modified on 6/24/2011 to add link to Document #27 (Inferrera, L.). (Entered: 06/23/2011) |
| 06/29/2011 | 32 | First MOTION for Extension of Time to File Response/Reply as to 27 MOTION to Dismiss until July 22, 2011 by Hartford Life and Accident Insurance Company, Wal–Mart Stores, Inc.. (Begos, Patrick) (Entered: 06/29/2011) |
| 06/30/2011 | 33 | ORDER granting 32 Motion for Extension of Time to File Response/Reply re 27 MOTION to Dismiss Responses due by 7/22/2011. Signed by Judge Janet Bond Arterton on 6/30/11. (Tooker, A.) (Entered: 06/30/2011) |
| 06/30/2011 | | Reset Deadlines as to 27 MOTION to Dismiss. Responses due by 7/22/2011 (Torday, B.) (Entered: 07/01/2011) |
| 07/12/2011 | 34 | Consent MOTION for Extension of Time until 8/25/11 Respond to Discovery Requests by Hartford Life and Accident Insurance Company, Wal–Mart Stores, Inc.. (Begos, Patrick) (Entered: 07/12/2011) |
| 07/12/2011 | 35 | NOTICE by Julie Heimeshoff of Unavailability (Krafchick, Steven) (Entered: 07/12/2011) |
| 07/13/2011 | 36 | ORDER granting 34 Consent MOTION for Extension of Time until 8/25/11 Respond to Discovery Requests. Signed by Clerk on 7/13/2011. (Kelsey, N.) (Entered: 07/13/2011) |
| 07/22/2011 | 37 | REPLY to Response to 27 MOTION to Dismiss filed by Hartford Life and Accident Insurance Company, Wal–Mart Stores, Inc.. (Begos, Patrick) (Entered: 07/22/2011) |
| 08/10/2011 | 38 | Oral Argument has been rescheduled to 9/19/11 at 3:30 p.m. in Courtroom Two, 141 Church Street, New Haven, CT before Judge Janet Bond Arterton (Tooker, A.) (Entered: 08/10/2011) |
| 08/10/2011 | | Reset Deadlines as to 27 MOTION to Dismiss. Motion Hearing set for 9/19/2011 03:30 PM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton (Torday, B.) (Entered: 08/11/2011) |
| 09/08/2011 | 39 | Oral Argument on 27 Motion to Dismiss will be held on 9/19/11 at 3:00 p.m. (time change only). (Tooker, A.) (Entered: 09/08/2011) |
| 09/14/2011 | 40 | NOTICE by Julie Heimeshoff of Unavailability (Krafchick, Steven) (Entered: 09/14/2011) |
| 09/16/2011 | 41 | NOTICE OF E–FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Oral Argument on 27 Motion to Dismiss has been rescheduled for 11/21/2011 at 11:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton. (Budris, K.) (Entered: 09/16/2011) |
| 10/19/2011 | 42 | Oral Argument on Motion to Dismiss 27 will be held on 12/19/2011 at 11:00 AM in Courtroom Two, 141 Church Street, New Haven, CT before Judge Janet Bond Arterton. (Tooker, A.) (Entered: 10/19/2011) |
| 12/19/2011 | 43 | Minute Entry for proceedings held before Judge Janet Bond Arterton: Motion Hearing held on 12/19/2011 re 27 MOTION to Dismiss filed by Wal–Mart Stores, Inc., Hartford Life &Accident Insurance Company. Taken Under AdvisementTotal Time: 1 hours(Court Reporter Sharon Montini.) (Torday, B.) (Entered: 12/19/2011) |
| 01/20/2012 | 44 | ORDER: Defendants' Motion 27 to Dismiss is GRANTED. Signed by Judge Janet Bond Arterton on 01/16/2012. (Budris, K.) (Entered: 01/20/2012) |

**JOINT APPENDIX 211**

| 01/23/2012 | 45 | JUDGMENT entered in favor of Hartford Life &Accident Insurance Company, Wal–Mart Stores, Inc. against Julie Heimeshoff. |
|------------|----|------------------------------------------------------------------------------------------------------------------------|
| | | For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms.html. Signed by Clerk on 1/23/12. (Torday, B.) (Entered: 01/23/2012) |
| 01/23/2012 | | JUDICIAL PROCEEDINGS SURVEY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link: https://ecf.ctd.uscourts.gov/cgi–bin/Dispatch.pl?survey (Torday, B.) (Entered: 01/23/2012) |
| 02/15/2012 | 46 | NOTICE OF APPEAL as to 45 Judgment, 44 Order on Motion to Dismiss by Julie Heimeshoff. Filing fee $ 455, receipt number 0205–2404766. (Krafchick, Steven) (Entered: 02/15/2012) |

**JOINT APPENDIX 212**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \*          \*
                                          \*
JULIE HEIMESHOFF,              \* Case No 10cv1813(JBA)
                               \*
              Plaintiff,       \*
                               \*
       vs.                     \*
                               \*
HARTFORD LIFE & ACCIDENT       \*
INSURANCE COMPANY,             \* December 19, 2011
                               \*
              Defendant.       \*

\* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF ORAL ARGUMENT ON MOTION TO DISMISS

BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

Appearances:
FOR THE PLAINTIFF:      STEVEN P KRAFCHICK, ESQ.
                        Krafchick Law Firm
                        100 W. Harrison Street
                        Seattle, WA 98119

FOR THE DEFENDANT:      PATRICK WALTER BEGOS, ESQ
                        Begos, Horgan & Brown
                        2425 Post Road
                        Southport, CT 06890

Court Reporter:         Sharon Montini, RMR
                        141 Church Street
                        New Haven, CT 06510

Proceedings recorded by mechanical stenography,
transcript produced by computer

---

THE COURT: Good morning, counsel. Please be seated.

We're here this morning for oral argument on Heimeshoff v. Hartford Life Accident Insurance, docket No. 10cv1813.

May I please have your appearances, starting with plaintiff.

MR. KRAFCHICK: My name is Steven Krafchick. I'm the attorney for the plaintiff.

THE COURT: Thank you.

MR. BEGOS: Good morning, your Honor. Patrick Begos, Begos, Horgan & Brown, for the defendants.

THE COURT: Very well. All right, the question is whether Ms. Heimeshoff's action is time barred under the terms of the plan, so why don't I give the plaintiff another opportunity to respond because the reply from the defendant was what the last word was.

All right, go ahead.

MR. KRAFCHICK: Thank you, your Honor.

THE COURT: Would you like to come to the lectern?

MR. KRAFCHICK: Where would you like me?

THE COURT: At the lectern would be

---

good.

MR. KRAFCHICK: That I can do. I guess in this case there is a lot of variety and statute of limitations law around the United States, and I think this is a very important case for this Court. It needs to be evaluated in the context of what the Supreme Court stated in MetLife v. Glenn, which is higher than marketplace duties placed on plan administrators. One of those duties set out in the regulations is that they should have a reasonable claims procedure. This is 29 C.F.R. 2560.503.1(b), and it's only reasonable if it complies with a variety of the subsequent regulations. The most pertinent one is (g); (g) says "the manner and content of notification of benefit determinations," and (iv) says "a description of plan's review procedures and time limits applicable to such procedures," including the right to bring a civil action.

THE COURT: Now, you don't dispute that the time period is set out in the actual plan documents themselves, right?

MR. KRAFCHICK: We don't dispute that the plan says that it's three years.

THE COURT: And with respect to when the

---

three years accrue, the language of the plan says that the action has to be brought 90 days after the benefits -- the proof --

MR. KRAFCHICK: It's the proof of loss.

THE COURT: Proof of loss is filed.

MR. KRAFCHICK: It has to be brought within three years proof of loss has been filed.

THE COURT: Proof of right, right.

MR. KRAFCHICK: And that creates a confusion because what is the proof of loss? It's defined in the policy, but it sets out a bunch of types of material that can be provided, and what happened in this case is until the final decision that happened in 2007, I believe, they were accepting proof of loss. They were asking us for more proof of loss or leaving it open to accept more proof of loss, and that's where the ambiguity comes.

THE COURT: So, why does that actually create ambiguity if a case has a statute of limitations, the parties continue to negotiate a settlement, that doesn't --

MR. KRAFCHICK: There is two parts of the statute of limitations; one is how long from the time it runs do you get, and the second is what's the accrual date of the statute of limitations.

**JOINT APPENDIX 213**

**5**

Other circuits have taken similar language and said the statute of limitations accrues at the point of a final decision.

Now, that's a clear and bright line, they tell you here is our decision, we're done, the next step you have, if you want to take it, is to file a lawsuit. Here, you have a situation, I didn't want to spend too much time on this, but the statute of limitations starts running before there is an accrual date where somebody could file a lawsuit.

THE COURT: Doesn't Burke say that's okay.

MR. KRAFCHICK: Burke does, and I believe Burke was wrong on that.

THE COURT: It is the Second Circuit, however.

MR. KRAFCHICK: I understand.

THE COURT: It does bind this Court, doesn't it?

MR. KRAFCHICK: I understand, and we're prepared to go wherever we have to go to deal with that issue. Burke was -- I think was not appealed from the Second Circuit. But I think the bigger issue in this case is the notification issue that

**6**

was found by another trial court in the Second Circuit in the Novick case.

THE COURT: So, let me ask you about Novick. In that case the limitations period was six months.

MR. KRAFCHICK: Correct.

THE COURT: Do you think Novick would come out differently here in Connecticut because there is a statute, 38a-290, that requires that the policy period not be less than one year?

MR. KRAFCHICK: I don't, because the issue in Novick was more than notice requirements, whether it was six months or three years. The ERISA regulations say that the time limits have to be provided in the notifications; that's in (g).

So, it is our position that the defendants violated the regulations in two ways. The time limits are supposed to be in the summary plan description, and then the time limits for the appeal of the ERISA final denial, once remedies have been exhausted, should have been in any of the denial letters. All they did is say you have a right to file a lawsuit, but they didn't say by what date. I would -- we'd take the position that with respect to the accrual date that they're now

**7**

asserting, that they certainly could have said in any denial letter that your statute began running 90 days after you made your claim.

THE COURT: Well, I don't hear the dispute to be whether they could, it's whether they had to.

MR. KRAFCHICK: I believe they had to under the regulations, both under the summary plan description and the statute of limitations.

THE COURT: So, under the regulations of 2560.503-1 claims procedures, (g) --

MR. KRAFCHICK: Correct.

THE COURT: -- it says that under "manner and content of notification of benefit determination," that "a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action," and so forth. Why -- what is it about the regulations that you say is required -- that you say requires the time limits to be in more than the plan and its discussion of its review procedures?

MR. KRAFCHICK: Right. The (g) is the manner and notification of a benefit determination. We're dealing with three benefit determinations here

**8**

at the various denial letters, or two, and it says in (iv), "a description of the plan's review procedures and the time limits applicable to such procedures," including a statement about the right to bring a civil action.

Now, we would argue, and I believe, that the time limits need to be set out in the notification, and part of the appeals process contemplated in the regulations is the right to file a lawsuit.

Now, in this case, the defendants are arguing that we had one year left to file a lawsuit. If they knew that at the time they made the final denial, why didn't they say that? Because the plan says you have three years from when proof of loss is due. The plan says they will accept additional proof of loss and that they can request additional proof of loss. So why are we to think -- if I'm a skilled attorney and I think that, okay, they're accepting proof of loss and evaluating proof of loss until they make their final decision, that's when it should run, and that's the way we had interpreted that policy provision until the Burke case came out, which was subsequent.

And the other thing is if you look at

# JOINT APPENDIX 214

**9**

the requirements of summary plan descriptions, that's in 29 C.F.R. 2520.102-3, and if you look at (s), it's important because that indicates that a summary plan description must include reviewing denied claims in the case of any plan, applicable time limits and remedies available under the plan for redress of claims.

This is tied to the ERISA because in the beginning it says it applies to welfare benefit plans. Right in the introduction it says "the following information shall be included in summary plan descriptions of both employee welfare benefit plans and pension plans." And then at (s) it talks about the procedures governing claims for benefits, including procedures for, blah, blah, blah, but "reviewing denied claims in the case of any plan, applicable time limits and remedies."

So, when you look at that requirement in the summary plan description, they are -- neither the summary plan description nor the denial letters mention anything about a time limit for filing a lawsuit. And if the filing for a lawsuit is part of the appeals process, which I think cannot really be disputed, then the time limit for filing a lawsuit is important.

**10**

Now, if you look at the --

THE COURT: Let me stop you a little on the "can't be disputed part." You make the claim that the judicial proceeding is part of the plan review procedures.

MR. KRAFCHICK: Correct.

THE COURT: Do you see a distinction between an external arbitration that, what was it, the Ninth Circuit had found part of the procedures, versus the very external judicial proceeding?

MR. KRAFCHICK: Right. I think if you look at the regulations and the rules, they all contemplate filing an action. So, that is part of what is contemplated as part of the appeals process in an ERISA claim. That's what I say can't be disputed. I mean, you could look at it almost as a voluntary act, part of an appeal process, but there are internal review requirements and then there is the opportunity to litigate them if the plaintiff so chooses to, and it's part of the process that's contemplated. And because they have higher than marketplace duties, it's our position that they should have put it in the notice letters, particularly when it's less than three years.

They're taking it down and saying there

**11**

was one year left. Well, if they know there is one year left, why can't they say you have a right to file a lawsuit and you have to do it within a year? It's those kinds of things that we believe fall below the higher than marketplace duties that fall on ERISA plans, their administrators and their fiduciaries. That's really the gist of what we're complaining about here. And that wasn't raised in <u>Burke</u>. It was evaluated in <u>Novick</u>, and that's the place, the only place that we could find where that issue was taken on, and we're here making that argument, the same argument made in <u>Novick</u>, and whether it was six months or three years or one year I don't think is the critical thing in this case because in this case it is the failure to comply with the regulations regarding the -- regarding the summary plan description and with respect to the notification in the denial letters.

THE COURT: So, if -- defendants make the claim that the plaintiff and counsel had the plan that has the limits in it, and thus had actual notice of when the statute should run. Do you dispute that, or is your dispute with when it should run?

MR. KRAFCHICK: The dispute -- I'm not

**12**

disputing the plan language. What I'm saying is the plan language is unclear as to when the statute starts running. They define proof of loss as submitting all kinds of different materials. Those same types of materials were submitted when there was no formal appeal, which happened initially, that's at CF -- there are six zeros, and then a 69 through 72 and then 73 and 74 through 75. They're saying more proof of loss there. And then they don't even count that first step when they are missing stuff from Dr. Saitta as an appeal. So, they knock it off and then we put in our appeal and they deny the appeal. And we don't have a right to bring a lawsuit until they have finally denied the claim.

So, one of the things in statute of limitations is how can you have an accrual date? Accrual date, to me, means that's a date at which point I can file a lawsuit.

THE COURT: And that's what <u>Burke</u> was getting at.

MR. KRAFCHICK: Right.

THE COURT: Now, you say that <u>Burke</u> postdated something. Do you mean that -- it was decided in July of '09, and by the defendant's

# JOINT APPENDIX 215

**13**

argument your three years after proof of loss was due is September '08. You are saying that <u>Burke</u> came after your statute of limitations had passed?

MR. KRAFCHICK: According to defendants, yes. We believe we timely filed the case. And the other thing that is important in this is if they're not required to comply with the ERISA regulations, how is an unrepresented person, let alone a represented person, going to know when it runs? When they say runs three years from when proof of loss is due, it's our point that they asked for more proof of loss at each step of the process, and it wasn't until they finally denied the claim that there was no proof of loss due and no proof of loss we could have submitted. And that harmonizes the exhaustion requirement and the statute of limitations then, because if I cannot file a lawsuit until they have -- until we have exhausted remedies, how can a case accrue before? And I understand some courts --

THE COURT: That's not this case.

MR. KRAFCHICK: It is, because remedies weren't exhausted until the final decision was made. It is this case.

THE COURT: But even after the final

**14**

decision was made on September 26, 2007 -- I'm sorry, that's the appeal date. On November 26, 2007, there still was until September 2008 to file the suit. That's why I was saying that's not this case that you couldn't file suit until after the statute of limitations has passed. That happens in cases, doesn't it?

MR. KRAFCHICK: Oh, of course, but in this particular case if the three-year statute of limitations stated in the policy had been whittled down to one, we believe that they had to notify us and the claimant in the denial letters. If they know that --

THE COURT: Well, you may be right, but do you have -- is this your case to assert? Because you didn't loose the cause of action by virtue of the passage of a statute of limitations where the plan would have barred you to bring it -- barred your bringing it.

MR. KRAFCHICK: If you take the ERISA regulations and the summary plan description out of it and you just look at the timing of it, and you assume that their proof of loss provision was correct, we look at the final denial date, and that's irrelevant, it is running from the three

**15**

years -- the time is running from that 90-days after. So, at the time of the final denial --

THE COURT: 90 days after final denial?

MR. KRAFCHICK: No, 90 days after the initial proof of loss is due. If you take that, there is one year left at the time of final denial. So that shortens the statute of limitations. There is nothing in the plan that makes clear that while you are doing your appeals you are wasting your statute of limitations time, that it's wasting and going away. There is nothing in the denial letters, there is nothing in the plan. It says three years from when proof of loss is due. Proof of loss was due up until the final decision, is our point.

THE COURT: So, let's go back and tell me exactly -- because you started out one of your points by saying if they hadn't had to comply with ERISA regulations.

MR. KRAFCHICK: Right.

THE COURT: What exactly is the ERISA regulation that you say that they violated by not putting in their final denial letter that the statute of limitation has been ticking since proof of loss? That's your claim. That's what you say they had to have done.

**16**

MR. KRAFCHICK: Right.

THE COURT: So, I want to know exactly where -- where did my regs go? Where that is found, where that requirement is found.

MR. KRAFCHICK: 29 C.F.R. 2560.503-1(g)(iv), which we discussed earlier.

THE COURT: Okay. All right, so that's what you are relying on.

MR. KRAFCHICK: That's one, and then the second piece is 29 C.F.R. 2520.102-3, which deals with the contents of a summary plan description, which essentially says the same thing at (s). It says, procedures governing claims for benefits, including reviewing denied claims, in the case of any plan they have to apply -- set out applicable time limits and remedies available under the plan.

With a statute of limitations I think the accrual date is very important. And you can't have mushy language setting out an accrual date because that's the date from which it runs. In this case it says from when proof of loss is due. So, is it due in 90 days to start your claim? Yes. But is that the final time it's due? No. They accept proof of loss in each appeal that they accept. And it's our position that that is really difficult for

**JOINT APPENDIX 216**

## 17

attorneys and claimants unrepresented to understand when that runs, and a brighter line is the date of the final denial. At that time they know exactly how much time is left on a statute of limitations.

One of the points that defendant raises is how is a poor claims analyst going to know what to write in one of these letters. Well, if you read the letters, they talk about a lot of things that the claims analyst may or may not understand, but they certainly get them vetted by in-house counsel. But, more importantly, they know if it's going to run from the 90 days.

If that is something they know, that your statute began running at the 90 days, regardless of where you filed it, then you have to look at what time is left at the time they make their final denial. It would be very easy and appropriate and necessary for them to say if you want to file a lawsuit, not you can file a lawsuit, but if you want to file a lawsuit, please note that while we gave you three years, you only have one year left because it's been running before the time you could file a lawsuit.

THE COURT: So, what if they said your time for bringing a civil action runs from the time

## 18

when your proof of loss was due, that they essentially recapitulate what was in the plan, and they give the plan participant that notice in -- repeated in the denial, the final denial letter. Is that satisfactory?

MR. KRAFCHICK: I think that would have been a different case. I would argue it's not satisfactory, but I could see that's a very different case because they made an attempt to tell you that this relevant statute provision, this relevant policy provision is key to your claim.

THE COURT: So, the failure that you rely on for the timeliness of this lawsuit, or the excusing of the untimeliness, is that the defendant did not repeat the plan language of -- relating to deadlines for filing civil actions in the final notice.

MR. KRAFCHICK: In any of the notices.

THE COURT: In any of the notices.

MR. KRAFCHICK: In any of the notices. They never called our attention, or the plaintiff's attention, to that plan provision and what they thought the time should be that things are run. And if they have a higher than marketplace duty, which the Supreme Court says they have, that's a very

## 19

small step in a higher marketplace duty and a very critical piece of information for both attorneys and claimants. The issue --

THE COURT: Let me just focus, if I may. Ms. Heimeshoff had the original plan documents that had this language in it.

MR. KRAFCHICK: No, we obtained that.

THE COURT: Okay, her counsel did.

MR. KRAFCHICK: Yeah.

THE COURT: And, therefore, the statute of limitations was, if not actually known, knowable.

MR. KRAFCHICK: What we knew is that the provision was there. What we were aware of at the time is that there had been a variety of different interpretations of that type of language, and that, really, it looks at if there is a continuing obligation to provide proof of loss at the request of the plan, then proof of loss isn't a fixed date. It doesn't say initial proof of loss. It could say initial proof of loss, but it just says proof of loss --

THE COURT: So how --

MR. KRAFCHICK: -- is due.

THE COURT: How does your claim that proof of loss doesn't have a concrete meaning --

## 20

given the conduct of the defendant here in seeking and accepting more proof of loss, what happens to your claim that they had to have put this language about three years after the proof of loss --

MR. KRAFCHICK: Right.

THE COURT: -- in the notice letters --

MR. KRAFCHICK: There are several --

THE COURT: -- why does that change anything given what Burke says is they can limit the time periods in the plan?

MR. KRAFCHICK: Right. We have a tougher case on limiting the time periods under the plan, and we accept that they can say it's three years or two years or one year. They can't go under that because of Connecticut law, if Connecticut law governs. But the issue is not so much what they can or can't do. If they didn't have the ERISA violations, I'm not sure I would be here, but I do believe --

THE COURT: Okay, and the ERISA violation --

MR. KRAFCHICK: Are the regs I've cited.

THE COURT: The (g)(iv) and 102-3(s).

MR. KRAFCHICK: Right, those two. But I don't want to leave that issue aside, because if

**JOINT APPENDIX 217**

**21**

this case goes anywhere from here, I want to know that we have open to us the argument that it doesn't make sense to have a case's statute of limitations running with no right to file a lawsuit until the final denial is made and then shortening what the plan sets out as the timeline for it. Suppose the final denial hadn't been with one year left, I think that's just coincidence, suppose it had been with six months. Then they're in violation of Connecticut law and you can't do it.

What's -- I mean, you are looking at a situation not only unique here, but something that happens in many, many different claims, and you need a rule that's a bright line rule for claimants. This is not something that a consumer can easily understand, which is also another obligation that they have. When a non-attorney looks at this they're not going to know what the heck it means, and when an attorney looked at this, he didn't take it to mean what they're now saying it to mean. That to me says it's a bit ambiguous, and I don't want to throw that argument away, but I believe the stronger argument in light of Burke is the regulation violations, and if they violated the regulations, then they can't claim the statute.

**22**

One of the remedies that you have, and I believe the appropriate remedy, is to reject their application of the statute in this case because they didn't notify the claimant that it was shorter than three years that they put in their plan.

THE COURT: Okay. All right then, Mr. Begos.

MR. BEGOS: Good morning, your Honor.

THE COURT: So, why isn't Mr. Krafchick right that the affected statute of limitations, the way this plan has it set up, is not three years?

MR. BEGOS: The -- well, Burke holds that the way the insurance regulations are for almost every state, almost every state provides for -- requires policies to have limitations periods that begin based on when the proof of loss is due. And what Burke holds, and what various other circuits have held, is that when you have that type of provision in a plan, that that provision is enforceable even though it has the effect of having the statute of limitations clock start running before administrative remedies are exhausted.

And what Burke held in that regard is because of the ERISA regulations that were enacted in 2002, I believe, which put very specific time

**23**

limits on the claim administrator to do each step in the process, and also time limits on the claimant to take each step in the process, that the administrative proceedings would be closed, would be completed well in advance of what's typically the three years from the date proof of loss is due. And so that under those circumstances you don't have a situation where the claimant -- the statute of limitations might expire before the administrative proceedings were concluded.

THE COURT: But that's not what we have here.

MR. BEGOS: No, it's not. Here there was at least a year left. The administrative proceedings were concluded in December of 2008 -- I'm sorry, 2006, and the --

THE COURT: November 29th.

MR. BEGOS: Sorry.

THE COURT: 29, 2006.

MR. BEGOS: November 2006, and the statute of limitations expired, in our view, December 8, 2008. The proof of loss had been due December 8, 2005. And I think the message, at least one of the messages in this case, your Honor, is that an attorney doesn't do well to decide what the

**24**

limitations period is in his mind and then wait until that limitation period almost expires before filing litigation, because he might be wrong.

Mr. Krafchick represented Ms. Heimeshoff since May of 2006. He's acknowledged that he had the plan. He had the plan in May of 2006. He knew what the plan said. He cited the plan back to Hartford, different provisions. But he studied the plan and cited it to Hartford during administrative proceedings, and he said here today he decided, he thought that the time to start the limitations period was when the final determination was made in November of 2006. But the Second Circuit has never so ruled.

There is a discussion of this in Burke. There were a line of cases in district courts in the Second Circuit that said absent something to the contrary in the plan, the statute of limitations begins to run at the initial denial. There is another line of cases which says absent something in the plan it begins to run at the final denial. Mr. Krafchick apparently decided, well, it's the final denial, so I'll just run my three-year clock from the final denial, and he filed a couple of weeks before that three-year period would have expired.

**JOINT APPENDIX 218**

## 25

THE COURT: November 18, 2010.

MR. BEGOS: Correct.

THE COURT: So, let me ask you this: The language of the plan says -- runs the accrual date from the date proof of loss is due.

MR. BEGOS: Correct.

THE COURT: What happens to, - I mean, at least some claims, like this one, in which the submission of proof of loss is not just a one-off activity?

MR. BEGOS: Correct.

THE COURT: And here, I gather, where her doctor wasn't cooperating with sending records or reports, or whatever he's supposed to do, the process of submitting proof of loss continued, and plaintiff makes the argument that where that is a continuing proof of loss, that there isn't a fixed date against which to measure the statute of limitations.

MR. BEGOS: I understand the argument, your Honor. And the answer to that is in a couple of pieces. Number one, Hartford did not demand additional proof in this case. Hartford certainly did give Ms. Heimeshoff and Mr. Krafchick an opportunity to submit additional proof if they so

## 26

desired, and they took advantage of that opportunity and submitted additional proof.

It would be one thing, I think, if Hartford had demanded additional proof, we want you to submit X, Y and Z. And, in fact, there is a very recent, it's an unreported decision, but a very recent decision by the Second Circuit in the Epstein case, and it is 2011, Westlaw, 5605703. I actually have an extra copy of it if your Honor would like.

THE COURT: Why don't you hand that up.

MR. KRAFCHICK: I would love to see a copy of it, your Honor.

THE COURT: Thank you.

MR. BEGOS: What the Epstein case holds, your Honor, is that if the plan administrator demands additional proof, then the statute of limitations will -- the clock will start again the date that additional proof is due. Number one, here, Hartford, as I said, didn't demand additional proof. But after Epstein came down, I looked back through the administrative record, and as your Honor knows, the plaintiff incorporated the entire administrative record expressly into the complaint. What it shows is that in May of 2007, this was after the initial denial was made, Mr. Krafchick wrote to

## 27

Hartford and said, "We request that you provide until September 30, 2007, to submit additional materials. We agree to a tolling of the time you will need to make your decision until the receipt of these supporting documents."

Hartford agreed to that, gave him 'til September 30, 2007, to file additional materials, and as your Honor noted previously, he actually filed it a few days earlier, September 26th or 27th, I believe, and I have extra copies of those correspondence. If you take three years, if you assume that Hartford exceeding to Mr. Krafchick's request to have until September 30, 2007, to file additional materials was in fact a new demand for proof of loss, which I don't think it was, but if you assume it was, three years from September --

THE COURT: It's still untimely.

MR. BEGOS: It's still untimely.

THE COURT: But -- okay. So, these additional materials that were permitted to be submitted, and were submitted, by September 26, 2007, they were submitted in the form of the appeal?

MR. BEGOS: Correct.

THE COURT: Okay.

MR. BEGOS: But that's the last possible

## 28

date --

THE COURT: Okay.

MR. BEGOS: -- in the file that it could be argued that Hartford allowed additional material to be submitted. And, as I said, I think the standard is whether Hartford demanded it, which we didn't do. I'm not sure if I answered the entirety of your Honor's question.

THE COURT: So, why do you think it makes a difference between whether the insurer demands it versus permits the plaintiff to submit it? Why should that make a difference?

MR. BEGOS: Well, I think that the Epstein case didn't discuss this, but my personal view of it is where the administrator affirmatively reaches out to the claimant and says we want additional information from you, we'd like you to submit additional information, they're taking an affirmative step that I think, in fairness, one could say you've taken that step, you should recognize the consequences of that, and one of them might be extending the limitations period.

I think that courts want to encourage -- and Mr. Krafchick said there is a higher than marketplace duty here. Administrators should be

**JOINT APPENDIX 219**

encouraged to allow claimants to submit additional material if they request to do so. It shouldn't necessarily pay a penalty for doing that and shouldn't have the statute of limitations restarted.

But, as I've said, in this case I don't think the Court needs to reach that issue because even if the Court were to conclude that allowing the additional submission restarts the clock, Hartford put a deadline on that additional submission of September 30, 2006, and the -- I'm sorry, September 30, 2007, and the limitation period with that start date ended on September 27, 2010. The action was not filed until November. So, under any analysis the limitations period has expired.

THE COURT: And I take it that the analysis is no different for the breach of fiduciary duty claim as the benefits claim. I note that the fiduciary duty claim seeks relief of having the Hartford removed as the administrator for the plan. So, it's a little different than seeking plan benefits.

MR. BEGOS: Correct, your Honor. And, frankly, there's been -- the plaintiff has not disputed the issue on the timeliness of the breach of fiduciary duty claim, to my recollection.

THE COURT: Because the plan says "any claim brought."

MR. BEGOS: Correct, your Honor. I do want to point out -- unless your Honor wants to discuss the regulations, I don't want to go too deeply into the regulations. We've briefed our view that the denial letter complied with the regulations. But I do want to point out that both of those arguments, either the denial letters violated the regulation or the summary plan description violated the regulation, really brings one back to the equitable tolling argument. It always comes -- the argument becomes the plan says what it says, but because the administrator did not give me some additional notice, it is equitably tolled from enforcing the limitations period. That's the Strom case in the Second Circuit, and the Veltri case before that, which is cited in Strom, and those cases hold very clearly that actual knowledge will preclude an equitable tolling claim when it comes to statute of limitations in ERISA.

And as Mr. Krafchick check said here today, he had the plan -- he asked for the plan, was given the plan, had the plan, knew what it said, and yet decided to interpret it in a different way. And

the way he interpreted it, I should point out, isn't really something that's accepted by most of the circuits. The Burke case expressly said it was following four other circuits in issuing its decision. So, this is not some -- and those cases it followed date back to I think 2001 or earlier. So, this is not some recent novel interpretation that's unique to the Second Circuit. There may very well be circuits that interpret things differently, but Mr. Krafchick chose to file in the Second Circuit.

And that brings up, I suppose, one final point of fairness here. The argument he's making is that Hartford should have in its denial letter figured out what the limitation period -- what the deadline was and specifically given a date in the denial letter, is how I heard his argument here. But I think this case is a perfect illustration of the fact that the actual deadline for filing the action may vary greatly depending on where the plaintiff chooses to bring it. It might have been a different date had they sued in Arkansas where I think probably most people would have expected that's where a lawsuit would be brought; typically it's where the plaintiff lives.

And so, what Mr. Krafchick is arguing is either the administrator has to read the future and know in the denial letter where the claimant is going to bring the lawsuit, or has to engage in a 50-state survey and describe what the deadline for filing would be; maybe not 50 states, but certainly in all of the circuits in which the action might be filed, and ERISA very specifically is designed not to require -- to lift the requirement on administrators and sponsors from having to go through that kind of review.

I think unless your Honor has additional questions for me --

THE COURT: Let me get the response to your arguments and positions set out today from Mr. Krafchick.

MR. BEGOS: Thank you, your Honor.

MR. KRAFCHICK: A couple things. We're not arguing that they have to scope out 50 states and figure out what would happen if it was filed in each state. What they knew is that their statute was running from the 90 days. If they had repeated that policy provision, which they have an obligation to do under a different ERISA regulation because they have to set out pertinent policy provisions in

**JOINT APPENDIX 220**

the denial letters -- and I can find the cite if it would help the Court.

THE COURT: Let me just make sure I have fully understood your argument and the authority for it. Okay?

MR. KRAFCHICK: Okay, under (g), also under (ii) it says "reference to specific plan provisions in which the determination is based." It's our position that if they had put that statute of limitations provision and tied it to "you can also file a lawsuit" language, that would have probably been enough because that puts everybody on notice that your statute has begun running long before we're making our final decision.

They have a plan provision that says what it says, we believe it's ambiguous, that's been talked about. But to respond to what counsel said, it really is not that complicated to say you can file a lawsuit and here is the language for it. And that is something that any plan administrator can do. They certainly can pull the language from the policy that talks about discretionary review or it's our discretion what proof of loss means and other things. So, if they're making a claim that the statute of limitations is running or they want to

preserve that claim for themselves, they certainly could let somebody know that this isn't the run-of-the-mill statute, it runs from 90 days and it has been running while you are making your appeal. That, I believe, is the notice that's necessary, and that's why this fails.

And the complaint that we've got to look at 50 states I think is not accurate because, really, and this was your Honor's question to me earlier, what if they had put that provision in there. I think if they put that provision in there, without the other ERISA violations, I think this would be a very different case, but it's not, and because they violated it in the SPD and in the regulations, they violated both. There're two major areas of ERISA regulations. And when you look at the plans having to be interpreted for the benefit of the beneficiaries, which is also in MetLife v. Glenn, and you look at the higher than marketplace duties, put those two things together, their obligation to disclose their statute of limitations provision, at the very least, was -- they failed to do that. So, they didn't give Heimeshoff, they didn't give me, they didn't give anybody else notice that's how they were running the statute.

Until the Burke case, I don't believe there was any law that was clear that the statute could keep running while you don't have a right to file a lawsuit. I mean, with a statute of limitations, you can't file a lawsuit for a breach of contract until there's a breach of contract, there is no justiciable issue. And we would argue the same thing is going on here. While you have a duty to exhaust your remedies, there is no justiciable issue that you can file a lawsuit on. So, how is it fair to anyone to have that statute start running while you are -- before you get the right to file a lawsuit? The two go together.

So, that's what doesn't make sense with their language when proof of loss is due, and you go further and further and further, and if they believed that proof of loss was due from the time they gave us to submit additional material and that they were going to run it from the date they received that material or the date they gave us, September 30th, they could have said that, too. They control the information. They have in-house counsel. They can -- if they're going to come in to court and say we offered three years, but it's really only one year now, they can find that

information out to notify the claimant. This is not providing information in a way a claimant can understand, for that matter an attorney. It's not something that's easy to understand. And they're obligated to put it in language that is unambiguous and easy to understand. So, anyway.

THE COURT: Okay, thank you. All right, Mr. Begos, any last comments?

MR. BEGOS: Very quickly, your Honor. Thank you. The argument that everything would have been okay, reasonably okay had Hartford just in the denial letter repeated the language of -- the policy language regarding the statute of limitations is just not correct in this case because Mr. Krafchick had that language, he knew that language, and he decided, for whatever reason, that language didn't apply as written.

So, we get back to the equitable estoppel. He had actual knowledge of it and chose to assume that it wouldn't apply. So the idea that had we repeated that language in the denial letter simply doesn't fly in this case.

I would also point out, your Honor, that there is a footnote in Burke that responds to this higher than marketplace duty argument, and that we

**JOINT APPENDIX 221**

**37**

should have been -- Hartford should have been more fair. This is Footnote 4 of Burke, which says, "Burke failed to counter the argument that 'absent a finding of unconscionability, it would be anomalous to now allow a plaintiff to maintain an action to recover a benefit which was created by and exists solely because of the terms of the plan, while at the same time to deny effect to the conditions those same terms place upon receipt of that benefit.'"

That's exactly the case here. The plan was clear, the limitations period provision complies with what's the law in virtually every state, and I believe it should be enforced.

And one question, I did cite a couple of letters from the administrative record to your Honor. I do have copies of those with the Bates number on it. I have also copies for Mr. Krafchick, if your Honor would like, so that you can see correspondence requesting additional time to submit material, and I can hand that up if your Honor would like.

THE COURT: All right, that's not part of the administrative record that we have?

MR. BEGOS: It is. It's part of the administrative record, it's not part of the excerpts

**38**

that were filed on the motion. The ECF rules said we should file essentially what we think we're relying on in the brief, and this became apparent afterwards.

But, as I said, the complaint incorporates the entire administrative record, so I believe that this really is part of the record on this motion.

THE COURT: All right, any objection, Mr. Krafchick?

MR. KRAFCHICK: I guess I would like to see what he's putting in.

THE COURT: Take a look before he does that.

MR. KRAFCHICK: I guess they didn't really argue in any of the briefing that I saw, unless I misread it, that the proof of loss was running as of September 30th --

THE COURT: No, I don't think they argue that. They're taking your argument about -- that you were talking about today about the continuous proof of loss time period giving rise to the ambiguity.

MR. KRAFCHICK: Right.

THE COURT: And the letter requesting

**39**

more opportunity for loss of proof submission and the deadline for it granting that request I think is the gist of what this correspondence is.

MR. BEGOS: Correct. And it's also in response to the Second Circuit's decision in Epstein which came down November 18, 2011. So, it was issued after the briefing in this motion was closed, and in the event that Epstein came up, I brought these letters along with me. So, I do believe it's certainly part of the record on this motion because the complaint incorporates the entire administrative record.

MR. KRAFCHICK: Do you know, I'm not going to object. It is part of the record and it is submitted. I think it's right to consider it.

THE COURT: Let me just have them for completeness.

MR. KRAFCHICK: I obviously don't agree with the argument.

THE COURT: Right.

MR. BEGOS: And I have nothing further, your Honor.

THE COURT: All right, so this is fine. If there is nothing further, then the matter is under advisement. Thank you very much. And we will

**40**

stand in recess.

(Proceedings concluded 12:09)

**JOINT APPENDIX 222**

41

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

3/12/12
Date

/S/ Sharon Montini
Official Reporter

**JOINT APPENDIX 223**